**No. 22-2839**
**CAPITAL CASE**

---

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

### ROBERT WHARTON, Petitioner,

#### v.

### DONALD T. VAUGHN, Respondent.

**Appeal of The Philadelphia District Attorney's Office,
Paul George, and Nancy Winkelman**

---

**Appeal from the Order entered on September 12, 2022, in the
United States District Court for Eastern District of Pennsylvania
in Civil Action No. 2:01-cv-06049-MSG**

---

**BRIEF OF APPELLANTS THE PHILADELPHIA DISTRICT
ATTORNEY'S OFFICE, PAUL GEORGE, AND NANCY
WINKELMAN AND VOLUME I OF THE APPENDIX
(PAGES A1-A71)**

**KAIRYS, RUDOVSKY,
MESSING, FEINBERG & LIN**
David Rudovsky (No. 15168)
drudovsky@krlawphila.com
718 Arch Street,
Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

**HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER**
John S. Summers (No. 41854)
jsummers@hangley.com
Matthew A. Hamermesh
(No. 82313)
mah@hangley.com
Andrew M. Erdlen (No. 320260)
aerdlen@hangley.com
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200

Dated: January 23, 2023          *Attorneys for Appellants*

# TABLE OF CONTENTS

Table of Contents ...................................................................... i

Table of Authorities................................................................iii

Introduction ........................................................................... 1

Jurisdictional Statement ......................................................... 6

Issues Presented for Review.................................................... 6

Related Cases and Proceedings ................................................ 7

Concise Statement of the Case ................................................ 8

    I.    Wharton's Prior Habeas Proceedings and this Court's
        2018 Decision .............................................................. 8

    II.   The DAO's Review and Decision to Concede Relief and
        Notice of Concession ................................................... 9

    III.  The District Court's March 4, 2019 Memorandum
        Opinion and Order ....................................................14

    IV.  The District Court's May 11, 2022 Memorandum Opinion .......16

    V.   The Hearing Concerning the DAO's Concession of Relief........20

    VI.  The District Court's September 12 Sanctions Opinion and
        Order ....................................................................... 23

Summary of Argument.......................................................... 27

Argument .............................................................................. 29

    I.    The DAO Did not Violate Rule 11(b)(3) ..................................... 29

        A.    Standard of Review ........................................... 29

        B.    The Imposition of Sanctions Under Rule 11(b)(3)
            Requires a Finding That a Lawyer's Statements Are
            "Patently Frivolous or Unmeritorious" ..........................30

C.   Appellants' Statements Regarding the DAO Review Cannot Be the Basis for Rule 11 Sanctions ...................... 35

1.   The Statements that Appellants Reviewed or Carefully Reviewed the Habeas Claim Were not "Patently Frivolous or Unmeritorious"............ 36

2.   The Central Question in the Reasonableness Inquiry Under Rule 11(b)(3) Is not Whether the Notice of Concession Was Reasonable, but Whether the DAO Had a Basis to State that the Capital Case Review Committee Had Engaged in a "Review" of the Merits...................... 43

D.   The Statement that the DAO Had Communication with the Victims' Family Was Not "Patently Frivolous or Unmeritorious" and Was True................... 47

II.   The District Court's Order Violated Appellants' Due Process Rights by Failing to Transfer this Matter to the Chief Judge in Violation of Local Civil Rule 83.6 and Repeatedly Shifting the Nature of Proceedings........................ 50

Conclusion................................................................ 56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re 15375 Mem'l Corp.*,
430 B.R. 142 (Bankr. D. Del. 2010) ....................................................... 32

*Matter of Abrams*,
521 F.2d 1094 (3d Cir. 1975) .................................................................. 52

*Adams v. Ford Motor Co.*,
653 F.3d 299 (3d Cir. 2011) ....................................................... 50, 52, 54

*Alston v. Speigel (In re Ames)*,
993 F.3d 27 (1st Cir. 2021) ..................................................................... 44

*Bock v. Pressler & Pressler, LLP*,
30 F. Supp. 3d 283 (D.N.J. 2014) ........................................................... 39

*Brady v. Maryland*,
373 U.S. 83 (1963) ........................................................................... 2, 32

*Commonwealth v. Brown*,
196 A.3d 130 (Pa. 2018) ................................................................*passim*

*Commonwealth v. Hughes*,
865 A.2d 761 (Pa. 2004) ......................................................................... 40

*Commonwealth v. Rega*,
933 A.2d 997 (Pa. 2007) ......................................................................... 49

*Commonwealth v. Wharton*,
607 A.2d 710 (Pa. 1992) ......................................................................... 13

*Commonwealth v. Wharton*,
665 A.2d 458 (Pa. 1995) ......................................................................... 13

*Commonwealth v. Wharton*,
811 A.2d 978 (Pa. 2002) ......................................................................... 13

*Commonwealth v. Wharton,*
  961 A.2d 107 (Pa. 2008) ........................................................... 13

*Cooter & Gell v. Hartmarx Corp.,*
  496 U.S. 384 (1990) ................................................................. 29

*Dawson v. United States,*
  68 F.3d 886 (5th Cir. 1995) ..................................................... 44

*Desert Palace, Inc. v. Costa,*
  539 U.S. 90 (2003) .................................................................. 37

*Eastway Constr. Corp. v. City of New York,*
  762 F.2d 243 (2d Cir. 1985) .................................................... 31

*Ford Motor Co. v. Summit Motor Prod., Inc.,*
  930 F.2d 277 (3d Cir. 1991) ............................................... 1, 30

*Garr v. U.S. Healthcare, Inc.,*
  22 F.3d 1274 (3d Cir. 1994) .................................................... 42

*Hockley by Hockley v. Shan Enters. Ltd. P'ship,*
  19 F. Supp. 2d 235 (D.N.J. 1998) ........................................... 32

*Hunter v. Earthgrains Co. Bakery,*
  281 F.3d 144 (4th Cir. 2002) .................................................. 32

*Kaplan v. DaimlerChrysler, A.G.,*
  331 F.3d 1251 (11th Cir. 2003) .............................................. 32

*Kennedy v. Superintendent Dallas SCI,*
  50 F.4th 377 (3d Cir. 2022) ...................................................... 4

*Mackler Prods., Inc. v. Cohen,*
  146 F.3d 126 (2d Cir. 1998) .................................................... 55

*Marshall v. Wetzel,*
  2018 WL 5801313 (E.D. Pa. Nov. 6, 2018) ............................. 12

*Martin v. Brown,*
  63 F.3d 1252 (3d Cir. 1995) .................................................... 50

*Moeck v. Pleasant Valley Sch. Dist.,*
  844 F.3d 387 (3d Cir. 2016) ................................................ 6, 31

*O'Brien v. Alexander,*
101 F.3d 1479 (2d Cir. 1996) ................................................................. 30

*Obert v. Republic W. Ins. Co.,*
398 F.3d 138 (1st Cir. 2005) ................................................................. 36

*In re Office of Alabama Att'y Gen.,*
No. 21-13514, 2023 WL 129438 (11th Cir. Jan. 9, 2023) ...................... 35

*In re Pennie & Edmonds LLP,*
323 F.3d 86 (2d Cir. 2003) ................................................................... 32

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions,*
278 F.3d 175 (3d Cir. 2002) ................................................................. 29

*Redland Soccer Club, Inc. v. Dep't of Army of U.S.,*
55 F.3d 827 (3d Cir. 1995) ................................................................... 40

*Rhedrick v. Option One Morg. Corp.,*
2015 WL 3871593 (E.D. Pa. June 22, 2015) .......................................... 51

*Smith v. Morrison,*
47 A.3d 131 (Pa. Super. 2012) .............................................................. 43

*Snow Machines, Inc. v. Hedco, Inc.,*
838 F.2d 718 (3d Cir. 1988) ................................................................. 42

*Speight v. Beard,*
2017 WL 914907 (E.D. Pa. Mar. 3, 2017) .............................................. 12

*Strickland v. Washington,*
466 U.S. 668 (1984) ...................................................................*passim*

*Summers v. Schriro,*
481 F.3d 710 (9th Cir. 2007) ................................................................ 39

*Matter of Thalheim,*
853 F.2d 383 (5th Cir. 1988) ................................................................ 52

*United States v. Gonzalez,*
905 F.3d 165 (3d Cir. 2018) ................................................................. 13

*United States v. Miller,*
833 F.3d 274 (3d Cir. 2016) ................................................................. 37

*Wall v. Kholi,*
    562 U.S. 545 (2011)................................................................ 39

*Weissman v. Quail Lodge, Inc.,*
    179 F.3d 1194 (9th Cir. 1999)................................................. 52

*Wharton v. Vaughn,*
    722 F. App'x 268 (3d Cir. 2018) .....................................*passim*

*Wilkinson v. Austin,*
    545 U.S. 209 (2005) ............................................................. 53

*Williams v. Beard,*
    637 F.3d 195 (3d Cir. 2011).................................................. 46

*Woosley v. U.S. District Court, Dist. of Conn.,*
    2016 WL 4247561 (E.D. Pa. Aug. 10, 2016)..........................51

*Worldwide Primates, Inc. v. McGreal,*
    87 F.3d 1252 (11th Cir. 1996) .............................................. 30

*Young v. United States,*
    315 U.S. 257 (1942) ............................................................. 45

## Statutes and Rules

18 U.S.C. § 3771 ....................................................................... 26

28 U.S.C. § 1291......................................................................... 6

28 U.S.C. § 2253(c)(2) .............................................................. 42

28 U.S.C. § 2254 ......................................................................... 6

Federal Rule of Civil Procedure 11.......................................*passim*

Pennsylvania Rule of Evidence 404(a).......................................13

Pennsylvania Rules of Professional Conduct .............................19

Pennsylvania Rules of Professional Conduct Rule 3.3 ....................16, 33, 34

Pennsylvania Rules of Professional Conduct Rule 3.8............................ 2, 32

E.D. Pa. Local Rule 83.6.......................................................*passim*

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ................................................. 33, 39

Bruce A. Green, *Candor in Criminal Advocacy?*, 44 Hofstra L.
Rev. 1105, 1124 (2016) ............................................................. 33

Chris Palmer, *Federal judge: Philly DA Larry Krasner's office
misled court while trying to free a man from death row*,
PHILADELPHIA INQUIRER, 2022 ................................................. 26

Gregory P. Joseph, SANCTIONS: THE FEDERAL LAW OF LITIGATION
ABUSE ..................................................................................... 31, 36

Renee Knake Jefferson, *Lawyer Lies and Political Speech*, 131
Yale L.J. ................................................................................. 43

**INTRODUCTION**

The District Court erred in imposing Rule 11 sanctions, *sua sponte*, on Appellants The Philadelphia District Attorney's Office ("DAO" or the "Office") and two high-level supervisors in the Office, Nancy Winkelman and Paul George. The Rule 11(b)(3) sanctions were based on two written statements made in connection with the DAO's concession of Petitioner Robert Wharton's death penalty habeas claim: (1) In its Notice of Concession, the Office stated, "[f]ollowing review of this case by the Capital Case Review Committee of the [DAO and] communication with the victims' family," the DAO concedes relief, A95; and (2) in a follow-up brief the DAO stated it "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in *Strickland v. Washington*, 466 U.S. 668 (1984)," A115.

The District Court made multiple errors in determining that these statements lack evidentiary support. A52-62. The question posed by a Rule 11(b)(3) inquiry is whether, "after an inquiry reasonable under the circumstances…the factual contentions have evidentiary support…." Fed. R. Civ. P. 11(b)(3). Rule 11 limits sanctions only to statements that are "patently unmeritorious or frivolous." *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991). Sanctions are further limited

to the most egregious cases where, as here, the Court imposes Rule 11 sanctions *sua sponte*.

The District Court erred in the following ways: (1) the Court failed to apply the "patently frivolous or unmeritorious" standard; (2) the Court misapprehended the statements and failed to acknowledge that the statements, as written, were true; and (3) the Court ignored the abundant evidentiary support for the statements. In addition, the statements regarding the Office's review are not the type of "factual" averments subject to Rule 11 sanctions. In sanctioning Appellants, the District Court also failed to recognize that the statements were consistent with the DAO's long-standing practice.

In ruling otherwise, the District Court made fact-findings not supported by record evidence, misinterpreted the statements, and misapplied the Rule 11(b)(3) standard for determining whether a statement has an evidentiary basis. Among many errors, the District Court erroneously applied a heightened standard of disclosure by prosecutors to the concession of a habeas claim, notwithstanding that a heightened standard applies only to disclosures to a criminal defendant, mandated by *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and Pa. R. Prof. Conduct 3.8(d).

In its reach to find a violation, the District Court also misinterpreted *Commonwealth v. Brown*, 196 A.3d 130 (Pa. 2018), and this Court's decision on Wharton's prior appeal, *Wharton v. Vaughn*, 722 F. App'x 268 (3d Cir. 2018). Appellants complied with those decisions and respected the role of the Court in deciding to concede the Sixth Amendment constitutional claim.

Finally, the District Court violated Appellants' due process rights by ignoring controlling Local Rule 83.6(V), which mandates referral of attorney discipline sanctions to the Chief Judge of the District Court, and repeatedly shifting the grounds for its ethics inquiry. This was an extraordinary, *sua sponte* proceeding below. In the usual Rule 11 proceeding, there is a party's motion, an opposing party's opposition, a safe-harbor opportunity for a party to withdraw an allegedly baseless pleading, and a hearing on the four corners of a Rule 11 motion. Not here. The District Court proceeded *sua sponte,* providing evolving explanations for its criticisms of the Office and for a hearing, none of which disclosed that the Court was considering imposing Rule 11 sanctions against Appellants until the hearing. Instead, the Court:

- Stated a "preliminary conclusion" that the DAO breached the ethical duty of candor *without any reference* to Rule 11, A33, A42;

- Assured the parties it was a "very discrete issue we're going to talk about [at the hearing], which is a possible breach of the duty [of] candor on the part of the DA's Office," A261; and

- Explained that the Court would proceed with the show-cause hearing, but the Court's concerns about the DAO's process would "be addressed **independent and irrespective of any disciplinary matters** that may stem from it...," A274 (emphasis added).

The Court erred at each of these steps in failing to grant Appellants' request to follow Local Rule 83.6(V)(A).

These errors provide ample grounds to reverse the District Court.

The District Court's sanctions further reflect its basic disagreement with the DAO on the role and purposes of the Great Writ, and the authority and powers of prosecutors to address convictions or sentences tainted by constitutional violations. All agree that the federal habeas court has the final say on the validity of constitutional claims. Crucially, however, a party may not be sanctioned under Rule 11 for asserting a legal position that the court rejects.

Here, the District Court imposed sanctions on prosecutors who acted consistently with their professional view that the Sixth Amendment claim has merit. *See, e.g.*, *Kennedy v. Superintendent Dallas SCI*, 50 F.4th 377, 382 (3d Cir. 2022) ("As we believe the Commonwealth's concession [that petitioner had exhausted his claim] to be a product of careful consideration, we accept it as a waiver made expressly through counsel. Doing so respects

the Commonwealth's 'primary authority for defining and enforcing the criminal law….'" (citations omitted)). While the Court rejected Mr. Wharton's habeas claim (though it did issue a certificate of appealability), neither Rule 11 nor the Rules of Professional Conduct authorize a court to transform its substantive disagreement with counsel's position into sanctions. The Court's decision, in effect, punished the DAO's lawyers for taking a position with which the Court disagreed.

Left uncorrected, the District Court's decision will discourage prosecutors from conceding an issue they believe justice requires them to concede. The District Court's concerns regarding the basis of a prosecutor's decisions to concede any issues can be met, as the DAO has agreed throughout this litigation, by a rule addressing the scope of facts to be provided to the court in support of a concession.[1]

The Appellants are experienced and respected attorneys. They followed the law, were truthful, followed the DAO's past practices, and acted reasonably in conceding relief in Wharton's case. While the District Court had the power to reject the concession and deny Mr. Wharton's Sixth

_____

[1]    The District Court suggested how this might be done at the end of its Memorandum Opinion. A69.

Amendment claim, there was no basis for Rule 11 sanctions. This Court should reverse the Order.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over Wharton's habeas action, out of which the issues in this appeal arise, pursuant to 28 U.S.C. § 2254.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. On May 11, 2022, the District Court entered an order fully and finally resolving Mr. Wharton's habeas petition. A88, A120. On September 12, 2022, the District Court entered a Memorandum Opinion and Order determining that the DAO and its attorneys violated Rule 11 and imposing sanctions. A43-71, A91. An order concerning Rule 11 sanctions entered after a final judgment in the underlying action is appealable as a final order under Section 1291. *Moeck v. Pleasant Valley Sch. Dist.*, 844 F.3d 387, 389 n.3 (3d Cir. 2016).

## ISSUES PRESENTED FOR REVIEW

1. In its notice of concession of penalty phase relief, the DAO stated that it was conceding relief on the Sixth Amendment claim "[f]ollowing review of this case [and] communication with the victims' family." In a later pleading, the DAO characterized the review as "careful." As those assertions

were factually accurate, did the statements lack evidentiary support in violation of Rule 11(b)(3)?

> Appellants raised this issue in various pleadings and at a hearing before the District Court. *See, e.g.,* A134, A380. The district court imposed sanctions in its September 12 Order. A43, A71.

2. Where the District Court imposed Rule 11 sanctions without following the local rule requiring a judge who believes an attorney has acted in a way that would warrant discipline or other action to refer the conduct to the Chief Judge, while providing shifting explanations of the focus of the proceedings the Court was undertaking, does the District Court violate the attorney's right to due process of law?

> Appellants raised this issue in a motion to cancel the District Court's show-cause hearing. A134. The district court denied that motion the day before the hearing. A273.

## RELATED CASES AND PROCEEDINGS

Robert Wharton's habeas claims were previously before this Court in an appeal resolved on January 11, 2018. *Wharton*, 722 F. App'x at 268. The

District Court's denial of his habeas claims is presently before this Court in an appeal docketed as No. 22-9001.

## CONCISE STATEMENT OF THE CASE

### I. WHARTON'S PRIOR HABEAS PROCEEDINGS AND THIS COURT'S 2018 DECISION

This appeal arises out of this Court's remand, on January 11, 2018, of Robert Wharton's habeas petition. *Wharton*, 722 F. App'x at 268. This Court reversed the denial of Wharton's *Strickland* claim regarding his trial counsel's ineffectiveness at his second penalty-phase hearing for "failing to obtain and present evidence reflecting Wharton's positive adjustment to prison life during the seven years between his two penalty hearings." *Id.* at 279.

This Court remanded for a hearing to determine whether Wharton's trial counsel "acted unreasonably by failing to investigate and/or present Wharton's prison-adjustment evidence" and whether that omission was prejudicial. *Id.* at 281. Wharton claimed that his penalty-phase counsel "was ineffective at the second penalty hearing for failing to obtain and present evidence reflecting Wharton's positive adjustment to prison life during the seven years between his two penalty hearings." *Id.* at 279. Wharton's trial counsel conceded that he was not aware that good

adjustment in prison was proper mitigation evidence, and that if he had properly researched the issue, he would have introduced good adjustment evidence. A11.

Nothing in this Court's opinion required the DAO to present any particular evidence at a remand hearing. And nothing in the opinion spoke to – much less prohibited – the DAO from doing what it did here, namely exercising its broad discretion to concede relief.

## II. THE DAO'S REVIEW AND DECISION TO CONCEDE RELIEF AND NOTICE OF CONCESSION

Following remand, the DAO's Capital Case Review Committee ("CCRC") reviewed Wharton's *Strickland* claim. The CCRC is a committee of senior members of the DAO, created to review the Office's position in capital cases. A299. It includes Appellants Law Division Supervisor Nancy Winkelman and Law Division Assistant Supervisor Paul George. A309, A315, A335. The CCRC makes recommendations to the District Attorney regarding pending capital cases, and the District Attorney makes the final decision. A299, A335.

The CCRC reviewed Mr. Wharton's penalty-phase habeas claim, concluded it was meritorious, and recommended to the District Attorney that he concede habeas relief on it. A299, A317. Mr. George reported the

decision to concede to Max Kaufman, then the Supervisor of the DAO's Federal Litigation Unit (part of the Law Division). A352-53.

While the CCRC was considering the claim, the DAO's Victim/Witness Coordinator contacted one member of the victims' family. A122-24. In December 2018, she reached out to David "Tony" Hart, the brother of Bradley Hart, one of the victims. A122-23. She advised him about the status of the case, provided her contact information, and invited the family to contact her. Tony Hart stated that "he did not feel a certain way about the death penalty but was adamant that [Wharton] not be released." A123. He said he would talk to his family, including Lisa Hart, the surviving victim of Mr. Wharton, and provide them the Coordinator's contact information. *Id.* In January 2019, the Coordinator informed Tony Hart that the DAO intended to agree to death penalty relief. A124. Mr. Hart stated that he and his brother would like to attend the hearing. *Id.* The Victim/Witness Coordinator did not have further communications with the victims' family before the Notice of Concession was filed.

On February 6, 2019, Mr. Kaufman filed the DAO's Notice of Concession of Penalty Phase Relief, A93 (the "Notice"), which stated in part:

> Following review of this case by the [CCRC], communication with the victims' family, and notice

> to petitioner's counsel, <u>respondent hereby reports to</u> <u>the Court that it concedes relief</u> on petitioner's remaining claim of ineffective assistance at the second penalty hearing, and does not contest the grant of a conditional writ of habeas corpus with respect to petitioner's death sentences.

A95, ¶ 9 (emphasis added); *see also* A129, ¶ 10-11. The Notice was a form document that did not purport to provide information favoring or disfavoring the decision to concede. A299. It simply reported the DAO's legal conclusion that the *Strickland* claim had merit.

The DAO's process of informing the District Court of its legal position was the same as that regularly followed by the DAO in other cases, both under the current District Attorney[2] and his predecessors.[3] In at least six

---

[2]    Examples filed in other cases (compiled at A180-247) include: *Ali v. Wetzel*, No. 11-cv-1812 (ER) (E.D. Pa. Sept. 17, 2019) (ECF 96); *Birdsong v. Wetzel*, No. 11-cv-4249 (JLS) (E.D. Pa. Aug. 12, 2019) (ECF 99); *Brown v. Beard*, No. 05-cv-4125 (GEKP) (E.D. Pa. June 20, 2018) (ECF 69); *Fletcher v. Horn*, No. 10-cv-3188 (RBS) (E.D. Pa. Dec. 10, 2020) (ECF 97); *Gwynn v. Beard*, No. 08-cv-5061 (PD) (E.D. Pa. Dec. 18, 2020) (ECF 106); *Hannibal v. Wetzel*, No. 13-cv-619 (GAM) (E.D. Pa. Feb. 4, 2020) (ECF 40); *Lambert v. Folino*, No. 10-cv-1339 (JCJ) (E.D. Pa. Apr. 10, 2018) (ECF 91); *Marshall v. Wetzel*, No. 03-cv-3308 (JFL) (E.D. Pa. June 6, 2019) (ECF 171); *Mason v. Wetzel*, No. 17-cv-3759 (WB) (E.D. Pa. Aug. 7, 2018) (ECF 31); *Murphy v. Wetzel*, No. 99-cv-6362 (RBS) (E.D. Pa. Apr. 7, 2021) (ECF 32); *Whitaker v. Mooney*, No. 14-cv-2321 (EGS) (E.D. Pa. June 27, 2018) (ECF 68).

[3]    *See, e.g, Crawley v. Horn*, No. 99-cv-5919 (TJS) (E.D. Pa. Feb. 2, 2015) (ECF 45).

other cases, the DAO filed notices of concession in substantially the same form as was used in this case.[4] In each, the respective courts accepted the concession.[5]

When the Notice was filed, Appellants Winkelman and George did not know that Mr. Wharton had attempted to escape from county custody in the Philadelphia courthouse in May 1986, at a sentencing hearing in another matter. A324-25, A336, A346-47. Although his escape attempt had previously been prosecuted by the DAO, neither the members of the CCRC nor Mr. Kaufman were aware of the escape attempt when the Office

---

[4]  *Speight v. Beard*, No. 04-04110, Doc. 94 at 10 n.11 (E.D. Pa. Dec. 22, 2014); *Lambert. Folino*, No. 10-01339, Doc. 91 (E.D. Pa. Apr. 10, 2018); *Mason v. Wetzel*, No. 17-3759, Doc. 25 (E.D. Pa. June 1, 2018); *Brown v. Beard*, No. 04-4125, Doc. 69 (E.D. Pa. June 20, 2018); *Marshall v. Wetzel*, No. 03-3308, Doc. 172 (E.D. Pa. June 25, 2018); *Whitaker v. Mooney*, No. 14-2321, Doc. 68 (E.D. Pa. June 27, 2018).

[5]  *See Speight v. Beard*, 2017 WL 914907, at *17 (E.D. Pa. Mar. 3, 2017) (memorandum opinion of Quinones Alejandro, J.) (accepting concession of capital penalty phase relief); *Lambert v. Folino*, No. 10-01339, Doc. 95 (E.D. Pa. Apr. 26, 2018) (order of Joyner, J.) (accepting concession of grant of new trial); *Mason v. Wetzel,* No. 17-3759, Doc. 31, at 2 (E.D. Pa. Aug. 7, 2018) (so-ordered stipulation of Beetlestone, J.) (accepting concession of capital penalty phase relief); *Brown v. Beard*, No. 04-4125, Doc. 71 (E.D. Pa. June 27, 2018) (order of Pratter, J.) (accepting concession of grant of new trial); *Marshall v. Wetzel,* 2018 WL 5801313 at *37 (E.D. Pa. Nov. 6, 2018) (opinion of Leeson, J.) (accepting concession of capital penalty phase relief); *Whitaker v. Mooney,* No. 14-2321, Doc. 69 (E.D. Pa. June 27, 2018) (order of Smith, J.) (accepting concession of grant of new trial).

conceded penalty-phase relief. A346-47. After all, the escape attempt occurred more than three decades before the CCRC's review.

Two aspects of the escape evidence bear emphasis. First, the former District Attorney did not present this evidence at Wharton's second death penalty hearing in 1992, only six years after the escape attempt, even though it was admissible to rebut evidence of good character that Wharton had presented as mitigation. *See* Pa. R. Evid. 404(a); *accord United States v. Gonzalez*, 905 F.3d 165, 205 (3d Cir. 2018) ("The District Court was well within the bounds of the Federal Rules of Evidence when it ruled that it would permit the Government to present rebuttal evidence if Gonzalez opened the door on the issue of her character."). Second, no court that reviewed this case over a 30-year period has ever referenced the escape attempt, nor did the DAO do so in its briefs in those cases.[6]

Based on the Notice, counsel for Mr. Wharton and the DAO submitted a joint draft order proposing relief based "upon a careful and independent review of all of the parties' submissions and all prior

---

[6]    *See, e.g.*, *Commonwealth v. Wharton*, 607 A.2d 710 (Pa. 1992); *Commonwealth v. Wharton*, 665 A.2d 458 (Pa. 1995); *Commonwealth v. Wharton*, 811 A.2d 978 (Pa. 2002); *Commonwealth v. Wharton*, 961 A.2d 107 (Pa. 2008); *Wharton v. Vaughn*, 722 F. App'x 268 (3d Cir. 2018).

proceedings in this matter...." A98. Under the proposed order, Mr.

Wharton would have been sentenced to life in prison without parole. *Id.*

### III. THE DISTRICT COURT'S MARCH 4, 2019 MEMORANDUM OPINION AND ORDER

The District Court filed a Memorandum Opinion characterizing the

DAO's position as a "complete reversal of course." A99. The Court

"decline[d] to adopt the parties' Proposed Order." A104. Instead, it stated it

"must make an independent determination of the merits of the Remaining

Sentencing Claim, and...cannot do so on the current record." A105.

The Opinion did not reject or question the Notice on the ground that

it did not provide evidence supporting – or contrary to – the concession.

The Opinion also did not request any facts or evidentiary support,

notwithstanding that the District Court later asserted that it had made that

request in its Opinion. A9 ("I ordered the parties to provide a fulsome

explanation justifying the relief requested.").

Instead, the Court directed the parties to brief two issues: "(A) May a

Court Grant Habeas Relief Based Only on the District Attorney's

Concession, or Must it Independently Evaluate the Merits of the Conceded

Claim?" and "(B) Can an Independent Evaluation of the Merits of the

Remaining Sentencing Claim Be Made on the Current Record?" A9, A14.

The DAO directly addressed both of those questions. Its April 2019 brief stated, "a court may, but is not bound, to accept [the DAO's] concession," A113, and "if the record is insufficient to rule on the remaining [ineffectiveness] claim, the Court can conduct an evidentiary hearing," A116. The DAO also stated that it had "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in *Strickland v. Washington*, 466 U.S. 668 (1984)." A114. The DAO explained that it had made its decision to concede relief based on, *inter alia*, Wharton's counsel's declaration that "he was not operating under any strategy or tactic when [he] did not investigate or present evidence of Mr. Wharton's positive prison adjustment in his second penalty hearing," and "the sentencing jury initially reported that it was deadlocked on whether to sentence Mr. Wharton to death." A114-15.

The District Court later significantly misstated what it requested of the DAO. The Court asserted, "I ordered the parties to provide a *fulsome* explanation justifying the relief requested." A9 (citing A99) (emphasis added). Not so. The District Court did not ask for *any* explanation justifying the relief requested, let alone a "fulsome" one.

Further, the District Court later asserted, the "District Attorney thus continued to decline or refused to provide me with any evidence of

Wharton's positive prison adjustment, the crux of the matter before me, nor did it advise that there was any evidence to the contrary I should consider— e.g., negative prison adjustment." A9. That, too, is incorrect. First, the DAO did not decline or refuse to provide the Court with any evidence. Instead, it did what it was asked to do by answering the Court's questions, along with an explanation and supporting evidence. A113.

Second, what the District Court called "the crux of the matter" was not a crux of any matter at the time of the February 2019 Notice or the DAO's April 2019 brief. The DAO under the former administration had not used the escape evidence in Wharton's second death-penalty trial. In fact, that evidence was never referenced – let alone made the heart of the matter – in any brief or judicial decision considering Wharton's habeas claims.

## IV.    THE DISTRICT COURT'S MAY 11, 2022 MEMORANDUM OPINION

Following five days of evidentiary hearings on Wharton's habeas claim, the District Court issued an opinion on May 11, 2022. A3. Though the Court denied Wharton relief, it granted a certificate of appealability. A120.

The District Court also announced that it had reached a "preliminary conclusion" that the DAO had breached the duty of candor under Rule 3.3(a)(1) of the Pennsylvania Rules of Professional Conduct. A42; *see also* A33. The Court's Opinion premised this charge on the theory that the

DAO had a "heightened duty" of candor to disclose supporting and non-supporting evidence in its Notice. A34.

The District Court asserted that the DAO lawyers improperly withheld information about Wharton's 1986 escape attempt. A33. The Court claimed this was one of "the most important facts bearing on the merits of the habeas petition," A36-37, and that the omission of the escape attempt was contrary to the DAO's having "carefully reviewed the facts and law." A37.

The District Court also criticized the DAO's lack of communication with the surviving victim and her family, concluding "minimal and woefully deficient communication took place with the siblings of the deceased." A33. The District Court contended that the DAO's reference in the Notice to "communication with the victims' family" left the Judge with the "the unmistakable impression...that the victims' family had agreed with the District Attorney's change of position."[7] A37-38. Yet, the Notice did not say that. It says nothing about whether the family agreed or disagreed with the DAO. In fact, the statement does not even say what was discussed with the

---

[7]   The Opinion also misquotes the Notice as referring to multiple "communications." A37. In fact, the Notice was singular, referring to "communication." A93. The Court's misreading aside, the Notice cannot support sanctions based on the extent of communication with the family.

DAO or what the family said to the DAO. And, to the central Rule 11(b)(3) issue of whether the communication has "evidentiary support," the Notice indisputably accurately states that the DAO had "communication with the victims' family." A95.[8] The District Court's March 4, 2019 Memorandum Opinion did not report that the Court had that (mis)understanding. A99.

The District Court ordered "the Supervisor of [the DAO's] Federal Litigation Unit, who signed the [Notice] and thereafter submitted, along with Petitioner's counsel, the proposed order suggesting that I grant the petition for habeas corpus vacating the jury's verdict...to address the concerns raised in my Opinion" at a hearing the following month. A126.

Significantly, the District Court raised these professional conduct issues *sua sponte*. Neither the Opinion nor the Order refers to Rule 11 or reveals that the Court was considering such sanctions. The District Court also failed to follow Local Civil Rule 83.6, which mandates the transfer to the Chief Judge of the District Court of any allegations that would warrant

---

[8]    Max Kaufman, the DAO lawyer who filed the Notice, acknowledged the Court's concern but made clear that he had no intent to mislead. A129-30, ¶ 12. That statement was credited by the Court, as Mr. Kaufman was not found in violation of Rule 11. Further, the views of a victim's family are not relevant to the determination of whether a defendant's *Strickland* ineffectiveness claim has merit. *See infra* Argument I.D.

discipline of an attorney in ongoing litigation for a confidential review by a
separate three-judge panel.

The DAO moved to vacate the Order for the hearing, arguing that the
DAO did not have a heightened duty of candor and had not violated any
ethical duty. A134. The DAO provided a full discussion of the governing
legal principles, as well as an expert declaration of Professor Bruce A.
Green. A248. The District Court had relied on Professor Green's
scholarship to support its conclusion that there was a breach of a
heightened duty of candor. A37. Professor Green concluded that the DAO
and its lawyers did not breach its ethical duties or engage in conduct
sanctionable under the Rules of Professional Conduct. A248.[9] The DAO
also requested that the District Court refer any professional discipline
proceedings to the Chief Judge, as required by Local Rule 83.6. A134.

In response, the District Court noted the narrow scope of the hearing,
stating, without any reference to Rule 11, that it is a "very discrete issue
we're going to talk about...which is a possible breach of the duty [of] candor
on the part of the DA's Office." A261. The District Court refused to refer the

---

[9]   The District Court has never addressed Professor Green's expert
declaration or explained why Professor Green's conclusions are incorrect.

matter to the Chief Judge, explaining that "referral at this time would be premature." A274.[10]

The District Court also alleged "that the [DAO] may have litigated this case in a way that threatened to undermine the limited role federal habeas corpus jurisdiction is intended to play in the state criminal justice system," emphasizing "[t]hat concern should be addressed independent and irrespective of any disciplinary matters that may stem from it." A274.

## V.    THE HEARING CONCERNING THE DAO'S CONCESSION OF RELIEF

The District Court started the June 23, 2022 hearing with a statement that the purpose was to determine whether the DAO lawyers had breached a duty of candor and whether any sanctions should be imposed:

> We are here for an exploration of a concern I have raised regarding the [DAO's] litigation conduct in this matter, as it relates to their obligation to be candid with the Court, pursuant to their ethical obligations, and also *whether, separately, there should be any type of sanctions levied*, based on my independent authority to oversee the case.

A278 (emphasis added). Later in the hearing, the Court stated that it was considering sanctions under Rule 11. A326-27, A355, A358.

---

[10]    The Chief Judge of the District Court also rejected a request by Appellants to assume jurisdiction over the attorney-disciplinary matter. ECF 307.

Ms. Winkelman, Mr. George, and Mr. Kaufman testified that the decision to concede relief was made by the District Attorney on the recommendation of the CCRC. A299, A317, A335, A340. They explained that Mr. George advised Mr. Kaufman of the DAO's decision, and Mr. Kaufman then submitted the Notice based on that decision. A352-53; *see also* A128-29, ¶¶ 8, 10. Mr. George reported to Mr. Kaufman the CCRC's recommendation, as he had done in other matters. A325-26, A352-53.

They also testified that they were not personally aware in 2019, when the Notice was filed, of Mr. Wharton's 1986 escape attempt. A324, A337, A346-47, A360, A367. Appellants only learned of the escape evidence when the Attorney General filed its brief in July 2019. A314-15, A347, A367. Mr. George stated that the District Attorney's Office *as an entity* was aware of the escape attempt in 1986 because it prosecuted Wharton, A349, A351-52, but neither he nor the CCRC was aware of that fact during their review of Mr. Wharton's case. A336, A346-47.[11]

---

[11]   The District Court questioned "the Assistant Supervisor's attempt to rationalize his present position that he and others on the [CCRC] were unaware of the escape with his prior statement to the Court, made during the remand hearings, that the Office was aware of it." A66 (emphasis added). The Court labeled this explanation "incredible," *id.*, but there was no basis for this assertion and, in any event, it was not grounds for sanctions.

As the DAO lawyers were not aware of Wharton's escape attempt evidence, the District Court's initial finding that they breached their duty of candor by failing to disclose it is without factual or legal support. It appears that the Court understood this point, as it pivoted to Rule 11, on the also-

---

The Court's Opinion does not review in relevant detail Mr. George's testimony at the show cause hearing and his earlier testimony. Had the Court done so, it would have seen that Mr. George's testimony was not inconsistent. *Compare* ECF 267, N.T. 5/11/2023, at 66:17-18 (the Court asking, without further explanation, in hearing on *Strickland* claim: "Was the District Attorney's Office aware of the escape from City Hall prior to filing your  notice of concession?") *with* A349-49 ("Are you saying, when I asked you, was the DA's Office aware of the escape prior to the concession, and your answer was yes, you meant to say the DA's Office going back two decades? I mean, clearly my question was the current DA's Office."). Respectfully, the question did not specify at which time the DAO was aware of the escape attempt.

Further, as documented below, the prosecutors who sought the death penalty at the second penalty hearing also likely had no knowledge of the escape attempt *just six years after it occurred*, as they did not use that evidence to rebut Wharton's good-character mitigation evidence. And, if the prosecutors knew of the escape attempt and made a strategic decision not to use that evidence, it plainly had very limited if any probative value.

Finally, if Mr. George knew about the escape attempt, the Court would have had no grounds to question the evidentiary basis for the DAO's statements. The sanctions would then be plainly and improperly targeted only at the DAO's *weighing* of the escape attempt and *decision* on the merits of Wharton's habeas claim.

In any case, the Court did not further question the Assistant Supervisor's credibility, and there was no question that Ms. Winkelman was unaware of the escape attempt.

flawed theory that the DAO had filed the Notice without evidentiary support. A278, A326 (citing Rule 11).

Ms. Winkelman and Mr. Kaufman also testified about the DAO's communications with the victims' family. A321-23, A367-68. Ms. Winkelman stated that the DAO, through the Victim/Witness Coordinator, communicated with the apparent "patriarch" of the Hart family, who served as a spokesperson for the family. A322. Ms. Winkelman acknowledged that it "would have been appropriate" to contact List Hart, the surviving victim. A323.

## VI.  THE DISTRICT COURT'S SEPTEMBER 12 SANCTIONS OPINION AND ORDER

On September 12, 2022, the District Court issued its Memorandum Opinion sanctioning Appellants. A43-70. The Court found that Ms. Winkelman, Mr. George, and the DAO violated Rule 11 "by asserting without 'evidentiary support' or an 'inquiry reasonable under the circumstances' that it had 'carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in *Strickland v. Washington*, 466 U.S. 668 (1984)' and that it had done so '[f]ollowing...communication with the victims' family.'" The Court did not sanction Mr. Kaufman, who signed the Notice of Concession.

The District Court sanctioned Appellants for violation of Rule 11(b)(3), but mistakenly cited Rule 11(b)(1).[12] A67. The Memorandum Opinion asserted, without explanation, that these violations were so "egregious" and "exceptional" as to "warrant sanctions under Rule 11." *Id.* The Court admonished Ms. Winkelman and Mr. George and required the DAO[13] to issue apology letters to the surviving victim and the victims' family members. A67-69.

The Memorandum Opinion reveals the District Court's core concern: disagreement on the *merits* with the DAO's decision to concede penalty-phase habeas relief. The Court asserted that the DAO should have considered "anti-mitigation evidence that the Commonwealth would have presented to rebut [Wharton's] mitigation testimony," such as the escape attempt. A44-45, A64 (quoting *Wharton*, 722 F. App'x at 283). In the

---

[12]  Subsection (b)(1) prohibits a party from advancing a pleading for an "improper purpose," and does not require that a factual contention in a paper have "evidentiary support." *Compare* Fed. R. Civ. P. 11(b)(1) *with id.* 11(b)(3). That plainly is not the provision the Court was applying.

The Court's Order, A71, similarly incorrectly stated that Appellants violated Rule 11(c). Yet Rule 11(c) does not address standards of conduct. *Compare* Fed. R. Civ. P. 11(b)(3) *with id.* 11(c).

[13]  District Attorney Larry Krasner was not sanctioned. As head of the DAO, he was directed to send apology letters to the victims' family.  A69. He did so on October 11, 2022. A397.

District Court's view, the DAO's failure to do so was also contrary to the Pennsylvania Supreme Court's ruling in *Commonwealth v. Brown*, 196 A.3d 130 (Pa. 2018).

The District Court concluded "that the [DAO's] representation that they had 'carefully reviewed the facts' was unreasonable." A53. The Court suggested an analogy comparing the DAO's actions to Wharton's complaint about his penalty hearing counsel: "Ironically, the [DAO] advocates that Wharton's death sentence be vacated because trial counsel failed to investigate prison adjustment, yet the [DAO] failed to do the same." A54. But there is no comparison. The Court misunderstood the Rule 11(b)(3) standard for what constitutes an assertion with evidentiary support, imposing sanctions based at least in part on its disagreement with the scope and result of the DAO's review.

With regard to communication with the victims' family, the District Court concluded that the statement in the Notice "lacked clarity and was vague." A61. The Court criticized the DAO for communicating with only one member of the family, and not communicating with the surviving victim. A61-62. The Court concluded that as a result the DAO was not aware that the surviving victim and other family members "would have been vehemently opposed to the concession had they been informed of it." A62.

The District Court asserted, again without record support, "the [DAO]'s statement regarding [its] communication with the victims' family was false and yet another representation to the Court made after an inquiry that was not reasonable under the circumstances." *Id.* Notably, the District Court did not – and could not – conclude that the DAO's communications did not comply with the statutory requirements for communications with victims and their family members under 18 U.S.C. § 3771.

Finally, in a footnote, the District Court referred the matter to the Chief Judge of the Court pursuant to L.R. 83.6(V)(A).[14] A70 n.8. Appellants timely filed a notice of appeal on September 30, 2022. A1.

---

[14]   While Rule 83.6(V) is designed to provide for confidential review of attorney discipline issues, the Court's sanctions order was the subject of news reports that identified the Appellants by name. *See, e.g.,* Chris Palmer, *Federal judge: Philly DA Larry Krasner's office misled court while trying to free a man from death row*, PHILADELPHIA INQUIRER, 2022 WLNR 29120157 (Sept. 14, 2022).

That lack of confidentiality also resulted in the unsuccessful effort to use this dispute as a basis for Article III of the Amended Articles of Impeachment against District Attorney Krasner. The Commonwealth Court found that Article III, along with all other Articles of Impeachment, failed to satisfy constitutional requirements and did not state a proper ground for impeachment. Order, *Krasner v. Ward,* No. 563 M.D. 2022 (Pa. Commw. Ct. Dec. 30, 2022); *Krasner v. Ward*, No. 563 M.D. 2022, 2023 WL 164777 (Pa. Commw. Ct. Jan. 12, 2023).

## SUMMARY OF ARGUMENT

The District Court's sanctions Order should be reversed because the Court repeatedly erred, in fundamental ways. The Court erred in failing to apply the governing "patently unmeritorious or frivolous" standard, in failing to recognize that the statements are not "factual contentions" of the type subject to review under Rule 11(b)(3), and in sanctioning Appellants based on the District Court's misinterpretations of the statements, rather than what the statements actually said. The record evidence demonstrates indisputably that the DAO's actual statements were factually accurate and had evidentiary support.

The District Court hung its sanctions against Appellants on the thread that the DAO had no evidentiary support for its statements – that it had "reviewed" or "carefully" reviewed Mr. Wharton's habeas claim. That cannot justify sanctions. The statements were not factual contentions in support of the DAO's concession. Indeed, the DAO was not even asked by the District Court to provide grounds for the statements and, at the time of the concession, Appellants and the CCRC had no knowledge of the escape attempt. The escape attempt, moreover, is only one fact among many; and tellingly a fact that the previous District Attorney had not sought to use in Wharton's second penalty hearing. Nor had the previous District Attorney

ever mentioned the escape attempt in the numerous briefs filed seeking to uphold the death sentence.

The DAO's statement about communication with the victims' family likewise had evidentiary support. The record evidence demonstrates indisputably that the DAO communicated with the victims' family. The DAO's statement –the DAO had "communication with the victims' family" – was accurate. That the District Court significantly misinterpreted those words to mean that the victims' family *agreed* with the DAO's concession is no basis to sanction Appellants.

Finally, the District Court erred by refusing promptly to refer this matter to the Chief Judge, as required by Local Rule 83.6(V) for attorney discipline matters. The District Court initially (and erroneously) charged Appellants with breaching a supposed "heightened duty" of candor by concealing Wharton's escape evidence in the DAO's concession notice and brief. At that point, the matter should have been referred to the Chief Judge. Instead, the Court offered an ever-changing set of ethical criticisms, depriving Appellants of their due process right to a fair and confidential proceeding.

The District Court was critical of the DAO's decision to concede Wharton's *Strickland* claim. The merits of his claim are now on appeal

before this Court. But whether the DAO should have conceded and whether that claim has merit are entirely separate from whether Appellants violated Rule 11 or any other attorney-ethics obligation. The District Court erred by conflating them and allowing its substantive disagreement about the DAO's concession to fuel a decision to sanction Appellants. The Court improperly sanctioned Appellants for taking a substantive position with which the Court disagreed. That is untenable.

The District Court's Order should be reversed, and the sanctions lifted from Appellants.

## ARGUMENT

### I.    THE DAO DID NOT VIOLATE RULE 11(B)(3)

### A.    Standard of Review

An order for disciplinary sanctions is reviewed for abuse of discretion; a district court will be reversed "if the sanctions resulted from an unsupported finding of fact, an errant conclusion of law, or an improper application of law to fact." *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 278 F.3d 175, 180 (3d Cir. 2002); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 409 (1990) ("[A]n appellate court should review the district court's decision in a Rule 11 proceeding for an abuse of discretion.").

### B. The Imposition of Sanctions Under Rule 11(b)(3) Requires a Finding That a Lawyer's Statements Are "Patently Frivolous or Unmeritorious"

Rule 11(b)(3) authorizes sanctions on attorneys who make unsupported allegations in court filings.

> By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney...certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> ...
>
> the factual contentions have evidentiary support....

Fed. R. Civ. P. 11(b)(3). Under Rule 11, sanctions are prescribed "only in the 'exceptional circumstance' where a claim or motion is *patently unmeritorious or frivolous.*" *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991) (emphasis added); *see also O'Brien v. Alexander,* 101 F.3d 1479, 1489 (2d Cir. 1996) ("[S]anctions may not be imposed unless a particular allegation is utterly lacking in support."); *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996) ("[A] court confronted with a motion for Rule 11 sanctions first determines whether the party's claims are objectively frivolous—in view of the facts or law—and then, if they are, whether the person who signed the pleadings

should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry.").

"[A]ll doubts [must be resolved] in favor of the presenter and [courts] impose sanctions only where it is 'patently clear' that they are appropriate." Gregory P. Joseph, SANCTIONS: THE FEDERAL LAW OF LITIGATION ABUSE § 6(D)(3), at 134 (citing *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985)) [hereinafter, Joseph, SANCTIONS]. "The standard under Rule 11 is 'stringent' because sanctions '1) are in derogation of the general American policy of encouraging resort to the courts for peaceful resolution of disputes, 2) tend to spawn satellite litigation counter-productive to efficient disposition of cases, and 3) increase tensions among the litigating bar and between [the] bench and [the] bar.'" *Moeck v. Pleasant Valley Sch. Dist.*, 844 F.3d 387, 392 n.7 (3d Cir. 2016). "If, on the record before the court, a finding of no violation is about equally plausible as a finding of a violation, no violation should generally be found." Joseph, SANCTIONS § 6(D)(3), at 135.

A court's *sua sponte* imposition of sanctions, as here, must meet an even higher standard. An attorney's conduct must be "akin to a contempt of court" to warrant *sua sponte* sanctions because Rule 11(c)(3) does not have a "safe harbor" permitting the attorney to withdraw the challenged paper.

*See* Fed. R. Civ. P. 11(c)(3) & 1993 adv. comm. note; *see also Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) ("The initiating court must employ...a higher standard ('akin to contempt') than in the case of party-initiated sanctions."); *In re Pennie & Edmonds LLP*, 323 F.3d 86, 89-90 (2d Cir. 2003) (requiring bad faith for *sua sponte* sanctions); *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 151 (4th Cir. 2002).[15]

The District Court's ruling that prosecutors have a heightened duty of disclosure when making a concession, A54-56, is error. A prosecutor's heightened duty applies only to disclosures mandated to a criminal defendant by *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and by Pa. R. Prof. Conduct 3.8(d). The District Court erred in conflating the prosecutor's special obligation to an *accused* with a heightened candor obligation to the *Court*. *Brady* and Rule 3.8 prescribe the former; nothing supports the District Court's latter theory.

---

[15] Although this Court has not addressed whether the "akin to contempt" standard applies, courts in this Circuit have applied it when considering *sua sponte* sanctions. *See, e.g., In re 15375 Mem'l Corp.*, 430 B.R. 142, 150 (Bankr. D. Del. 2010) ("Courts will...impose '*sua sponte* sanctions only in situations that are akin to contempt of court.'"); *Hockley by Hockley v. Shan Enters. Ltd. P'ship*, 19 F. Supp. 2d 235, 240 (D.N.J. 1998) ("Implicit in the amended Rule 11 is the policy provision that, absent clearly abusive behavior akin to contempt of court, a party will always have the chance to withdraw offending papers it has submitted.").

The District Court further erred in concluding that a heightened duty applied because the habeas proceeding became non-adversarial and *ex parte*, citing Rule 3.3(d). A34-35, A56. By its terms, Rule 3.3(d) does not extend to instances where, as here, all parties are provided notice and are participating. *See Ex Parte*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining *ex parte* as "[d]one or made at the instance and for the benefit of one party only, and without notice to, or argument by, anyone having an adverse interest; of, relating to, or involving court action taken or received by one party without notice to the other, usu. for temporary or emergency relief."). As a matter of law, the habeas proceeding was not *ex parte*, as all parties were present, received notice of the Notice and the proceedings, and given an opportunity to be heard. The Notice was served on Wharton, and the District Court thereafter appointed the Attorney General's Office as *amicus curiae* and held adversarial hearings on the petition.

The District Court's reliance on Professor Green's article to support sanctions was further error. A55-56 (quoting Bruce A. Green, *Candor in Criminal Advocacy?*, 44 Hofstra L. Rev. 1105, 1124 (2016)). Professor Green's article correctly stated, "prosecutorial discretion does not justify the prosecutor in withholding evidentiary information that is of obvious importance to the sentencing court, and there is no other compelling public

interest that outweighs the prosecution's ordinary duty of candor to the court." *Id.* Specific to this case, in his expert report, Professor Green explained that sanctions are *not* appropriate where (as here) an attorney does not intend to mislead the court, is unaware of the facts at issue, and the statement was made in a context in which the attorney did not expect discussion of the evidence.[16] A129.

The DAO further did not breach a duty of candor as that duty, even in an *ex parte* proceeding, is only to "inform the tribunal of all material facts *known* to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse." Pa. R. Prof. Conduct 3.3(d) (emphasis added). Here, the DAO's statements were correct and did not omit facts known to the attorneys.

In sum, the standard for imposition of sanctions is very high, particularly when imposed *sua sponte*. As shown below, the District Court erred in not applying the applicable standards and in disregarding that the DAO's statements were well supported and accurate. The District Court's Order therefore must be reversed.

---

[16]  Notwithstanding Professor Green's expert declaration in support of Appellants, and without acknowledging its existence, the District Court continued to rely upon his article. A55-56. The Court did not attempt to rebut or question his expert opinion.

### C.    Appellants' Statements Regarding the DAO Review Cannot Be the Basis for Rule 11 Sanctions

The District Court imposed Rule 11(b)(3) sanctions on the ground that the DAO's statements in the Notice, proposed order, and April 2019 Brief – that the DAO "reviewed" or "carefully reviewed" Mr. Wharton's claim before deciding to concede relief – were lacking in evidentiary support. This interpretation and application of Rule 11 suffers from two fundamental flaws: (1) the statements were true, not "patently frivolous or unmeritorious"; and (2) the District Court based its decision on its view of the merits of the DAO's decision, rather than the evidentiary basis for the statements at issue.[17]

---

[17]   The recent decision in *In re Office of Alabama Att'y Gen.,* No. 21-13514, 2023 WL 129438 (11th Cir. Jan. 9, 2023), is instructive. The Court explained that the Rule 11(b)(3) standards is the following:

> The standard for testing conduct under amended Rule 11 is reasonableness under the circumstances. In determining reasonableness under the circumstances, we employ a two-step inquiry: first whether the party's claims are objectively frivolous with no reasonable factual basis; and second, whether the person who signed the pleadings should have been aware that they were frivolous after conducting a reasonable inquiry.

2023 WL 129438, at *3 (citations and quotations omitted). Hence, the key inquiry is whether Appellants should have been aware, had they conducted a reasonable inquiry, that the statements were frivolous, not whether the underlying concession decision had factual support. The District Court fundamentally erred in not engaging in that inquiry. Moreover, as demonstrated below, the statements indisputably were not frivolous.

### 1.    The Statements that Appellants Reviewed or Carefully Reviewed the Habeas Claim Were not "Patently Frivolous or Unmeritorious"

The DAO's statements were not "patently frivolous or unmeritorious" for three reasons: (i) the statements are not factual contentions subject to Rule 11(b)(3); (ii) the District Court based its decision on its own misinterpretation of the statements, when a plain reading shows they were indisputably true; and (iii) the escape attempt on which the District Court focused was irrelevant to the proceedings before the Court.

First, as a matter of law, characterizations such as "careful" are not statements amenable to sanctions. *See* Joseph, SANCTIONS § 9 (citing *Obert v. Republic W. Ins. Co.*, 398 F.3d 138, 143 (1st Cir. 2005), for the proposition that a sanctions award should be reversed where the "challenged statement [is] more fairly described as an unsound piece of lawyer advocacy rather than a lie about a fact" that is "simply tendentious characterization."). An "unsound piece of lawyer advocacy rather than a lie about a fact" is not subject to Rule 11 sanctions. *Obert*, 398 F.3d at 144.

Second, the District Court made a fundamental error in its interpretation – unrooted in the DAO's actual words – of the statements made by Appellants. Words matter. The Notice and follow-up brief say: the

DAO conceded relief "[f]ollowing review of [the] case by" the CCRC, A93, and the DAO "carefully reviewed the facts and law," A115.

Untethered from the text of the statements, the District Court reports that the DAO "unmistakably represented that the Office had found no facts that would lead any reasonable judge to reject the claim." A54; *see also* A45, A57. But the statements don't say that or anything like it. Just as a court determines what the law is through a careful reading of the text of a statute, so a court must interpret the words of a lawyer's statement in determining whether the statement has evidentiary support. Thus, the Court erred as its interpretation finds no support in the text of the statements. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) ("Our precedents make clear that the starting point for our analysis is the statutory text."); *United States v. Miller*, 833 F.3d 274, 280 (3d Cir. 2016) ("Our starting point is the text...").

In fact, the statement in the Notice said nothing about what the DAO reviewed or found; it just says the DAO conducted a review. The Court's decision to impose sanctions based on a misreading of the DAO's statements should be reversed.

The sole purpose of the Notice was to advise the District Court of the DAO's intention to concede habeas relief. If the Court was of the view at

that stage that there was a duty to support the concession with a statement of facts both in support of the concession and cutting against the Sixth Amendment claim, it was free to demand that information. It did not.[18]

Critically, the District Court neither made an effort to identify what would constitute a "review" or "careful review" of a claim like Wharton's, nor sought to evaluate whether what the DAO did was such a review. Instead, the Court decided that there was not a review or careful review of Wharton's ineffectiveness claim <u>solely</u> because Appellants and the CCRC did not consider Wharton's escape attempt. But the CCRC reviewed a range of facts and legal issues concerning Wharton's ineffectiveness claim. The District Court either ignored this evidence or found that the failure to give *definitive* weight to the escape attempt (of which the CCRC was unaware) was impermissible. The District Court's focus on the lack of consideration of a single, later-discovered fact ignores that that lacuna does not render what the DAO did something other than a careful review.

---

[18]   The District Court erred in stating that it had "ordered the parties to provide a *fulsome* explanation justifying the relief requested." A9 (citing A99) (emphasis added)). The Court did not do that. Its March 2019 memorandum *did not* ask for any explanation of the DAO's decision to concede relief; it only asked the parties to address whether the Court was bound by the concession and whether the then-current record was sufficient for the Court to make an independent evaluation. A105, A110.

If the District Court had interpreted the DAO's statements in light of what the DAO actually did, it would have recognized that the statements were accurate. A review involves "[c]onsideration, inspection, or reexamination of a subject or thing." Review, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Wall v. Kholi*, 562 U.S. 545, 553 (2011) ("'[R]eview' commonly denotes 'a looking over or examination with a view to amendment or improvement.'" (citing dictionary definitions)); *Summers v. Schriro,* 481 F.3d 710, 713–14 (9th Cir. 2007) (quoting BLACK'S LAW DICTIONARY definition). And that review is "careful" it if involves "[s]erious attention" to the subject under review. *See* Care, BLACK'S LAW DICTIONARY (11th ed. 2019). *Cf. Bock v. Pressler & Pressler, LLP*, 30 F. Supp. 3d 283, 305 (D.N.J. 2014) (a "rapid look-over of the complaint...one of 673 complaints he reviewed that day...cannot really be considered a careful review").

That is precisely what the DAO did here. In reviewing Wharton's ineffectiveness claim, the CCRC inspected the opinions and briefs from prior stages of the case. A318, A338. The CCRC also reexamined the facts of the case and counsel's admittedly deficient performance. A302. And the CCRC specifically considered "the pros and cons of whether or not Mr. Wharton's issue had merit." A341. The CCRC did not consider Mr.

Wharton's escape attempt because no member of the CCRC was then aware of it.[19] A302, A315, A324-25, A336-37, A346-47. If the District Court had considered whether the statements were true – whether the DAO "carefully reviewed" Wharton's claim – it would have been compelled to deny Rule 11 sanctions.

Third, the District Court's sanctions decision was fundamentally flawed because the evidence of the escape was of limited value. The escape attempt occurred while Wharton was in county, not state DOC custody, over 33 years prior to the concession. He later had a five-year favorable record in state custody prior to the resentencing hearing. *See Commonwealth v. Hughes,* 865 A.2d 761, 797 & n.40 (Pa. 2004) (evidence of prior assault would not have been admissible to rebut mitigating evidence of intellectual deficits and a history of parental abuse; "The

---

[19]    The District Court relied on this limited testimony and did not inquire further into the scope and nature of the DAO's review. The DAO properly asserted a deliberative-process privilege objection to any deeper inquiry. A284-85, A309-15. *See Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 853 (3d Cir. 1995) ("The deliberative process privilege permits the government to withhold documents containing confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice." (cleaned up)). Rule 11 does not require a party or attorney to waive a privilege in defending a Rule 11 inquiry. Fed. R. Civ. P. 11 adv. cte. notes 1983 amend. ("The rule does not require a party or an attorney to disclose privileged communications or work product in order to show that the signing of the pleading, motion, or other paper is substantially justified.").

appropriate scope of rebuttal has always been defined according to the evidence that it is offered to rebut."). The escape attempt in county custody has minimal relevance to Wharton's adjustment to state custody.

One further critical point firmly establishes that Wharton's escape attempt was not deemed important throughout the long history of this case: The prior DAO administrations in 26 years of litigation – first seeking, and then seeking to uphold, the death penalty – never argued that his escape attempt undermined the prejudice element of the ineffectiveness claim. Most important, the DAO did not use this evidence at Wharton's 1992 death penalty hearing, even though it was admissible to rebut the good character testimony presented as mitigation by Wharton. That hearing was much closer in time to the escape attempt, and it is hard to imagine that it escaped the attention of the prosecutors. Notably, while the District Court opined from its vantage point thirty-six years later that a prosecutor intent on securing the death penalty would surely regard this as "powerful anti-mitigation evidence," A54, it ignored the fact that the prosecutors only six years after the escape attempt – who the Court noted were vigorously seeking the death penalty – did not present this evidence. Thus, virtually by definition, the escape attempt had limited, if any, relevance to the issue on which the DAO conceded relief.

Significant also is that the District Court issued a certificate of appealability on the ineffectiveness claim. That is appropriate only if Wharton made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In other words, by the District Court's own telling, a prosecutor or a judge could reasonably conclude that the escape evidence did not require denial of the *Strickland* prejudice claim.[20]

In sum, the DAO's statements were not factual contentions amenable to Rule 11 sanctions, were true, and concerned an escape attempt that was not material to the habeas claim at issue. The District Court nonetheless concluded – without further explanation – that "the violation [of Rule 11] was sufficiently 'egregious' and 'exceptional' under the circumstances of this case to warrant [*sua sponte*] sanctions under Rule 11." A67. The District Court plainly erred in reaching that result.[21]

---

[20]   The District Court also erroneously imposed sanctions because Appellants provided the Court with an unsigned joint proposed order in which the Court could have found that *the Court* had conducted "a careful and independent review." A46, A54. But a proposed order is an unsigned paper and, therefore, not subject to Rule 11. *See Snow Machines, Inc. v. Hedco, Inc.*, 838 F.2d 718, 726 (3d Cir. 1988) ("We also have no occasion to decide whether Rule 11 applies to proposed orders, since appellant does not pursue this contention on appeal. We observe, however, that there are substantial reasons to believe that it does not.").

[21]   *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1279 (3d Cir. 1994) ("[A] signer making an inadequate inquiry into the sufficiency of the facts

### 2. The Central Question in the Reasonableness Inquiry Under Rule 11(b)(3) Is not Whether the Notice of Concession Was Reasonable, but Whether the DAO Had a Basis to State that the Capital Case Review Committee Had Engaged in a "Review" of the Merits

The District Court erred in conflating the merits of whether the CCRC should have conceded Mr. Wharton's ineffectiveness claim with the evidentiary basis for the DAO lawyer's statement in the Notice and April 3 brief. In assessing whether the statements are sanctionable under Rule 11(b)(3), the District Court's focus on the former rather than the latter reflects the District Court's disagreement with the DAO's policy and practice in conceding habeas relief in certain death penalty cases.[22]

---

and law underlying a document will not be saved from a Rule 11 sanction by the stroke of luck that the document happened to be justified."), which the District Court cited, A63, is not to the contrary. Here, it is not a mere stroke of luck that the statements are correct. Appellants undertook a reasonable inquiry and the statements that the DAO reviewed the underlying case and communicated with the victims' family had evidentiary support. *See supra,* Concise Statement of the Case part II; *infra* Part I.D.

[22] Neither the Rules of Professional Conduct nor Rule 11 sanctions should be used as a weapon to resolve policy differences. *See* Renee Knake Jefferson, *Lawyer Lies and Political Speech*, 131 Yale L.J. Forum 114, 138 (2021) (stating that "bar authorities and regulators should take caution to ensure that the lawyer discipline system is not weaponized against disfavored political alliances or causes"); *Smith v. Morrison*, 47 A.3d 131, 135 (Pa. Super. 2012) ("[T]he purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons." (quoting the preamble to the Pa. R. Prof. Conduct)).

The DAO lawyers made an ample inquiry that fully supports that the DAO conducted a review and it was careful. *See supra* at 39-40. The District Court's disagreement with the DAO's position – i.e., that the Office should not have conceded Mr. Wharton's ineffectiveness claim – cannot serve as a basis for sanctions. *Alston v. Speigel (In re Ames)*, 993 F.3d 27, 35 (1st Cir. 2021) ("The mere fact that a claim ultimately proves unavailing, without more, cannot support the imposition of Rule 11 sanctions.") (cleaned up); *Dawson v. United States,* 68 F.3d 886, 896 (5th Cir. 1995) ("[N]eedless to say, a district court's disagreement with the merits of a position asserted in good faith by counsel cannot serve as the basis for sanctions.").

The District Court's disagreement with the DAO's position on Mr. Wharton's habeas claim arises in part from the Court's reading of the Pennsylvania Supreme Court's decision in *Commonwealth v. Brown*, 196 A.3d 130, 144 (Pa. 2018), and this Court's prior decision in *Wharton*. The District Court asserted that the DAO "ignored [*Brown* and *Wharton*] or, perhaps worse, intentionally chose not to follow them." A45. In *Brown,* the DAO and the capital defendant filed a joint motion in the Supreme Court to vacate a death sentence, but the DAO provided no legal reason as to why the final judgment of sentence was unconstitutional or otherwise

impermissible. In that context, the Supreme Court ruled that, without a finding of legal error, "neither the parties, by agreement, nor this Court...have the power or ability to order that the jury's verdict be commuted to a life sentence without parole." *Brown*, 196 A.3d at 144.

The District Court (mis)interpreted *Brown* to preclude a reversal of a jury's death sentence verdict unless and "until *all* facts are placed on the table so that a fully-informed judge, not the District Attorney, can make the decision as to whether a decades-old verdict should be set aside." A44-46 (emphasis in original). But *Brown* held only that a confession of error without identifying and showing a legal error in the lower court "does not relieve [the] Court of the performance of the judicial function." *Brown*, 196 A.3d at 148 (quoting *Young v. United States,* 315 U.S. 257, 258-59 (1942)). A prosecutor may "attempt[], through the exercise of effective advocacy, to persuade the courts to agree that error occurred as a matter of law," *id.* at 146, but the court must "examine independently the errors confessed." *Id.* at 148 (quoting *Young*, 315 U.S. at 258-59). Appellants followed that guidance by basing the concession on the specific ground that Wharton was denied the effective assistance of counsel and by agreeing that the District Court had the independent power both to reject the concession and to hold a hearing on the claim. A115-17.

With respect to this Court's decision remanding the Sixth Amendment claim, the District Court erred in ruling that this Court's instruction that any hearing must take into account both the mitigation evidence that would have been presented by Wharton and the "anti-mitigation evidence that the Commonwealth would have presented [in rebuttal]," *Wharton*, 722 F. App'x at 282-83 (quoting *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011)), precluded a concession of the claim.

The Notice of Concession was not, as the District Court appears to have believed, a defiance of the remand mandate. This Court directed only *how* Wharton's remaining claim should be assessed *by the District Court* if a hearing were to be held. This Court did not preclude the DAO from conceding the claims, and it did not address the issue of the contents of any such concession. On remand, the District Court and the parties were in the same position as they were before this Court addressed this habeas claim, and nothing prevented the DAO from conceding a legal issue that would narrow or moot the need for an evidentiary hearing. Of course, as the DAO agreed, A117, the District Court was fully empowered to hold an evidentiary hearing on the issue (and it did so) regardless of any concession.

Neither *Brown* nor *Wharton* precluded the DAO from conceding relief or otherwise changing its legal position, required the DAO to present

any evidence – pro or con – in the Notice or at any time prior to a hearing, required the DAO to take the matter to a hearing, or prevented the Court from holding a hearing. The District Court's refusal to recognize that nothing precluded the DAO from conceding relief demonstrates that the Court's primary concern was the merits of the DAO's decision, not the validity of the DAO's pleadings under Rule 11, requiring reversal of the Rule 11 sanctions.

### D. The Statement that the DAO Had Communication with the Victims' Family Was Not "Patently Frivolous or Unmeritorious" and Was True

The District Court's sanction for the statement that the DAO had "communication with the victim's family" similarly rests on false premises. As with the statements concerning the DAO's review, we start with the words of the statement: The DAO wrote that it had "communication with the victim's family." A95. That statement does not say with whom the communications were made. Nor does it say how many family members were contacted. And – pointedly – it does not in any way characterize what the DAO said to the family or what the family said to the DAO.

Measuring the words of the statement – "communication with the victim's family" – against the undisputed record facts, the statement is

wholly accurate.[23] The undisputed facts are that in December 2018, the DAO's Victim/Witness Coordinator contacted David "Tony" Hart; Mr. Hart said "he did not feel a certain way about the death penalty but was adamant that [Wharton] not be released"; and he said he would talk to his family, including Lisa Hart, the surviving victim, and provide the Coordinator's contact information. A122-23. In January 2019, the coordinator informed Tony Hart that the DAO intended to agree to death penalty relief. A123. In response, Mr. Hart stated that he and his brother would like to attend the hearing. *Id.* That is communication with the victim's family. The statement was accurate. That should be the end of the inquiry.

The District Court erred in nonetheless sanctioning Appellants because, it says, the DAO's statement "communication with the victims' family" left him with "the unmistakable impression...that the victims' family had agreed with the District Attorney's change of position." A38; *see also* A61. That cannot be a basis for sanctions. There is a chasm between the text of the statement and the District Court's "impression." The statement says nothing – directly or indirectly – about whether the victims'

---

[23]  Of course, the burden for imposing sanctions is much higher, as the District Court must demonstrate that the phrase "communication with the victim's family" is "patently unmeritorious or frivolous."

family agreed with the concession. That should come as no surprise, as the victims' family's views are irrelevant to the merits of Mr. Wharton's claim and the decision whether to accept or reject the DAO's concession. A10 n.3 (noting that "the victims' family's testimony has no bearing on the merits of Wharton's Sixth Amendment claim"); *see also Commonwealth v. Rega*, 933 A.2d 997, 1022 (Pa. 2007) ("Victim impact evidence was inadmissible under the procedures established by the Sentencing Code, 42 Pa. C.S. § 9711, prior to its amendment on October 11, 1995.").[24]

A final note. As the DAO has acknowledged, more or different communications with the surviving victim and the rest of the victims' family could have been done. Ms. Winkelman, for example, agreed it "would have been appropriate" to contact the surviving victim, Lisa Hart. A323. But that acknowledgment is irrelevant to any sanctions issue. It does

---

[24] The District Court also stated, "[had] these facts, readily obtainable, been known to me, they could have been material to my decision regarding what weight to give the District Attorney's concession of Wharton's habeas petition." A41-42. However: (1) Appellants had no knowledge as to what weight the District Judge might give to the victims' family's views; (2) the District Court's Memorandum and Order on the Notice did not request any information regarding the content of the communication with the victim's family; and (3) as noted above, the family's views were irrelevant to the merits of Mr. Wharton's claim and the decision whether to accept or reject the DAO's concession.

not make the statement that there was "communication with the victims' family" untrue, let alone "patently unmeritorious or frivolous."

In sum, the District Court erred in sanctioning Appellants based on the Court's own misimpression of Appellants' statement, not an interpretation of Appellants' actual statement. Appellants doubtless are accountable for the words they use. But, here, they were sanctioned for the Court's misimpressions, untethered from the DAO's words. That is error and should be reversed.

## II.   **THE DISTRICT COURT'S ORDER VIOLATED APPELLANTS' DUE PROCESS RIGHTS BY FAILING TO TRANSFER THIS MATTER TO THE CHIEF JUDGE IN VIOLATION OF LOCAL CIVIL RULE 83.6 AND REPEATEDLY SHIFTING THE NATURE OF PROCEEDINGS**

The District Court's sanctions should be reversed because the Court's Orders deprived Appellants of their right to due process by failing to follow the governing Local Rule 83.6(V), which mandates referral of disciplinary matters to the Chief Judge, and by shifting among various targets and grounds for discipline as the matter proceeded. As this Court has ruled, "[w]hen the procedure the court uses to impose sanctions raises due process issues of fair notice and the right to be heard, the standard of review is plenary." *Adams v. Ford Motor Co.,* 653 F.3d 299, 304 (3d Cir. 2011) (citing *Martin v. Brown*, 63 F.3d 1252, 1262 (3d Cir. 1995)).

Transfer of the disciplinary matter was required because the District Judge identified a potential breach of Appellants' duty of candor. Local Rule 83.6(V)(A) states:

> When the misconduct or other basis for action against an attorney (other than as set forth in Rule II) or allegations of the same *which, if substantiated, would warrant discipline or other action against an attorney* admitted to practice before this court shall come to the attention of a Judge of this court, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these Rules, *the judge shall refer the matter to the Chief Judge* who shall issue an order to show cause.

L. Civ. R. 83.6, at V(A) (emphasis added). The Rule is intended to protect attorneys from public accusations and hearings by the accusing judge. A hearing is proper only before a three-judge panel with the confidentiality protections provided in the Local Rule.[25]

---

[25]  Other judges in the Eastern District have referred matters to the Chief Judge pursuant to the Local Rule. *See, e.g.*, *Woosley v. U.S. District Court, Dist. of Conn.*, 2016 WL 4247561, at *12 (E.D. Pa. Aug. 10, 2016) (referring attorney's "repeated abuse of the legal system" to Chief Judge under this Local Rule); *cf. Rhedrick v. Option One Morg. Corp.*, 2015 WL 3871593, at *4-5 (E.D. Pa. June 22, 2015) (finding that attorney had not been *de facto* sanctioned, in part because there were no factual findings of misconduct per Local Rule 83.6(V)).

The District Court's "preliminary conclusions" of the DAO's alleged breach of the duty of candor, A42, triggered the Rule. Its subsequent rulings and statements confirmed the duty of referral:

- The May 13 Order identified "a possible breach of the duty of candor." A126.

- The May 26 Order required the Supervisor of the Federal Litigation Unit, who signed the Notice, to attend the hearing, citing Fed. R. Civ. P. 11(b)(2)-(4). A132.

- The Court's June 22 Order rejected Appellants' request for a referral to the Chief Judge, even though ethical violations were alleged. A273.

- The Court stated at the June 23 hearing that it intended to explore "a concern that I have raised regarding [DAO's] litigation conduct…as it relates to their obligation to be candid [and whether] there should be any type of sanctions levied, based on my independent authority to oversee the case." A278.

A district court is "obliged to follow its own procedural rules." *Matter of Abrams,* 521 F.2d 1094, 1104 (3d Cir. 1975). That is particularly important when it comes to attorney disciplinary matters, which can have profound consequences for a lawyer's professional reputation. In *Adams,* this Court reversed a district court order that an attorney violated rules of professional conduct "for failing to follow the local rules." 653 F.3d at 308; *see also Weissman v. Quail Lodge, Inc.,* 179 F.3d 1194, 1199 (9th Cir. 1999) ("The district court did not observe its own rules [and therefore the attorney discipline] Order cannot stand"); *Matter of Thalheim,* 853 F.2d

383, 386 (5th Cir. 1988) ("It is well-settled that federal district courts are bound by their own disciplinary rules when proceeding against attorneys for violation of ethical standards."); *cf. Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) ("A liberty interest may arise from...an expectation or interest created by state laws or policies."). The District Court's failure to follow its own Local Rule is reversible error.

Moreover, the constantly shifting focus of the District Court's inquiry itself deprived Appellants of due process. Initially, the Court stated it had reached a "preliminary conclusion" that the DAO breached the ethical duty of candor, without saying anything about Rule 11. A42. A month later, at the June 21 telephone conference, the District Judge emphasized that he "wanted to...not surprise anyone" and that "it's a very discrete issue we're going to talk about [at the Show Cause Hearing], which is a possible *breach of the duty of candor* on the part of the" DAO. A260-61 (emphasis added).

The day before the hearing, the District Court entered an order stating that the hearing – which resulted in Rule 11 sanctions – would focus on the Court's concerns about the DAO's process, which would "be addressed *independent and irrespective of any disciplinary matters* that may stem from it...." A274 (emphasis added). The District Court acknowledged that sanctions proceedings would need to be referred to the

Chief Judge, but that any such referral was "premature." A274. The Court

mistakenly asserted that because "no sanctions have been imposed…

*Adams* does not require that this matter be referred to the Chief Judge at

this time." A274. To the contrary, the Local Rule already required referral

to the Chief Judge well before that point.

Nonetheless, when the District Court commenced the show-cause

hearing the following day, the Court stated it was considering sanctions:

"We are here for an exploration of a concern I have raised regarding [the

DAO's] litigation conduct…as it relates to their obligation to be candid with

the Court…*and also whether, separately, there should be any type of*

*sanctions levied….*" A278 (emphasis added). The District Court provided no

pre-hearing notice of its intent to sanction the Appellants, let alone the

required "particularized notice…of the precise sanctioning tool that the

court intends to employ." *Adams*, 653 F.3d at 308.

If the District Judge had simply referred the matter to the Chief Judge

on May 11, 2022, as required by Rule 83.6(V), there would have been no

need for shifting justifications for the proceedings, and the process would

have protected the Appellants' rights. Before a neutral, three-judge panel –

instead of the judge accusing the Appellants of violation[26] – Appellants would have had a fair opportunity to consider how to respond to the District Court's accusation, such as by deciding whether and to what extent to assert a deliberative-process privilege objection to the inquiry. By repeatedly shifting its reasoning and failing to follow the Local Rule, the District Court committed reversible error.

---

[26] *See Mackler Prods., Inc. v. Cohen,* 146 F.3d 126, 128 (2d Cir. 1998) ("A troublesome aspect of a trial court's power to impose sanctions…is that the trial court may act as accuser, fact finder and sentencing judge, not subject to restrictions of any procedural code and at times not limited by any rule of law governing the severity of sanctions that may be imposed.").

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this

Court reverse the District Court's order and vacate the opinion.

Respectfully submitted,


KAIRYS, RUDOVSKY,
MESSING, FEINBERG & LIN

By: */s/ David Rudovsky*
    David Rudovsky (No. 15168)
    drudovsky@krlawphila.com
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

By: */s/ John S. Summers*
    John S. Summers (No. 41854)
    jsummers@hangley.com
    Matthew A. Hamermesh (No.
    82313)
    mah@hangley.com
    Andrew M. Erdlen (No. 320260)
    aerdlen@hangley.com
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
(215) 568-6200

*Counsel for Appellants Philadelphia
District Attorney's Office, Paul
George, and Nancy Winkelman*

Dated: January 23, 2023

## COMBINED CERTIFICATIONS

Pursuant to Fed. R. App. P. 32(g) and L.A.R. 28.3(d), 32.1, and 46.1, I, the undersigned, hereby certify that:

1.    I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

2.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i). Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,502 words. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

3.    This brief complies with the typeface and type style limitation of Fed. R. App. P. 32(a)(5) and (6). The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Georgia font.

4.    In addition, pursuant to Third Circuit Local Appellate Rule 31.1(c), the text of the brief filed with the Court via CM/ECF is identical to the text of the paper copies.

5.     The electronic version of the brief has been scanned for viruses by SentinelOne v 21.5.7.370 and Trend Micro ApexOne v14 (updated continuously) and is, according to that program, free of viruses.

6.     On January 23, 2023, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.


Dated: January 23, 2023            */s/ John S. Summers*
                                   John S. Summers (PA 41854)

No. 22-2839
CAPITAL CASE

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

ROBERT WHARTON, Petitioner,

v.

DONALD T. VAUGHN, Respondent.

Appeal of The Philadelphia District Attorney's Office,
Paul George, and Nancy Winkelman

Appeal from the Order entered on September 12, 2022, in the
United States District Court for Eastern District of Pennsylvania
in Civil Action No. 2:01-cv-06049-MSG

APPENDIX
VOLUME I OF II
PAGES A1-A71

KAIRYS, RUDOVSKY,
MESSING, FEINBERG & LIN
David Rudovsky (No. 15168)
drudovsky@krlawphila.com
718 Arch Street,
Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
John S. Summers (No. 41854)
jsummers@hangley.com
Matthew A. Hamermesh
(No. 82313)
mah@hangley.com
Andrew M. Erdlen (No. 320260)
aerdlen@hangley.com
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200

Dated: January 23, 2023          *Attorneys for Appellants*

# APPENDIX

## VOLUME I

Notice of Appeal to Third Circuit Court of Appeals, dated
September 30, 2021 (D. Ct. ECF No. 317)................................. A1

Memorandum Opinion, Hon. Mitchell S. Goldberg, dated
May 11, 2022 (D. Ct. ECF No. 284) .......................................... A3

Opinion, dated September 12, 2022 (D. Ct. ECF No. 314) ....................... A43

Order, dated September 12, 2022 (D. Ct. ECF No. 315)............................ A71

## VOLUME II

Docket entries from *Robert Wharton v. Superintendent Graterford
SCI, et al.*, United States District Court for the Eastern District of
Pennsylvania, Civil Action No. 2:01-cv-06049-MSG ........................... A72

Notice of Concession of Penalty Phase Relief, dated February 6, 2019
(D. Ct. ECF No. 155) ................................................................. A93

Order in Notice of Joint Filing of Proposed Order, dated
February 8, 2019 (D. Ct. ECF No. 156-1) ................................. A98

Memorandum Opinion, Hon. Mitchell S. Goldberg, dated
March 4, 2019 (D. Ct. ECF No. 160) ....................................... A99

Order, Hon. Mitchell S. Goldberg, dated March 4, 2019
(D. Ct. ECF No. 161)................................................................ A111

Respondent's Brief in Response Letter Response to Court Order of
March 4, 2019, dated April 3, 2019 (D. Ct. ECF No. 162)..................... A113

Order Denying Petition for Writ of Habeas Corpus, Hon. Mitchell S.
Goldberg, dated May 11, 2022
(D. Ct. ECF No. 285)................................................................ A120

Affidavit of Heather Wames, Victim/Witness Coordinator, Law
Division of the Philadelphia District Attorney's Office, Ex. A for
Reply to Attorney General's Amicus Brief, dated August 1, 2019
(D. Ct. ECF No. 176-2) .......................................................... A122

Order Scheduling Rule to Show Cause Hearing for June 2, 2022,
dated May 13, 2022 (D.Ct. ECF No. 286) ........................... A126

Affidavit of Max C. Kaufman, Esq., in the District Attorney Office's
     Motion to Excuse and Continue Hearing, dated May 24, 2022
     (D. Ct. ECF No. 287-1)............................................................................A127

Order Postponing Hearing until 6-10-2022, dated May 26, 2022
     (D. Ct. ECF No. 288) ............................................................................ A132

Philadelphia District Attorney's Office's Motion to Cancel Scheduled
     Evidentiary Hearing & Dismiss Allegations of Sanctionable
     Conduct, with Exhibits 7 and 10, dated June 17, 2022 (D. Ct. ECF
     No. 300)................................................................................................ A134

     Exhibit 1, Memorandum Opinion, Hon. Mitchell S.
          Goldberg, dated May 11, 2022 ....................................... *see* A3

     Exhibit 2, Order Scheduling Rule to Show Cause Hearing
          for June 2, 2022, dated May 13, 2022 ........................*see* A126

     Exhibit 3, Order Postponing Hearing until 6-10-2022,
          dated May 26, 2022 ....................................................*see* A132

     Exhibit 4, Order Granting Motion to Continue Hearing
          to June 23, 2022, dated June 6, 2022 ........................ Omitted

     Exhibit 5, Notice of Concession of Penalty Phase Relief,
          dated February 6, 2019 ................................................ *see* A93

     Exhibit 6, Respondent's Brief in Response Letter
          Response to Court Order of March 4, 2019, dated
          April 3, 2019................................................................ *see* A113

     Exhibit 7, Compilation of Concession Documents...............A179

     Exhibit 8, Memorandum Opinion, Hon. Mitchell S.
          Goldberg, dated March 4, 2019 ................................... *see* A99

     Exhibit 9, Order, Hon. Mitchell S. Goldberg, dated
          March 4, 2019 ...........................................................*see* A111

     Exhibit 10, Expert Report of Professor Bruce A. Green,
          dated June 16, 2022.........................................................A248

     Exhibit 11, Philadelphia District Attorney Office's Motion
          to Exclude Max Kaufman from the June 2, 2022
          Hearing, and Motion to Continue Hearing, dated
          May 24, 2022 ............................................................. Omitted

Exhibit 12, Affidavit of Max C. Kaufman, Esq., in the
   District Attorney Office's Motion to Excuse and
   Continue Hearing, dated May 24, 2022 .................... *see* A127

Exhibit 13, Philadelphia District Attorney Office's
   Response to Commonwealth's Post-Hearing Brief,
   dated September 30, 2021 ......................................... Omitted

Exhibit 14, Affidavit of Heather Wames, Victim/Witness
   Coordinator, Law Division of the Philadelphia District
   Attorney's Office, Ex. A for Reply to Attorney General's
   Amicus Brief, dated August 1, 2019 ........................... *see* A122

Transcript of the Telephone Conference Hearing Before the
   Honorable Mitchell S. Goldberg, United States District Court
   Judge, on June 21, 2022 ........................................................ A257

Order Denying DAO's Motion to Cancel 7-23-2022 Hearing, dated
   June 22, 2022 (D. Ct. ECF No. 304) .................................... A273

Transcript of Motion to Show Cause Hearing held on June 23, 2022
   (D. Ct. ECF No. 309) ............................................................ A276

Philadelphia District Attorney Office's Supplemental Memorandum
   in Opposition to the Imposition of any Sanctions, dated July 14,
   2022 (D. Ct. ECF No. 312).................................................... A380

Notice of Apology Letters from District Attorney Larry Krasner to
   the victims' family, dated October 11, 2022
   (D. Ct. ECF No. 319) ............................................................ A397

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ROBERT WHARTON, | CIVIL ACTION |
| Petitioner, |  |
| v. | No. 2:01-cv-06049-MSG |
| DONALD T. VAUGHN, |  |
| Respondent. | CAPITAL CASE |

### NOTICE OF APPEAL

Notice is hereby given that Respondents The Philadelphia District Attorney's Office, Paul George, and Nancy Winkelman hereby appeal to the United States Court of Appeals for the Third Circuit from the Order entered in the above-captioned action on September 12, 2022.  (ECF No. 315)

Dated:  September 30, 2022

KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN

By: */s/ David Rudovsky*
    David Rudovsky (No. 15168)
    drudovsky@krlawphila.com

718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

By:  */s/ John S. Summers*
     John S. Summers (No. 41854)
     jsummers@hangley.com
     Andrew M. Erdlen (No. 320260)
     aerdlen@hangley.com

One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
(215) 568-6200
*Counsel for Respondent The Philadelphia District Attorney's Office*

**A1**

## CERTIFICATE OF SERVICE

I, John S. Summers, hereby certify that on September 30, 2022, I caused the

foregoing Notice of Appeal to be served on the following counsel of record via ECF:

James P. Barker
Cari Mahler
Pennsylvania Office of Attorney
General
16th Floor-Strawberry Square
Harrisburg, PA 17120

Elizabeth McHugh
Claudia Van Wyk
Federal Community Defender Office
Capital Habeas Corpus Unit District
Attorney's Office
601 Walnut Street, Suite 545 West 3
South Penn Square
Philadelphia, PA 19106

*/s/ John S. Summers*
John S. Summers

*Counsel for Respondent The Philadelphia District
Attorney's Office*

**A2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT WHARTON,** | |
| *Petitioner*, | **Civil Action** |
| *v.* | **No. 01-cv-6049** |
| **DONALD T. VAUGHN,** | |
| *Respondent.* | |

**GOLDBERG, J.**                                                     **May 11, 2022**

<u>**MEMORANDUM OPINION**</u>

In this ongoing federal death penalty habeas matter, Petitioner Robert Wharton, now joined by the Philadelphia District Attorney's Office, advocates that I vacate a jury's sentence of death, affirmed decades ago by the Pennsylvania Supreme Court. Both Wharton and the District Attorney assert that such relief should be granted because trial counsel was ineffective for failing to offer positive prison adjustment evidence during the death penalty phase of Wharton's trial. Both Wharton and the District Attorney take this position despite the fact that had trial counsel presented such mitigation evidence, Wharton's premeditated escape from a City Hall courtroom and his subsequent fashioning of escape tools in prison would also have been presented in rebuttal to the sentencing jury.

After considering the record developed during hearings on Wharton's habeas petition, and having reviewed the matter's entire history, I conclude that there is no reasonable probability that, but for counsel's alleged deficient performance, one juror would have voted to impose a life, rather than a death sentence.

**A3**

This Opinion sets forth the basis for my denial of Wharton's ineffective assistance of counsel claim and also addresses an issue of possible lack of candor to the Court on the part of the Philadelphia District Attorney's Office.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Overview

Wharton received the death penalty in 1985 after he and his co-defendant forced their way into the home of Bradley and Ferne Hart at knifepoint and strangled the Harts to death. Wharton and his co-defendant then turned off the heat and abandoned the Harts' infant, Lisa, to freeze to death. Lisa was found two days later suffering from dehydration but miraculously survived.

Before me on remand from the United States Court of Appeals for the Third Circuit is Wharton's single, remaining ineffective assistance of counsel claim for death penalty habeas corpus relief. Wharton seeks to vacate his two death sentences because his trial counsel was allegedly ineffective for failing to present evidence of Wharton's alleged positive adjustment to prison at the penalty phase of his state court proceeding. I had previously decided that a hearing on this claim was unnecessary because Wharton had failed to make a prima facie showing of a Sixth Amendment violation. The Third Circuit disagreed and remanded the matter, directing that I hold an evidentiary hearing.

After I attempted to schedule this hearing, the District Attorney's Office, which had zealously defended Wharton's death sentence for decades, changed its position and advised that it now believed a Sixth Amendment violation had occurred and that it joined with Wharton in his requested relief. For reasons explained below, I invited the Pennsylvania Office of the Attorney General to participate in the evidentiary hearings so that I would have the benefit of a developed

factual record. These hearings were held on February 25, 2021, March 8, 2021, March 16, 2021, May 11, 2021, and August 5, 2021.

**B.    Wharton's Penalty Hearing and Death Sentence**

Wharton was first sentenced to death on July 5, 1985, but that sentence was vacated due to a jury instruction error. See Commonwealth v. Wharton, 607 A.2d 710, 721-24 (Pa. 1992). At Wharton's second penalty hearing in 1992, held seven years after the first, the Commonwealth presented evidence of the history between Wharton and the Hart family, including his participation in burglaries of the Hart home on August 14, 1983 and August 22, 1983 and a September 6, 1983 burglary of the Germantown Christian Assembly Church, where Bradley Hart worked. (See Aug. 16, 2012 Mem. Opinion, ECF No. 126, at 107.) The jury also heard the grisly evidence regarding Wharton's involvement in the murders of Bradley and Ferne Hart. (See id.)

In support of life imprisonment, Wharton's trial counsel, William Cannon, offered evidence of his character from his family members, including the testimony of his mother, brother, sister, aunt, cousin, and brother-in-law. They testified that Wharton was a good family member and community member; that he was kind, humble, athletic, loving, loveable, and "good with his hands"; and that he had accepted religion into his life. (See ECF No. 126 at 107; N.T., 02/25/21, 123:7-15, 125:4-126:16.)

Based upon this evidence, the jury found two aggravating circumstances: that Wharton committed a killing while perpetrating a felony (a robbery), 42 Pa. Con. Stat. § 9711(d)(6), and that Wharton had been convicted of another offense punishable by life imprisonment or death (that is, Wharton committed two homicides), 42 Pa. Con. Stat. § 9711(d)(10). The jury also found certain mitigating circumstances under the Pennsylvania statute's "catch-all" provision, 42 Pa. Con. Stat. § 9711(e)(8), including that Wharton "did not murder Lisa Hart," was a good family

member, and cooperated with police.[1] (N.T., 02/25/21, 121:7-13.) The jury concluded that the aggravating circumstances outweighed the mitigating circumstances and, on December 23, 1992, returned a verdict of death on each murder count.

###    C.    PCRA Proceedings

Following an unsuccessful direct appeal, Wharton petitioned for relief under Pennsylvania's Post Conviction Relief Act (PCRA). Among other arguments, Wharton contended that his trial counsel was ineffective at the second penalty hearing for failing to obtain and present evidence reflecting Wharton's positive adjustment to prison life during the seven years between the two penalty hearings.

The PCRA court rejected Wharton's petition and the Pennsylvania Supreme Court affirmed, finding that Wharton had not shown either that counsel's performance was deficient or that Wharton was prejudiced by the failure to offer prison adjustment evidence. Commonwealth v. Wharton, 811 A.2d 978, 981 (Pa. 2002). Regarding deficient performance, the Pennsylvania Supreme Court decided that counsel did not act unreasonably by failing to present evidence of prison adjustment because the evidence was not "sterling" and "cut both ways." Id. at 988-89. Regarding prejudice, the court found that prison adjustment evidence could not have aided Wharton's case for life imprisonment because the evidence supported only the "catch-all" mitigating factor that the jury in fact found. Id. at 989. As explained below, the Court of Appeals for the Third Circuit later found this analysis to be an unreasonable application of federal law. Wharton v. Vaughn, 722 F. App'x 268, 281-84 (3d Cir. 2018).

---

[1]    "Mitigating circumstances shall include … [a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa. Con. Stat. § 9711(e)(8).

D.    **Wharton's Federal Habeas Petition**

Following the conclusion of the PCRA proceedings, Wharton filed federal habeas claims under 28 U.S.C. § 2254. On August 16, 2012, I issued an extensive opinion denying each of Wharton's twenty-three claims.

Wharton appealed, and in January 2018, the Court of Appeals for the Third Circuit affirmed twenty-two of those rulings and remanded for an evidentiary hearing on a single issue: Whether, under Strickland v. Washington, 466 U.S. 668 (1984), Wharton can establish that: (1) his counsel acted unreasonably by failing to investigate and/or present prison adjustment evidence; and (2) if so, there was a reasonable probability that at least one juror would have changed his or her vote if presented with prison records from the time between Wharton's death penalty hearings. Wharton v. Vaughn, 722 F. App'x 268, 281-84 (3d Cir. 2018).

The Third Circuit determined that the Pennsylvania Supreme Court used an "unreasonable application of Strickland" in affirming the denial of Wharton's PCRA petition and that Wharton was entitled to de novo review of the claim of counsel's failure to present prison records. Id. at 281. In considering whether Wharton had made a prima facie showing of a Sixth Amendment violation, the Third Circuit explained that Wharton's prison records from the time between his two penalty hearings could establish that he was adjusting well to prison life, and this may have affected the jury's sentence. The Third Circuit also noted that the prison records could "cut both ways" because "the Commonwealth might have countered with other evidence, including an expert holding a contrary opinion." Id. The Third Circuit thus determined that a hearing before me was necessary to resolve this remaining Strickland claim. Id. at 284.

Soon after remand, I scheduled a status conference with Wharton's counsel and the District Attorney to discuss the remand hearing process. On February 6, 2019, with little explanation, the District Attorney responded by filing a "Notice of Concession of Penalty Phase Relief," which in

pertinent part stated that the decision to concede was made "**[f]ollowing review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, communication with the victims' family, and notice to [Wharton's] counsel**." (Notice of Concession, ECF No. 155, ¶ 9.) This concession also advised that the District Attorney would not "seek new death sentences in state court" and that "the grant of sentencing relief on [Wharton's] penalty phase ineffectiveness claim in accordance with [the District Attorney's] concession would end the litigation of this case … and eliminate the need for … [further] proceedings in this Court." (Id. at ¶ 10-11.) The Notice provided no factual or legal analysis as to the District Attorney's basis for this complete about-face, and no explanation as to why, after decades of advocating for the death penalty, the District Attorney had now reached the conclusion that a Sixth Amendment violation had occurred due to a failure on trial counsel's part to introduce positive prison adjustment evidence. And as will be explained infra, this concession notice was filed five months after the Pennsylvania Supreme Court had explicitly found, in a death penalty matter on collateral review, that the District Attorney does not maintain prosecutorial discretion to alter a capital jury's verdict via an agreement or by concession and that vacating a jury's death sentence should only occur after careful and independent judicial review. Commonwealth v. Brown, 196 A.3d 130, 144-46 (Pa. 2018)

The District Attorney's concession notice was followed by a draft order, submitted two days later, by Wharton's counsel and the District Attorney. This Order proposed that the death penalty sentence be vacated and suggested that I had undertaken a "careful and independent review of the parties' submissions and all prior proceedings in this matter," and had thus concluded that a Sixth Amendment violation had in fact occurred. (Proposed Order, ECF No. 156.) Because I had

received no facts or analysis which would allow me to undertake a "careful independent review" and grant such extraordinary relief, I declined to sign this proposed order.

Rather, given the Third Circuit's directive to hold a hearing and the District Attorney's unwillingness to fully explain its concession, and based upon my obligation to independently examine the remaining issue in this case that necessarily required a full exploration of facts,[2] I ordered the parties to provide a fulsome explanation justifying the relief requested. (March 4, 2019 Order, ECF No. 160.) The District Attorney responded that the jury's verdict and the Pennsylvania Supreme Court's affirmance of that verdict should be overturned because: de novo review was ordered by the Third Circuit; trial counsel had submitted a declaration "that he had no strategy for not presenting adjustment evidence"; and at one point the jury had been deadlocked. (ECF No. 162.) The District Attorney thus continued to decline or refused to provide me with any evidence of Wharton's positive prison adjustment, the crux of the matter before me, nor did it advise that there was any evidence to the contrary I should consider—e.g., negative prison adjustment.

Given the District Attorney's continued reluctance to provide me with a meaningful analysis regarding its concession, and my inability to properly explore this highly factual issue, I appointed the Pennsylvania Attorney General to investigate and provide, if available, evidence of Wharton's prison adjustment, including contrary facts. As will be detailed infra, the Attorney

---

[2]    In Sibron v. New York, 392 U.S. 40 (1968), the United States Supreme Court reasoned that "[i]t is the uniform practice of this Court to conduct its own examination of the record in all cases where the Federal Government or a State confesses that a conviction has been erroneously obtained." Id. at 58. Other precedent, including a recent pronouncement by the Pennsylvania Supreme Court, supports this conclusion. See Young v. United States, 315 U.S. 257, 258-59 (1942) ("[O]ur judicial obligations compel us to examine independently the errors confessed."); Commonwealth v. Brown, 196 A.3d 130, 141-49 (Pa. 2018) ("[I]f the 'power' of a court amounts to nothing more than the power 'to do exactly what the parties tell it to do, simply because they said so and without any actual merits review, it is not judicial power at all. It is a restriction on power.'").

General's investigation revealed significant negative prison adjustment evidence, including an attempted, planned escape from a City Hall courtroom and subsequent efforts to manufacture escape tools while in prison.

In addition, because the District Attorney cited communications with the victims' family members as a reason for its concession of death penalty relief, and because I have a statutory obligation in 28 U.S.C. § 2254 proceedings to afford victims an opportunity to be heard where sentencing or release is involved, I allowed that the parties and the Attorney General could introduce evidence of the District Attorney's communication with the victims' family members and the family's view on the proposed concession of relief. (Notice of Concession, ECF No. 155, ¶ 9.)

## II.   <u>**EVIDENCE PRESENTED AT THE HABEAS EVIDENTIARY HEARINGS**</u>

Hearings in this matter took place over the course of five days. During these proceedings, I heard testimony from multiple prison and psychiatric experts, Wharton's trial counsel, a former corrections officer assigned to Wharton's housing unit, a former Department of Corrections ("DOC") hearing examiner who reviewed one of Wharton's misconducts, and a former Philadelphia Assistant District Attorney who was present on the day of Wharton's escape from a Philadelphia Court of Common Pleas courtroom in 1986. I also heard testimony regarding the District Attorney's communications with the victims' family.[3]

I have considered the following facts in conjunction with Wharton's remaining Sixth Amendment claim. These facts cover Wharton's prison adjustment between the two jury verdicts sentencing Wharton to death, which is the relevant time period for purposes of Wharton's Sixth

---

[3]   As the victims' family's testimony has no bearing on the merits of Wharton's Sixth Amendment claim, it is discussed later in this opinion.

Amendment Claim. See Wharton, 722 F. App'x at 283 (analyzing "Wharton's prison records for the time between his two penalty hearings").[4]

### A. Trial Counsel's Investigation into Prison Adjustment

1.    Wharton's trial counsel, William Cannon, acknowledged that he did not investigate Wharton's prison adjustment in preparation for the penalty hearing. Cannon admitted there was no strategy involved in his decision not to request prison records and that it was "pure ignorance." (N.T., 02/25/21, 129:2-14.)

2.    Cannon had worked on four or five prior cases where his client faced a possible death penalty, but Wharton's case was the first time he had represented a client at the penalty phase of such a proceeding. (N.T., 02/25/21, 106-07.)

### B. Wharton's Adjustment to Incarceration: The 1986 Escape Attempt

3.    On April 21, 1986, less than a year after he was first sentenced to death (but before judgment of death was formally entered), Wharton was transported to City Hall in Philadelphia County to attend a sentencing hearing in an unrelated robbery case. (OAG Ex. 6.)

4.    When given an opportunity to address the court, Wharton stated:

> … I believe I did lose sight of reality and caused a lot of people pain and suffering. As you said, something went wrong somewhere. Unfortunately the family isn't here to accept my apology, but I'm sorry and any time I serve I will use to better myself.

(N.T., 04/21/1986, 36.)

5.    Shortly after making this statement, and while being transported from the second-floor City Hall courtroom to the seventh-floor "cell room," Wharton pushed the deputy sheriff transporting him into a closing elevator door and ran down the courthouse stairs from the second

---

[4]    The Attorney General investigated and presented all of the evidence regarding Wharton's negative prison conduct and adjustment.

to the first floor. (OAG Ex. 7.) To effectuate this escape, Wharton had used a key to open his handcuffs. (Id.) While Wharton was fleeing down a public stairwell toward the exit leading to the street, a deputy sheriff was forced to fire two shots at Wharton to prevent his escape, wounding Wharton in the left thigh. (Id.)[5]

6.     On December 3, 1986, as a result of this incident, Wharton pled guilty to escape. (OAG Exs. 11-12.)

**C.     Wharton's 1986 Classification Assessment**

7.     In July 1986, the Pennsylvania Department of Corrections ("DOC") performed a classification assessment for Wharton. The DOC's Classification Summary includes Wharton's account of the Hart murders:

> "In 1/84, two other guys and I burglarized a house in S. Phila. and robbed the owners. We took their car and were later arrested after one of the guys left his identification in the car. Police found the guy's cards. One guy got arrested, implicated me and I was arrested about 2 months later."

(OAG Ex. 39 at 4.)

8.     The Summary included a psychiatric report, which, consistent with the above, noted that Wharton "used a great deal of denial and rationalization." (OAG Ex. 39 at 8.) The report stated:

> [Wharton] impresses as a sociopath with dependent features and dissocial attitudes. He does not cope well with rejection and tends to cling to important

---

[5]     In a prior written order, I overruled Wharton's objection to admission of the facts underlying his escape as reflected in the 1986 arrest report. (ECF No. 227 ¶¶ 11-14.) When Wharton pleaded guilty to escape, he signed an acknowledgement that the "facts" of the crime had been read to him. (Id. ¶ 13.) I therefore ruled that, in 1992, the Commonwealth could have sought to introduce these facts as Wharton's adoptive admission. (Id. ¶ 14.)

Other details pertaining to Wharton's 1986 escape are set out in newspaper articles. As to these, I found that the articles were not admissible to prove the truth of the facts described therein. (Id. ¶ 20.) Rather, the newspaper articles were accepted only to show that the parties would have been aware of the facts contained in them when preparing for the 1992 sentencing hearing.

others. He does not trust authority figures and will not seek their help. He found acceptance among a group of his peers and was easily led by them.

(Id.)

9.    The Summary determined that Wharton was "an extremely high public risk because of his Murder detainer and because he admits attempting to escape from Sheriff's on 4/21/86." (OAG Ex. 39 at 4 (emphasis added).) The Summary also determined that Wharton was a "moderate institutional risk." (Id.)

### D.    Wharton's Prison Adjustment at SCI Huntington

10.    In September 1986, Wharton was placed at the Restricted Housing Unit ("RHU") at State Correctional Institution Huntington ("SCI Huntington"). (N.T., 02/25/21, 18:11; N.T., 02/25/21, 20:25-21:2.)

### 1.    Misconduct Findings

11.    While incarcerated at SCI Huntington, Wharton received six misconducts, the last occurring in 1992. (N.T., 02/25/21, 22:12-14; N.T., 05/11/21, 18:16-24.) None of Wharton's misconducts involved violence, and four were relatively minor. (N.T., 02/25/21, 22:14-23:10; N.T., 05/11/21, 19:2-5; N.T., 08/05/21, 42:2-11, 62:4-16.) However, two of Wharton's misconducts, described below, were considered by Huntington to be serious, involving implements of escape. (N.T., 02/25/21, 22:15-23:8; N.T., 03/16/21, 10:19-20; N.T., 05/11/21, 19:5-23; N.T., 08/05/21, 65:3-9.)

12.    On May 15, 1989, Daniel Hayes, a Corrections Officer assigned to the RHU, found two pieces of broken antenna in one of the holes in the wall behind Wharton's toilet where there was a bolt securing the toilet to the wall. (N.T., 03/16/21, 156:6-158:15; N.T., 03/16/21, 165:1-19.) The smaller piece of antenna was fashioned into the shape of a handcuff key. (Id.; OAG Ex. 17A.)

13.    Hayes had been employed at SCI Huntington for about five years and had used handcuffs and handcuff keys every day. (N.T., 03/16/21, 150:18-153:20.) The makeshift handcuff key found in Wharton's cell was the only time in Hayes's 28-year career that he had found a makeshift handcuff key that he thought "would work." (N.T., 03/16/21, 163:21-24.) Wharton's cell was a single cell that had been occupied only by him when Hayes found the makeshift handcuff key. (N.T., 03/16/21, 199:19-200:3; OAG Ex. 17C.)

14.    Hayes filed a misconduct report against Wharton for possessing implements of escape. (OAG Ex. 17A.) Hayes's report was reviewed and approved by the ranking corrections officer on duty, "C. Kyle." (Id.; N.T., 03/16/21, 160:15-161:8.) Hayes showed Kyle the pieces of antenna that he had found before Kyle "signed off" on the report. (N.T., 03/16/21, 160:15-161:8.) Kyle did not conduct an additional investigation of the incident. (N.T., 03/16/21, 172:19-23.) There is no evidence that Wharton had used or attempted to use the handcuff key. (N.T., 02/25/21, 27:2-7.)

15.    Wharton pled not guilty to the misconduct, arguing that another inmate in the cell before him must have hidden the antenna behind the toilet. (OAG Ex. 17B.)

16.    George Conrad was the hearing examiner with the Pennsylvania Department of Corrections in 1989 who presided over Wharton's misconduct hearing stemming from the makeshift handcuff key. (N.T., 03/16/21, 185, 190-91.) As reflected in the Disciplinary Hearing Report on Wharton's misconduct, Conrad found that the physical evidence "clearly represents a handcuff key. Conrad stated the key was found in a single cell occupied by Wharton for several months. It is more likely than not that the key was possessed and under the control of Wharton." (OAG Ex. 17C.) Conrad found Wharton guilty. (N.T., 03/16/21, 196.)

**A14**

17.    Conrad admitted that inmates can sometimes be taken out of their cells unexpectedly with no time to gather any contraband, and, at the time of the hearing, there was no evidence presented regarding when the toilet mounting in Wharton's cell had been searched prior to May 15, 1989. (N.T., 03/16/21, 209:15-210:9; N.T., 03/16/21, 211:18-212:2.) However, as the Attorney General's corrections expert, Jeffrey Beard, testified, each RHU cell is searched before a new inmate is moved into it. (N.T., 05/11/21, 40:8-41:14.)

18.    Four days after the May 15, 1989 search of Wharton's cell and finding of a handcuff key, Wharton's cell was searched again, and an additional four-inch piece of antenna was found hidden in the binding of Wharton's legal material. (OAG Ex. 19A.) Wharton was again found guilty of possessing implements of escape. (OAG Ex. 19C.) The hearing examiner at Wharton's second misconduct hearing in 1989 noted that Wharton, again, denied that the piece of antenna was his, stating that he had "no idea" where the corrections officer found it. (OAG Ex. 19B.) The hearing examiner explained: "[T]he reporting officer specifically found the piece of antenna in [Wharton's] legal material binding. Wharton is in a single cell and has sole control over his possessions. … Also noted that a handcuff key was fashioned out of such a piece [of] material in the past by Wharton." (OAG Ex. 19B.)

19.    According to the Department of Correction's Policy Statement on Inmate Disciplinary and Restricted Housing Procedures, possession of contraband/implements of escape is a Class 1, Category B misconduct. (OAG Ex. 27; N.T., 05/11/21, 43:5-44:2.) The only misconducts more serious than implements of escape, which are in Category A of the Class 1 misconducts, are murder, rape, arson, and robbery. (Id.) Conrad explained that possessing implements of escape is a significant misconduct because it presents "a serious threat to a prison system" and the outside community. (N.T., 03/16/21, 194.)

20.     Wharton was sentenced to 90 days in Disciplinary Custody, the maximum sanction

for a Class 1 misconduct, for each of his 1989 implements of escape misconducts. (OAG Exs. 17C,

19C; N.T., 05/11/21, 39:21-24.) Wharton was released from Disciplinary Custody three weeks

early for good behavior. (N.T., 05/11/21, 64:1-15.)

21.     Conrad testified that in his experience, approximately ten to twelve of the more

than a thousand hearings in which he participated during the ten years that he was a Hearing

Examiner involved a makeshift handcuff key. (N.T., 03/16/21, 206:5-17.) He explained that such

a misconduct was uncommon. (Id.)

22.     As late as 1990, Wharton denied the possession of the antenna material, telling the

Program Review Committee ("PRC") that he had served his time and did not want to discuss it.

As a result of his refusal to accept responsibility for these misconducts, Wharton's radio and

television privileges were not reinstated until March 1990. (N.T., 05/11/21, 54:20-56:3; OAG Ex.

37C.)

            2.     Wharton's Participation in Prison Life

23.     While incarcerated at SCI Huntington, Wharton had the opportunity to attend

monthly meetings with the PRC to review his conduct and prison adjustment. (N.T., 03/08/21 (Part

2), 24:25-25:20, 55:5-10, 56:17-57:4; see also Wharton Ex. 4 at 919-990; OAG Exs. 37A-C.)

Inmates were not required to attend these meetings and could decline to do so. (Id.; N.T., 08/05/21,

50:25-51:10.) Wharton attended approximately forty percent of the PRC meetings available to him

during the relevant period. (Id.)

24.     The PRC noted in various reviews that Wharton was polite, cordial, well-mannered,

well-behaved, and had regular contacts with his counselor. (N.T., 02/25/21, 132:2-140:19; see

Wharton Ex. 4 at 919-990; OAG Ex. 37A-C; N.T., 08/05/21, 39:6-14.) Wharton did not exhibit

any signs of assaultive, predatory, or violent behavior while incarcerated at SCI Huntington during

**A16**

the relevant time period. (N.T., 08/05/21, 42:6-11.) According to Wharton's corrections expert, Baird, the PRC repeatedly noted that Wharton was adjusting well. (N.T., 08/05/21, 48:20-24.)

25.    DOC records for Wharton also include Prescriptive Program Plans ("PPP"). (OAG Exs. 31A-D.) In various PPP reports, DOC staff notes that Wharton "maintain[s] misconduct free behavior," "sustain[s] positive housing reports," "exercise[s] routinely," "maintain[s] counselor contacts," and "continue[s] with educational development." (N.T., 05/11/21, 117:8-10.)

26.    Wharton also participated in a poetry project while incarcerated. (N.T., 02/25/21, 138:10-17; N.T., 05/11/21, 65:1-7; N.T., 08/05/21, 40:15-22.) He made efforts to improve his education by seeking to earn his high school equivalency diploma, playing chess, and learning Spanish. (N.T., 02/25/21, 32:4-16, 139:3-139:14; N.T., 05/11/21, 65:8-19; see also OAG Ex. 39; N.T., 08/05/21, 40:15-22.)

27.    The 1986 Classification Assessment noted that Wharton "expressed an interest in both academic and vocational programs." (OAG Ex. 39 at 3.)

28.    Wharton made multiple requests to study for his GED while at SCI Huntington. (Wharton Ex. 4 at PE0965-66, 0972.) When these requests were denied, Wharton filed a grievance. (Id. at PE0867.) In response to the grievance, prison staff "arranged" for capital inmates such as Wharton to be given GED tests. (Id.) The response also "commend[ed] [Wharton] for [his] interest in taking the test." (Id.)

29.    The 1986 Classification Assessment noted that Wharton had an interest in "Bible Study and Chapel services while incarcerated." (OAG Ex. 39 at 3.)

30.    Wharton was visited by family members during the relevant period of incarceration and regularly attended chapel services. (N.T., 02/25/21, 139:18-23; N.T., 05/11/21, 65:13-16, 84:1-4; see also OAG Ex. 39; N.T., 08/05/21, 40:13-22.)

31.    Wharton received no negative housing reports or negative psychiatric reports. (N.T., 05/11/21, 116:23-117:5; see also Wharton Ex. 4 at 992-1019.)

32.    Wharton utilized the grievance system at SCI Huntington. (N.T., 02/25/21, 31:15-32:3; 143:16-144:24; Wharton's Ex. 4 at 768-918.) "When [Wharton] felt that he was not being treated fairly or that the conditions with his confinement were not appropriate, he would file a complaint." (N.T., 02/25/21, 31:18-20.)

**E.    Trial Counsel's Later Assessment of Wharton's Adjustment After He Had an Opportunity to Review Prison Adjustment Information**

33.    Wharton's Trial Counsel, William Cannon, acknowledged that the prosecution's case at the second penalty hearing was "extremely strong." (N.T., 02/25/2021, 128:2-3.)

34.    Cannon felt that the mitigation evidence he offered at the penalty hearing, which consisted of testimony from Wharton's family members, "wasn't strong." (N.T., 02/25/2021, 128:4-16.)

35.    Cannon first reviewed Wharton's prison records in connection with the present federal proceedings, roughly six months before the evidentiary hearing. After this review, Cannon believed Wharton's adjustment to prison was "extremely favorable, extremely," and "all positive." (N.T., 02/25/2021, 131-34.)

36.    Cannon testified that he would have wanted to present Wharton's prison records to the jury and regretted "so much" that he did not do so in 1992. (N.T., 02/25/2021, 138-39.)

37.    Cannon said he would have argued from the prison records that Wharton was

> a person who ha[d] accepted his then situation in life. He is either going to serve … the rest of his life in prison or he's going to face the death penalty, but rather than hang his head, he pursues things that [allow] him to be a semi-vibrant member of the prison community by seeking educational opportunities, doing writings, doing drawings and participating to the extent that he can in prison life in a meaningful way.

(N.T., 02/25/2021, 139.)

**A18**

38.     Cannon felt this evidence would have corroborated the positive testimony of Wharton's family members. Cannon also believed that records of Wharton's grievance filings helped Wharton's image by showing he was "living within the system." (N.T., 02/25/2021, 140, 144.)

39.     Cannon acknowledged that presenting evidence of positive prison adjustment would have opened the door to rebuttal evidence. (N.T., 02/25/2021, 174.)

40.     Cannon did not consider the misconducts for possessing makeshift handcuff keys a problem because the keys were never used. (N.T., 02/25/2021, 148, 191.)

41.     When Cannon represented Wharton at the 1992 sentencing hearing, he was aware of Wharton's 1986 escape. (N.T., 03/08/2021, 35.) Had the prosecution sought to introduce Wharton's escape conviction to rebut evidence of Wharton's adjustment to prison, Cannon would have sought to exclude the escape charge on the ground that it happened while Wharton was in County, rather than State, custody. Alternatively, Cannon would have sought to exclude the facts surrounding the escape. (N.T., 02/25/2021, 161-62.)

42.     Even if the escape charge could not be excluded at the penalty phase, Cannon testified that he would still have presented prison adjustment evidence to the jury. Cannon conceded that he could have "done without" evidence of the escape charge, but explained that the facts related to Wharton's escape efforts were minor compared to the "very grisly and bad" facts of the murders that the jury would have heard anyway.  (N.T., 02/25/2021, 33, 163, 200.)

F.    **Expert Opinions on Wharton's Adjustment**

43.    Corrections officers Hayes and Conrad, as well as the Attorney General's corrections expert, Jeffrey Beard,[6] all testified that an inmate, especially one housed in the RHU, in the possession of a handcuff key is a serious threat to a prison system, to staff at the facility, the inmate, other inmates at the facility, and the community outside of the prison. (N.T., 03/16/21, 159:3-160:14, 194:1-25, 204:13-206:4; N.T., 05/11/21, 38:2-15, 46:4-47:3; N.T., 08/05/21, 103:7-12.) Hayes, Conrad, Beard, and Wharton's own corrections expert, Maureen Baird,[7] all confirmed that an implements of escape charge constitutes a very serious misconduct. (Id.)

44.    Wharton's corrections expert Baird acknowledged that in her experience, escape is a "greatest security level prohibited act." (N.T., 08/05/21, 96:15-19.)

45.    Baird considered Wharton's use of PRC meetings "appropriate." (N.T., 08/05/21, 47:24-48:19.) Baird explained that one of the reasons why a prison system conducts reviews for a capital inmate is so that the inmate can discuss problems they are having or make requests of the Committee. (Id.) The PRC meetings are a forum for the inmate to voice his concerns. (Id.)

46.    Baird opined that Wharton's use of the grievance process was "appropriate," "constructive," and "pro-social" or, in other words, that he used this process "the way it was intended." (N.T., 08/05/21, 61:20-24.) Baird explained that Wharton often attempted to resolve issues informally with prison staff first, but, if they were not resolved, he would file a grievance. (Id.) Baird stated that Wharton was, in fact, often granted relief by the institution after filing a

---

[6]    Jeffrey Beard is the former Secretary of Corrections of both the State of California and the Commonwealth of Pennsylvania. He has been working in corrections since 1971. Beard currently works as a consultant on correctional issues. (OAG Ex. 5.)

[7]    Maureen Baird has been employed as a warden and other executive roles in various federal prisons since 1989. Baird also currently works as a consultant on correctional issues. (Wharton's Ex. 41.)

grievance. (N.T., 08/05/21, 57:14-59:23; Wharton's Ex. 4 at 780-81 (food tray grievance).) She characterized Wharton's tone in these grievances as "not demanding," "polite," and "well-mannered." (N.T., 08/05/21, 59:24-60:7.)

47.     According to Baird, Wharton's records showed that the impression of Wharton from his counselor and the members of the PRC was "overly positive." (N.T., 08/05/21, 46:15-21.) Baird said Wharton had a rapport with and the respect of prison staff. (N.T., 08/05/21, 67:17-23.)

48.     Baird explained that "strong ties" to family are important to an inmate's adjustment. According to Baird, family visits demonstrate to an inmate that "somebody really cares about [him]," which is significant because a lack of family connection while incarcerated can lead to feelings of "hopelessness" and a negative adjustment. (N.T., 08/05/21, 40:23-42:5.)

49.     Baird noted that, in the isolation of the RHU, an inmate's mental health can decline rapidly. (N.T., 08/05/21, 55:20-25.) "Everything becomes … overly depressive," including "feelings of hopelessness," and "inmates will start acting out after … a long period of restricted housing." (N.T., 08/05/21, 56:3-17.) Baird testified that there was no evidence of this kind of mental deterioration and no evidence of a mental health issue that could affect institutional safety or institutional adjustment in Wharton's psychiatric records. (N.T., 08/05/21, 56:18-57:5.) Baird expressed surprise that Wharton handled restrictive housing "so well." (Id.)

50.     Wharton's psychiatric expert, Neil Blumberg,[8] testified that when Wharton tortured and murdered the Harts, he was 21 years old, and his brain was not fully developed. (N.T.,

---

[8]     Neil Blumberg is a medical doctor and licensed psychiatrist who has provided expert consulting services in various roles in the criminal justice system, including in capital sentencing. (Wharton's Ex. 14; N.T., 02/25/21, 15-17.)

02/25/21, 25:2-10.) In Blumberg's opinion, Wharton's prison psychiatric records reflect a more mature brain with a reduced tendency to engage in impulsive behavior. (Id.)

51.    In particular, Blumberg noted that Wharton met regularly with a counselor and never received a negative report. (N.T., 02/25/21, 21:12-25:24; see also N.T., 05/11/21, 116:23-117:7; N.T., 08/05/21, 52:16-22, 120:12-24.)

52.    Experts on both sides agreed that Wharton did not meet the criteria for antisocial personality disorder. (N.T., 02/25/21, 20:5-8; N.T., 03/08/21 (Part 2), 14:11-25.)

53.    The Attorney General's psychiatric expert, Dr. John O'Brien,[9] opined that Wharton did exhibit some antisocial traits, including that Wharton "can present himself as behaving in a certain way when … evidence suggests that he's actually thinking and preparing to behave differently." (N.T., 03/08/21 (Part 2), 32:2-5.) Wharton's corrections expert, Baird, disagreed, noting that prison staff are trained to identify inmates who are "[phonies]" or "manipulators" and that there was no indication in the records demonstrating that Wharton possessed these character traits. (N.T., 08/05/21, 47:11-23.)

54.    The Attorney General's corrections expert, Jeffrey Beard, testified that being polite to staff, attending PRC meetings, meeting with a counselor, and exhibiting no negative housing or psychiatric reports reflects the "minimum" expectation for an inmate in the RHU population. (N.T., 05/11/2021, 56.)

55.    Beard characterized elements of Wharton's 1986 escape as suggesting a "premeditated" plan. Specifically, Wharton came into City Hall with a concealed handcuff key,

---

[9]    John O'Brien is a medical doctor and former licensed psychiatrist who has been employed as a staff psychiatrist at various hospitals. (OAG Ex. 2.)

and may have been feigning an arm injury so that he could keep one arm unrestrained in a sling. (N.T., 05/11/2021, 27-28.)

56.     Beard stressed that Wharton's repeated effort to escape "throws into question" all the positive reports from Wharton's counselors and other prison staff. Beard described how Wharton appeared "very contrite" at his 1986 plea allocution in City Hall, while, at the same time, Wharton was carrying a concealed handcuff key and planning to escape. Beard compared this behavior to Wharton's politeness with staff at SCI Huntington while Wharton was simultaneously in possession of makeshift handcuff keys. Beard stated that such behavior fit his experience with inmates who appear polite while waiting for staff to let "their guard down." (N.T., 05/11/2021, 48-49.)

57.     Ultimately, Beard considered Wharton's 1986 escape and two misconducts for possessing implements of escape to "form the greater part of [his] opinion that [Wharton] had negative adjustment" to prison. (N.T., 05/11/2021, 46.) These incidents were most significant to Beard because they "put the community at risk." (Id.)

## III.   DISCUSSION: STRICKLAND ANALYSIS

Wharton asserts that his Sixth Amendment rights were violated during the second penalty hearing when his counsel failed to obtain and introduce mitigating evidence contained in his prison files for the seven years following Wharton's 1985 murder convictions. Wharton claims that his prison files from that period provided counsel with significant mitigating circumstances to explore and present to the jury as evidence that he "made a positive adjustment to prison life; [would not be] a future danger should he remain incarcerated for life; and [was] amenable to rehabilitation." (Pet. at 55.)

Ordinarily, pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts owe substantial deference to the decisions of state courts. Weeks v. Snyder, 219 F.3d 245, 258 (3d Cir. 2000). Here, the Third Circuit has previously determined that the Pennsylvania Supreme Court's reasoning in denying Wharton's Sixth Amendment claim constituted an unreasonable application of federal law and that Wharton was entitled to a de novo review of this claim in federal court.[10] Wharton, 722 F. App'x at 280-81. I therefore consider de novo whether Wharton has satisfied the requirements of Strickland v. Washington, 466 U.S. 668 (1984).

Under Strickland, Wharton must "show that counsel's performance was deficient" and that this performance caused him prejudice. Strickland, 466 U.S. at 687. A court may approach the analysis in either order, and, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, … that course should be followed." Id. at 697. Because the prejudice element of Wharton's Strickland claim is more straightforward, I begin my analysis there.

To establish prejudice, Wharton "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." Id. Because Wharton is challenging the sentence imposed at a penalty hearing,

---

[10]    The Third Circuit found that the Pennsylvania Supreme Court misapplied both the deficient performance and prejudice elements of Strickland. As to deficient performance, the Third Circuit decided that Cannon's decision not to obtain prison records could not be defended on the ground that the records "cut both ways" since Cannon was unaware of the records' contents. Wharton, 722 F. App'x at 280. As to prejudice, the Third Circuit found it unreasonable to assume that additional evidence going to the "catchall" mitigating factor was superfluous merely because the penalty jury already found that factor. Id. at 280-81. Rather, since the jury must weigh the aggravating and mitigating factors, additional evidence to support the "catchall" factor had the potential to tip the balance, and thus a hearing in federal court was necessary to develop that evidence. Id.

prejudice exists if there is a reasonable probability that, but for counsel's deficient performance, "one juror [would have] voted to impose a sentence of life imprisonment rather than the death penalty." Bond v. Beard, 539 F.3d 256, 285 (3d Cir. 2008).

In considering prejudice, I must review the evidence that was before the sentencing jury; the mitigating evidence that counsel failed to present; and "the anti-mitigation evidence that the Commonwealth would have presented to rebut" that evidence. Williams v. Beard, 637 F.3d 195, 227 (3d Cir. 2011). Once the record is "reconstructed," I must "reweigh the evidence in aggravation against the totality of available mitigation evidence" and determine whether there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's error. Id. (internal quotation marks omitted).

### A.      The Evidence Presented at the Penalty Hearing

During Wharton's 1992 penalty hearing, the Commonwealth presented evidence of the history between Wharton and the Hart family, including the burglaries of their home and Bradley Hart's father's church. Because those facts were important in establishing the aggravating factors underlying Wharton's death sentence, and are therefore important in my Strickland analysis, I recount those here.

Angry that he had not been paid what he believed was a debt owed for construction work, in early August, 1983, Wharton and Larue Owens went to the Harts' home at a time when they knew the family would be at church. Wharton entered the house through an unlocked basement window, and he and Owens stole numerous items. (N.T., 12/15/92, 95-99.)

On August 22, 1983, the next Sunday, Wharton and Owens, joined by co-defendant Eric Mason, again burglarized the Harts' home. This time, in addition to stealing property, they committed multiple acts of vandalism that resulted in the house being temporarily uninhabitable. Wharton and his cohorts smeared pancake batter, mustard, and tomato sauce on the walls, slashed

**A25**

the sofa and sliced its cushions, defaced family pictures by blotting paint on the faces of Bradley, Ferne, and their baby daughter Lisa Hart, left a child's doll hanging with a rope tied around its neck, left the refrigerator door open, piled food inside the oven and turned it on, dumped the contents of cabinets and drawers all over the kitchen, urinated in the second floor hallway and defecated on the bathroom floor, heaped clothes on the bed and splattered them with paint and turpentine, flipped over the bassinet and slashed the baby's mattress in the form of an "X," threw books and papers all over the floor of the office, and turned up the thermostat causing the smell of urine and rotten eggs to permeate the home. (N.T., 12/14/92, 79-84, 83-86, 98; N.T., 12/16/92, 99-101.)

On September 4, 1983, Wharton and Mason burglarized the Germantown Christian Assembly, a church founded by Bradley Hart's father. Wharton and Mr. Mason stabbed a picture of Bradley Hart on the wall with a letter opener and stole a computer and petty cash. (N.T., 12/15/92, 17-18.)

Finally, on January 30, 1984 at 10:00 p.m., Wharton confronted Bradley Hart at knifepoint and forced his way into the Harts' home. Once inside, Wharton let Mason in and ordered Bradley Hart to write him a check for $935.00. Wharton and Mason then tied up Bradley and his wife, Ferne, holding them and their seven-month-old daughter Lisa. After watching television for several hours, Wharton decided to kill the victims to avoid being identified. He and Mason separated Bradley and Ferne. Wharton took Ferne Hart and her daughter to the second floor, and Mason took Bradley Hart to the basement. Wharton taped Ferne's face with duct tape covering her eyes and mouth and tied her hands and feet. They similarly taped and bound Bradley Hart. They also wrapped electrical cords around Bradley's neck. (N.T., 12/14/92, 123-25; N.T., 12/17/92, 8-9.)

**A26**

Wharton and Mason removed various items from the house, including silverware, cameras, jewelry, and the victims' wallets, and placed them in Bradley's car. Wharton returned to the second floor, moved Ferne to the bathroom, strangled her with one of her husband's ties, then filled the bathtub and forced her head under water. Mason forced Bradley Hart to lie on the floor of the basement with his face in a shallow pan of water. He then stood on Bradley's back and pulled the cords around his neck, strangling him to death. (N.T., 12/17/92, 9-10.) Wharton and Mason removed additional property from the house, including the baby's crib, then turned off the heat and drove away in Bradley's car, leaving seven-month-old Lisa, in the dead of winter, with her dead parents. (N.T., 12/17/92, 10.) Lisa was found two days later suffering from severe dehydration, and on the way to the hospital, suffered respiratory arrest, but survived. (N.T., 12/15/92, 34-36, 47.)

In seeking life imprisonment at the second penalty hearing, Wharton countered those facts with evidence of his character from his family members. (See infra Section I.B.)

It is important to consider the strength of the evidence already offered in support of Wharton's death sentence because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. Here, the vicious nature of Wharton's offenses and the aggravating circumstances found by the jury cannot be understated. The brutality exhibited by Wharton and his co-defendant as they terrorized Bradley and Ferne Hart for months before murdering them and leaving their infant daughter to freeze to death would surely have weighed heavily in the minds of the jury.[11]

---

[11]     The District Attorney points to the fact that: (1) deliberations lasted two or three days (depending on how it is counted); and (2) at the end of the second day, the jury submitted a note stating, "We the Jury at this point in time are unable to reach a unanimous verdict." (N.T.,

**B.**     **Mitigating Evidence Not Presented and Rebuttal Anti-Mitigation Evidence**

I must now decide whether, had evidence of Wharton's adjustment to prison been added to the above presentation, there is a reasonable probability that the outcome would have been different. This analysis must be done in conjunction with considering anti-mitigation evidence that would have been offered in rebuttal. In so doing, the question is not whether Wharton's adjustment was positive or negative. Rather, I must determine whether there is a reasonable probability that one juror would have found that Wharton's evidence of mitigation, including his prison adjustment, outweighed evidence in aggravation.

Wharton proposes that his counsel could have offered evidence of his positive behavior while in prison. To recap, Wharton's positive behavior was that he attended PRC meetings, actively pursued his education, took part in a poetry activity, attended chapel services, was polite to staff, and handled disagreements through the proper grievance process rather than acting out. (Supra ¶¶ 23-32.) In addition, Wharton amassed only two serious misconducts during his six years in prison, and could have offered an expert to characterize his behavior as positive. (Supra ¶¶ 11, 48-55.)

Again, under Strickland, I cannot consider these facts in isolation but rather must do so as part of "the totality of the evidence before the … jury," including the prosecution's case for

12/22/92, at 12-13.) According to the District Attorney, these facts establish a reasonable probability that, had the jury been presented with positive prison adjustment evidence, one juror would have voted for a life sentence.

In some cases, the length of a jury's deliberations can be relevant in assessing whether an error during trial was harmless. See Johnson v. Superintendent, SCI Fayette, 949 F.3d 791, 805 (3d Cir. 2020). Johnson is the most recent Third Circuit case to consider this issue. In Johnson, the jury deliberated for six full days (longer than the trial itself), and the Third Circuit viewed the trial evidence to be "not overwhelming." Id. at 805. Johnson also involved a significant Confrontation Clause violation. Here, the jury heard overwhelming evidence of aggravating factors. A three-day deliberation over whether to impose a death sentence provides little insight into what form the jury's deliberations took before the jury was ultimately convinced of its conclusion.

**A28**

aggravation. <u>Strickland</u>, 466 U.S. at 695. In so doing, and after careful review of all the prison conduct evidence, I agree with corrections expert Jeffrey Beard, who explained that the behavior Wharton characterized as positive is the "minimum" expectation for an inmate in the RHU population. (N.T., 05/11/2021, 56.)

Wharton also offered expert testimony that, at the time of the murders, he was just 21 years old and his brain was not fully formed. While I agree that Wharton's age should be considered, his deliberate method of murdering the Harts reflects much more than youthful impulsivity. And in any event, the positive aspects of Wharton's adjustment to SCI Huntington were unremarkable, and would not have convinced the jury that Wharton had grown into a less dangerous person while incarcerated.

This conclusion is significantly strengthened by the fact that Wharton's "adjustment" in prison was marred by multiple efforts to escape. Wharton's escape conviction and surrounding facts, wherein he fled from a courthouse and had to be shot by Philadelphia Sheriffs to prevent him from entering into the public, would greatly undermine any positive prison adjustment evidence. It is difficult to fathom how any juror would have found Wharton's positive adjustment evidence more significant than this premeditated escape from a City Hall courtroom followed by two subsequent misconducts, received days apart, for possessing a makeshift handcuff key and other implements of escape. This particular evidence would be most significant in the minds of the sentencing jury, especially when viewed in conjunction with the facts of Wharton's murder of Bradley and Ferne Hart.

Wharton and the District Attorney emphasize that Wharton's trial counsel, William Cannon, did not view Wharton's attempts to escape as sufficiently serious to outweigh the mitigating effect of Wharton's prison adjustment evidence. While Mr. Cannon's assessment of his

own effectiveness may be relevant, I find his testimony unconvincing. At Wharton's 1992 penalty hearing, Cannon called Wharton's mother, as a witness, to ask for mercy, who acknowledged, tearfully, that her "son will never be free." (N.T., 12/21/1992, 37.) Cannon then recalled the mother's testimony in closing to remind the jury that Wharton "is never coming out of jail," an argument that would have had little value had the jury heard the escape evidence. (Id. at 89.)[12]

Similarly, I agree with Beard's assessment that Wharton's 1986 escape and subsequent misconducts for possessing implements of escape reflect calculated planning and undermine Wharton's superficially good prison behavior. While Wharton promised the sentencing judge in 1986 that he would seek to better himself while in prison, he simultaneously possessed a handcuff key that he used to nearly escape from City Hall. And while Wharton acted politely toward prison staff at SCI Huntington, he continued his efforts to make yet another handcuff key. These facts would have greatly undermined, rather than corroborated, Wharton's family members' testimony as to his character. In particular, the jury would be left with the distinct impression that Wharton's positive attributes could not be trusted.[13]

---

[12]    Cannon also testified that he would have sought to exclude evidence of the escape. Such effort would not have succeeded. In a death penalty hearing, the prosecution may offer evidence to rebut the defendant's evidence in mitigation, even if the rebuttal evidence does not itself constitute an aggravating factor. See Commonwealth v. Basemore, 582 A.2d 861, 870 (Pa. 1990); see also Wharton, 722 F. App'x at 283 ("[W]e must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony….").

[13]    I also note that had the penalty hearing included evidence of positive prison adjustment, the jury would also likely have heard, in rebuttal, of Wharton's repeated failure to accept responsibility for his misconducts. Wharton refused to admit that the makeshift handcuff key and additional pieces of antenna found in his single cell belonged to him. He claimed that he had no idea where the second piece of antenna came from, even though it was recovered from the binding of his own legal material. This is consistent with the psychological evaluation performed at the time of his classification assessment in which Wharton was described as using "a good deal of denial and rationalization" and minimizing "the few transgressions he admitted to doing." (OAG Ex. 39.)

C.     **Expert Testimony**

The expert opinions offered during the hearing support my conclusion that the mitigation evidence that could have been offered would not have changed any juror's mind. According to Baird, while the two implements of escape "incidents" were serious, Wharton's adjustment was positive overall. Baird testified that Wharton used PRC meetings and the grievance process appropriately, had a positive rapport with prison staff, maintained strong ties with his family, and kept a positive outlook despite the bleakness of his situation. (Supra ¶¶ 48-52.) Baird also noted that "other than the incident in 1986" (i.e., escaping), Wharton's behavior while incarcerated was "uneventful." (N.T., 08/05/21, 42:12-20.)

But even if the penalty phase jury accepted Baird's assessment, its effect on the overall impression of Wharton's positive adjustment would have been small compared to the overwhelming evidence of aggravation. Baird minimized Wharton's implements of escape misconducts on the ground that the makeshift keys were not actually used to escape. This reasoning would have been unconvincing to a jury that would also hear evidence that Wharton did, in fact, come alarmingly close to escaping from City Hall. Wharton's psychiatric expert, Dr. Blumberg, similarly discounted Wharton's escape conviction by focusing solely on Wharton's time at SCI Huntington. Had Wharton's trial counsel called experts such as these to testify at the second penalty hearing, they would not have been able to undo the substantial negative impression left by Wharton's multiple attempts to escape.

Countering this testimony would have been Beard's opinions prioritizing threats to the safety of the prison and the outside community over other aspects of Wharton's adjustment. Beard would have told the jury that Wharton's "premeditated attempt" to escape from City Hall using a concealed handcuff key "put the public at great risk." (N.T., 05/11/21, 27-28.) And Beard would have explained that Wharton's pleasant behavior toward prison staff was "superficial" given that

Wharton was simultaneously fashioning implements in an effort to escape yet again, thus "throw[ing] into question everything that you see going on with Mr. Wharton during that six-year period of time while he was in the Pennsylvania Department of Corrections." (N.T., 15/11/21, 48-49.)

Considering this testimony as a whole, as I must under <u>Strickland</u>, the opinions of these experts would not have altered the penalty jury's impression that Wharton's behavior from 1986 to 1992 was not sufficiently mitigating to tip the balance in favor of life imprisonment.

  **D. Conclusion—<u>Strickland</u> Analysis**

Given "the overwhelming aggravating factors," and the fact that Wharton's multiple efforts to escape would have rebutted any mitigation based on Wharton's adjustment to prison, "there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." <u>Strickland</u>, 466 U.S. at 700. In light of the weight of the evidence in aggravation as compared to the weight of the mitigation evidence that was presented at Wharton's second penalty hearing and the hearings before me, I decline to grant relief on Wharton's remaining Sixth Amendment claim. It was Wharton's burden to demonstrate that because of the mitigation his counsel did not present, there is a reasonable probability that one juror would have voted to impose a sentence of life imprisonment rather than the death penalty. Wharton has not met that burden. For the reasons set forth above, Wharton's petition for a writ of habeas corpus is denied.

**IV. <u>THE DISTRICT ATTORNEY'S POSSIBLE BREACH OF THE DUTY OF CANDOR</u>**

While every case is important, determining whether a defendant's sentence of death should be vacated due an alleged Sixth Amendment violation necessitates meticulous scrutiny, utmost

care, and diligence from all involved—the presiding judge and the attorneys. This process must include transparency from the attorneys and complete candor to the court so that all material facts can be considered.

That said, I preliminarily conclude that on two critical issues in this case, it appears that the District Attorney was less than candid with this Court. The first issue pertains to facts known to the District Attorney, but withheld, regarding Wharton's premeditated escape from a Philadelphia courtroom. This escape was <u>not</u> disclosed to me when the District Attorney requested that I blindly vacate Wharton's death sentence on the ground that his trial counsel had ineffectively failed to offer positive prison adjustment evidence, and was only brought to my attention after I appointed the Attorney General's Office.

The second possible instance of lack of candor involves the District Attorney's representation to me that in reaching its decision to concede the death penalty, and asking that I vacate Wharton's death sentence, the District Attorney had consulted with the victims' family. Yet the fully developed record before me reflects that no communication occurred between the District Attorney and the only surviving victim, Lisa Hart-Newman, and that minimal and woefully deficient communication took place with the siblings of the deceased, Bradley and Ferne Hart.

"[A]n attorney, as an officer of the Court, has an overarching duty of candor to the Court." <u>Eagan by Keith v. Jackson</u>, 855 F. Supp. 765, 790 (E.D. Pa. 1994). That duty requires that a "lawyer shall not knowingly … make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer…." Pa. Rule of Professional Conduct 3.3(a)(1).

The duty of candor "takes its shape from the larger object of preserving the integrity of the judicial system." <u>United States v. Shaffer Equipment Co.</u>, 11 F.3d 450, 458 (4th Cir. 1993); Pa.

Rule of Professional Conduct 3.3 cmt. 2. In matters of criminal justice, in particular, "[t]he need to develop all relevant facts in the adversary system" and to avoid "judgments … founded on a partial or speculative presentation of the facts" is "fundamental and comprehensive." United States v. Nixon, 418 U.S. 683, 709 (1974). The attorneys who represent the government in such matters therefore have "special responsibilities to both [the] court and the public at large" and a concomitant obligation to "ensure that the tribunal is aware of … significant events that may bear directly on the outcome of litigation." Douglas v. Donovan, 704 F.2d 1276, 1279 (D.C. Cir. 1983); see also United States v. Tocur Int'l, Inc., 35 F. Supp. 2d 1172, 1188 (N.D. Cal. 1998); Brewer v. District of Columbia, 891 F. Supp. 2d 128, 133 n.7 (D.D.C. 2012); Fusari v. Steinberg, 419 U.S. 379, 391 (1975) (Burger, J., concurring). These lawyers must be "minister[s] of justice and not simply … advocate[s]." Pa. Rule of Professional Conduct 3.8 cmt. 1; American Bar Association, Standards for the Prosecution Function § 3-1.4, "The Prosecutor's Heightened Duty of Candor" ("In light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor to the courts….").

The duty of attorneys to be especially forthcoming with the court is further heightened where the proceeding lacks the "balance of presentation by opposing advocates." See Pa. Rule of Professional Conduct 3.3 cmt. 14. This was exactly the dynamic at play here, where Wharton's counsel and the District Attorney joined to advocate that the death sentence be vacated. "In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse." Pa. Rule of Professional Conduct 3.3(d). But a proceeding may be in effect ex parte where, although others are "technically parties to [it], they ha[ve] no adversarial interest in opposing [the movant's] request." Eagan by Keith v. Jackson, 855 F. Supp. 765, 790 (E.D. Pa. 1994). The heightened duty

of candor that applies in <u>ex parte</u> proceedings is therefore "equally applicable when the parties make a joint request to the Court because, in this situation also, the Court is denied the benefit of adversarial advocacy." <u>Pa. Env't Def. Found. v. U.S. Dep't of Navy</u>, No. 94-cv-1486, 1995 WL 56602, at *2 (E.D. Pa. Feb. 3, 1995).

Lastly, the duty of candor in this case has special significance to constitutional matters of federalism and Article III jurisdiction, given that these proceedings involve a federal court being asked to interfere with a state criminal prosecution. Federal courts must exercise habeas jurisdiction in "light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the States…." <u>Rose v. Lundy</u>, 455 U.S. 509, 515 (1982). And "the jurisdiction of courts of the United States to issue writs of habeas corpus is limited to cases of persons alleged to be restrained of their liberty in violation of" federal law. <u>Matters v. Ryan</u>, 249 U.S. 375, 377 (1919).

Viewed through this lens, the timing of the District Attorney's presentation of its concession is troubling. Shortly before the District Attorney asked me to vacate Wharton's sentence, the Pennsylvania Supreme Court had ruled, in a separate but similar death penalty matter, that was also on collateral review, that the District Attorney does not have the authority to stipulate to such relief on behalf of the state. <u>See</u> <u>Commonwealth v. Brown</u>, 196 A.3d 130, 144-46 (Pa. 2018). Thus, the District Attorney was well aware that state law did not afford that Office the discretion to decide that a death sentence should be removed without a further independent review by a court. <u>Id.</u> at 144. Yet this is exactly what the District Attorney attempted to do in federal court.

In <u>Brown</u>, the same prosecutor's office sought the power to stipulate to death penalty relief and was denied that right by the Pennsylvania Supreme Court. The court stated that at the collateral review stage of a case, "the prosecutor's discretion … is limited to attempts, through the exercise

of effective advocacy, to persuade the courts to agree that error occurred as a matter of law. Prosecutorial discretion provides <u>no power</u> to instruct a court to undo the verdict without all necessary and appropriate judicial review." <u>Brown</u>, 196 A.3d at 146 (emphasis added). The court went on to proclaim that "[a]fter the jury … reached its decision to enter a verdict recommending a death sentence, the district attorney lost any prosecutorial discretion to alter that verdict." <u>Id.</u> at 149.

Four months after <u>Brown</u> was decided, the District Attorney filed a stipulation of death penalty relief in this case, without substantial explanation and despite having zealously defended Wharton's death sentence for twenty-six years. Complete candor was thus imperative to ensure that this was not a collusive misuse of federal jurisdiction to alter state policy in a manner not required by federal law. <u>Cf.</u> <u>Leyva v. Williams</u> 504 F.3d 357, 362 (3d Cir. 2007) ("A federal court has jurisdiction to entertain a habeas petition under 28 U.S.C. § 2254(a) only if a petitioner is in custody in violation of the constitution or federal law." (alterations and quotation marks omitted)).[14]

Applying all of these principles, it is likely that the District Attorney's Office failed to disclose all relevant information and provided other information that was misleading, and thus was not candid with this Court. When the District Attorney notified me that it was conceding Wharton's habeas petition and asked that I grant the requested relief, I was unaware of the most important

---

[14]   This is not the first time the District Attorney has attempted to use this Court to evade the strictures of the state judicial system, while providing incomplete information and asking that I grant relief before hearing evidence, based on its concession alone. In <u>Martinez v. DelBalso</u>, No. 19-cv-5606, 2021 WL 510276 (E.D. Pa. 2021), the assigned Assistant District Attorney affirmatively advised me that the District Attorney's Office was waiving the exhaustion requirement of 28 U.S.C. § 2254(b)(1)(A) despite the existence of a long-pending petition in state court seeking identical relief. <u>Id.</u> at *1. Then, without advising me that any facts related to exhaustion had changed, the District Attorney litigated and obtained the relief it was seeking in the state court while a hearing was scheduled on the federal petition. <u>Id.</u> at *1-2.

**A36**

facts bearing on the merits of the habeas petition: Wharton's 1986 escape attempt that nearly succeeded and his continued propensity to fashion implements of escape while in prison. These facts were known to the District Attorney and bore directly on the issue on remand—yet that Office decided to withhold this information. (N.T., 5/11/21, 66:16-19.) Instead, in asking me to grant relief, the District Attorney chose only to represent that it had reached its decision after having "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in Strickland v. Washington, 466 U.S. 668 (1984)." (ECF No. 162 at 4.) And when pressed for an explanation, the District Attorney relied on a declaration of trial counsel that Wharton's prison records could have shown that Wharton "posed no danger to inmates or staff if he were sentenced to life," a statement that was entirely misleading without also disclosing Wharton's 1986 escape attempt.

The District Attorney's Office may well have concluded that Wharton's escape conduct would not tip the scales in favor of maintaining the death penalty. But surely, these incidents would be crucial information to provide to a judge who had been asked to vacate a death penalty sentence. This lapse on the part of the District Attorney also ignores the public's right to know the position taken by the District Attorney and to understand the basis for a court's decision as to whether a significant penalty imposed by a jury thirty years ago for a horrific crime would be preserved or set aside. As one commentator aptly stated, "prosecutors are expected to volunteer relevant factual and legal information in various situations where other lawyers … might legitimately remain reticent." Bruce A. Green, Candor in Criminal Advocacy, 44 Hofstra L. Rev. 1105, 1116 (2016).

A second possible critical lapse of candor on the part of the District Attorney pertains to that Office's purported communication with the victims' family. When the District Attorney filed its notice conceding that Wharton's death sentences should be vacated, it cited "communications

with the victims' family" as a basis for that change of course. (Notice of Concession, ECF No. 155, ¶ 9.) "[A]n assertion purporting to be on the lawyer's own knowledge … may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." Pa. Rule of Professional Conduct 3.3 cmt. 3 (emphasis added). Having provided no details regarding the victims' family's position on this significant concession, where the facts were so heinous and the most serious penalty—death—had been imposed, the unmistakable impression conveyed by the District Attorney's concession was that the victims' family had agreed with the District Attorney's change of position. But this was not the case.

Lisa Hart-Newman, now age thirty-seven, the infant left to die by Wharton, is a surviving victim but was never contacted by the District Attorney. In her June 6, 2019 letter to this Court, Lisa Hart-Newman stated that she was "extremely disappointed to learn of the District Attorney's stance [to seek to vacate the death penalty] and very troubled that the District Attorney implied that the family approved of his viewpoint." (ECF No. 117-5, Ex. F.) She stressed:

> At no point was I contacted by the District Attorney or anyone in his office to ascertain what my views are. Seeing as I was also a victim in this tragedy, my opinion should have been sought and should carry weight. At seven months old, after my parents had been murdered, I was left in a house where the heat had been intentionally turned off in hopes that I would die. I am the sole survivor of this tragedy and I am alive despite his efforts.

(Id.)

During the hearing, Lisa Hart-Newman testified that, when she did find out about the District Attorney's concession, "it was as though, well, it's already done, and there's nothing you can do about it. … [Y]ou don't matter, essentially." (N.T., 03/16/21, 90:3-14.) Hart-Newman explained that if the District Attorney had contacted her about its concession, she would have said "Please don't do this. I don't in any way agree with the position that you've taken in this matter, and as a victim I feel like that should matter." (N.T., 03/16/21, 90:23-91:9.)

**A38**

Both of the deceased parents, Bradley and Ferne Hart, had siblings, but as confirmed by the District Attorney's Victim Witness Coordinator, only one member of the entire Hart family was contacted, Dr. David "Tony" Hart, Bradley Hart's brother. While the Victim Witness Coordinator testified that she eventually informed Tony Hart that a "committee" had decided to concede Wharton's death sentence, Tony Hart's testimony at the evidentiary hearing reflects that either this message was not conveyed or it was not clearly understood. (See N.T., 05/11/21, 185.) But in any event, the District Attorney's Office made this concession without the input of Lisa Hart-Newman or the other siblings of the deceased.

While Tony Hart had difficulty recalling the specifics of his conversation with the District Attorney's Victim Witness Coordinator, he remembered being "left with the impression that she would get back to us, that they were considering … what they were going to do with regard to the case[,] that Wharton had … won the right to an appeal, and that they weren't sure … what they were going to do, what their position was going to be, and so … she was going to get back to me and let me know, keep me informed." (N.T., 05/11/21, 145:21-146:3.) Tony Hart explained that his impression was that Wharton "had won the right to be heard again." (N.T., 05/11/21, 153:22-154:8.) In short, even after subsequent contact with the District Attorney's representative, it was Tony Hart's belief that the District Attorney's Office never provided "any detail" and never "clearly communicated" to him that the Office had decided to concede the death penalty. (N.T., 05/11/21, 146, 160.)[15]

---

[15]    In his letter submitted to the Court, Tony Hart stated that he was told by the District Attorney that "in order to avoid a new trial, a plea deal was offered and accepted." (OAG's Amicus Br., Ex. F.) If this information was in fact relayed by the District Attorney's representative, it would have been entirely misleading in that a "new trial," which could have retraumatized the family, had never been an option or even remotely contemplated by the Third Circuit. (N.T., 05/11/21, 146:16-147:15.)

Tony Hart explained that it was not until the Attorney General's Office contacted him in May or June 2019 that he fully understood what was happening, i.e. that the District Attorney had conceded the death penalty. (N.T., 05/11/21, 156:22-157:9.) Tony Hart recalled being "taken [a]back" by the conversation with the Attorney General's Office. (N.T., 05/11/21, 160:13-161:15.) He explained that had he fully understood that the District Attorney's Office was considering conceding the death penalty, he would have immediately informed Lisa Hart-Newman and his other family members, which he did after speaking with the Attorney General's Office. In fact, only after the Attorney General's Office spoke to the victims' family members was it learned that none of the family agreed that the jury's sentence of death should be vacated. (See N.T., 05/11/21, 164-65; ECF No. 117-5, Ex. F.)

Bradley and Ferne Hart's other siblings also expressed outrage regarding the District Attorney's failure to contact their family. In his letter to the Court, dated June 7, 2019, Ferne Hart's brother, Michael Allen, stated:

> I understand that the DA's office has gone on record to say that they communicated with the family of Wharton's victims. I understand that they have represented either expressly or impliedly that the family agrees with this outrageous position they have taken to seek to vacate Wharton's death penalty. The position of the DA's office is nothing less than an egregious insult to injury and an affront to the sensibilities of a responsible community which holds its members accountable for their acts.

(ECF No. 117-5, Ex. F.) Michael Allen added that "it would appear that there was a substantially deficient briefing by the DA's office regarding the significance and implications for vacating Wharton's death penalty." (Id.)

The District Attorney responds to all of this by positing that Tony Hart, a family member, was in fact contacted and that the Victim Witness Coordinator believed Tony Hart would pass her contact information along to his siblings and niece. (DAO Ex. 1.) But the Victim Witness Coordinator did not ask Tony Hart to act as the family's liaison, and Tony Hart believed she never

asked him to pass on that a concession of the death penalty was being considered. (N.T., 05/11/21, 148-49, 167-68, 203.) Nor did the Coordinator confirm whether Tony Hart had conveyed any information she had provided him to his family, nor did she inquire as to whether the other family members might have a different view regarding concession of death penalty relief. (N.T., 08/05/21, 5:5-18, 6:5-12, 20:5-21:4.) In fact, Tony Hart was left with the impression that the family's views would not "make any difference" to the Office's decision making. (N.T., 05/11/21, 158.) And, as noted above, the Victim Witness Coordinator never contacted the only surviving victim, Lisa Hart-Newman. (N.T., 05/11/21, 202.) Tellingly, the District Attorney acknowledges that "[e]mploying 20/20 hindsight, one could say that [the Victim Witness Coordinator] should have taken additional steps." (District Attorney's Post-Hearing Brief at 23.)[16]

I recount all of this background on the District Attorney's contacts with the victims to assess whether the District Attorney's representation to me that its concession was based, in part, on "communications with the victims' family" lacked candor. I conclude that, before making such a representation, the District Attorney should have delved much deeper, where it would have easily learned, as the Attorney General did, that the victims' family and the only surviving victim were vehemently opposed to vacating the death sentence. See Pa. Rule of Professional Conduct 3.3 cmt. 3 ("[A]n assertion purporting to be on the lawyer's own knowledge … may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." (emphasis added)) Had these facts, readily obtainable, been known to me, they could have been material to my decision regarding what weight to give the District Attorney's

---

[16]   The District Attorney also argues that it had no "reason to assume that other family members were opposed to death penalty relief" because "it is not uncommon for survivors to be indifferent to or even against the death penalty." (District Attorney's Brief at 23.) But the District Attorney stated that its concession was based on "communication with the victims' family" not speculation that the family would agree with its decision. (ECF No. 155 ¶ 9 (emphasis added).)

concession of Wharton's habeas petition. The thoroughness of the District Attorney's assessment of its case is a factor in evaluating whether its concession reflects an application of "considered judgment" as opposed to merely the "differing views of the current office holder." See Young v. United States, 315 U.S. 257, 258 (1942); Brown, 196 A.3d at 149.

And finally, in asking me to sign a stipulated order based upon insufficient information, the District Attorney ignored the fact that there is a statutory obligation to ensure that victims are provided an opportunity to be heard at proceedings involving sentencing or release and are "treated with fairness and with respect for [their] dignity and privacy." 18 U.S.C. § 3771(b)(2)(A). To carry out this obligation, I must depend on truthful information from the lawyers who practice before me.

The District Attorney's Office should be given an opportunity to explain or challenge my preliminary conclusion that there has been a breach of their duty of candor. And facts may need to be developed as to who made decisions regarding communications with this Court.[17]

An order to show cause will follow.

---

[17]    The February 6, 2019 concession and proposed order asking me to vacate the jury's verdict was submitted by the Supervisor of the District Attorney's Federal Litigation Unit who represented that members of a "Capital Case Review Committee" had reviewed this matter.

**A42**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT WHARTON,** | |
| *Petitioner*, | **Civil Action** |
| *v.* | **No. 01-cv-6049** |
| **DONALD T. VAUGHN,** | |
| *Respondent.* | |

**MEMORANDUM OPINION**

GOLDBERG, J.                                                    September 12, 2022

Trial courts and lawyers take direction from appellate judges. This is such a basic legal

principle that no precedential or statutory citation is needed. As it relates to the federal habeas

death penalty case before this Court, clear directives were issued by the United States Court of

Appeals for the Third Circuit.

Approximately three years ago, the Third Circuit directed that a hearing be held to deter-

mine whether Petitioner Robert Wharton's trial counsel was ineffective under Strickland v. Wash-

ington, 466 U.S. 668 (1984). Wharton alleged, with the District Attorney's Office now in agree-

ment, that his Sixth Amendment rights were violated by his trial counsel's failure to investigate

and present evidence of Wharton's positive adjustment to prison at the penalty phase of his homi-

cide trial. Wharton v. Vaughn, 722 F. App'x 268, 280 (3d Cir. 2018). The Third Circuit directed

that analysis of this Strickland claim should entail reconstructing the record to consider mitigation

evidence not presented by trial counsel and that this hearing "must also take account of the anti-

**A43**

mitigation evidence that the Commonwealth would have presented to rebut the petitioner's miti-gation testimony." <u>Id.</u> at 283 (emphasis added). That court also ordered that the <u>Strickland</u> analysis be conducted "consistent with [its] opinion." <u>Id.</u> at 284.

In siding with Wharton that his requested relief was warranted, the District Attorney's Of-fice has continually asserted that, despite specific guidance from the Third Circuit as to how Whar-ton's Sixth Amendment claim should be analyzed, it was free to concede relief and that a full exploration by the Court of all relevant facts was unnecessary.[1] But this position flatly contradicts unambiguous directives issued by the Pennsylvania Supreme Court regarding the handling of death penalty matters on collateral review. In <u>Commonwealth v. Brown</u>, 196 A.3d 130 (Pa. 2018), the Supreme Court spelled out its rejection, "in the strongest terms," of the District Attorney's position that it maintained authority, via a concession and stipulation, to undo a penalty of death on collat-eral review. <u>Id.</u> at 321. <u>Brown</u>'s reasoning is easily understood and mandates that after a jury has imposed a sentence of death, affirmed on appellate review, the only way to vacate that verdict is through "appropriate" and "independent" judicial review—with the District Attorney's role in that process being limited to that of an "advoca[te]." <u>Id.</u> at 319-20. The Supreme Court admonished that if the District Attorney's concession were allowed to serve as the sole basis for undoing a verdict, "the power of a court [would] amount[] to nothing more than the power 'to do exactly

---

[1] <u>See, e.g.</u>, ECF No. 278 at 22 ("[B]oth the federal and state courts regularly accepted the Com-monwealth's concessions of death penalty relief, without conducting evidentiary hearings and without appointing a substitute prosecutor [i.e., the Attorney General's Office] to aggressively ar-gue for death."); ECF No. 312 at 12 ("[P]arties often concede issues or arguments that narrow or preclude an evidentiary hearing."); N.T. 6/23/22 at 17 ("What the District Attorney's Office did was file a Notice that, after having reviewed the case, they agreed there was merit to the Defend-ant's Claim, having reviewed whatever evidence they had at that time, therefore consistent with what they'd been doing for years, before Larry Krasner was District Attorney, and while he was. They simply filed a Notice saying that's our position."); N.T. 6/23/22 at 19 ("That was their posi-tion. They did what Lawyers do all the time and said, under those circumstances, we agree with our Opponent. Lawyers do it in civil cases. They do it in criminal cases. It goes on all the time.").

**A44**

what the parties tell it to do, simply because they [the District Attorney] said so and without any <u>actual merits review</u>[.]'" Id. at 325 (emphasis added). In short, <u>Brown</u> plainly holds that a jury's death sentence verdict cannot be undone until <u>all</u> facts are placed on the table so that a fully-informed judge, not the District Attorney, can make the decision as to whether a decades-old verdict should be set aside. Any suggestion that the Pennsylvania Supreme Court said anything different would be disingenuous.

Yet, in asking this Court to approve its concession in this matter, supervisors at the District Attorney's Office, following procedures implemented by the District Attorney, either ignored these precedential directives or, perhaps worse, intentionally chose not to follow them. And despite a clear order from the Third Circuit directing consideration of "anti-mitigation evidence" and an equally clear admonition from the Pennsylvania Supreme Court that unexplained concessions were frowned upon and that a "merits review" must occur, the District Attorney's Office failed to advise this Court that prison adjustment evidence in this case included significant anti-mitigation evidence involving Wharton's violent escape from a City Hall courtroom. Moreover, and according to its own (former) supervisor, the District Attorney's Office communicated to this Court in "vague" and unclear terms, "amenable" to misinterpretation, that the victim's family, including the only surviving victim, had approved of its concession, when in fact that was not the case. (ECF No. 287-1 ¶ 12.)

For these reasons, I am obligated to conclude that the Philadelphia District Attorney's Office and two of its supervisors violated Federal Rule of Civil Procedure 11(b)(3) based upon that Office's representations to this Court that lacked evidentiary support and were not in any way formed after "an inquiry reasonable under the circumstances."

I.   **BACKGROUND**

The sole remaining question in this case was fairly straightforward: Was Wharton's trial

counsel's conduct in not investigating prison adjustment evidence at the penalty phase of Whar-

ton's trial so deficient that, under <u>Strickland v. Washington</u>, 466 U.S. 688 (1984), there was a

reasonable probability that at least one juror would have voted against imposing the death penalty.

The District Attorney's litigation tactics in addressing this question are the subject of this opinion.

A full explanation of this Court's reasons for questioning the District Attorney's conduct is

set out in my May 11, 2022 opinion and need not be repeated here. Briefly summarized, those

concerns involved statements made by the District Attorney's Office regarding that Office's deci-

sion to concede relief on Wharton's last remaining habeas claim. The first representation was filed

on February 6, 2019 through a "Notice of Concession of Penalty Phase Relief." This submission

was signed by the Supervisor of the Federal Litigation Unit. There it was represented that the

District Attorney's Office had decided to concede relief "[f]ollowing review of [the] case by" the

Office's "Capital Case Review Committee" and "communication with the victims' family." (ECF

No. 155.) The second representation was a proposed order submitted jointly by Wharton and the

District Attorney's Office that stated that this Court had performed "a careful and independent

review of all of the parties' submissions and all prior proceedings in this matter." (ECF No. 156-

1.) Subsequently, in a brief filed April 3, 2019, the Office stated it had "carefully reviewed the

facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated

in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984)." (ECF No. 162.)[2] (This brief was filed by the

---

[2] In the first two pages of this filing, the District Attorney's Office outlines its obligation to "pursue justice" and to "change" course in death penalty collateral review matters (e.g., concede) at its own discretion. (ECF No. 162 at 1-2.) But as noted above, just a few months prior to this filing, the Pennsylvania Supreme Court in <u>Brown</u> rejected this discretion.

Supervisor of the Federal Litigation Unit and also named the Supervisor and Assistant Supervisor of the Law Division below the signature line.) That submission went on to recite "facts" that supported the Office's view that if prison adjustment evidence had been presented at the original sentencing hearing, a death sentence would not have been reached. (ECF No. 162 at 4.) Omitted from these facts, and indeed absent from any of these submissions, was any mention of Wharton's escape.

The present question is whether the District Attorney's Office, or any of its attorneys, should be sanctioned under Federal Rule of Civil Procedure 11(c) for making assertions in these submissions that lacked "evidentiary support" and which were not formed based on an "inquiry reasonable under the circumstances." See Fed. R. Civ. P. 11(b)(3). This issue overlaps with a lawyer's duty under the Rules of Professional Conduct to refrain from making assertions to the court on the lawyer's "own knowledge" unless the lawyer "knows the assertion[s] [are] true or believes [them] to be true on the basis of a reasonably diligent inquiry." Pa. Rule of Professional Conduct 3.3 cmt. 3; In re Price, 732 A.2d 599, 603 (Pa. 1999).

## II.     SUMMARY OF THE SHOW-CAUSE HEARING TESTIMONY

After raising concerns regarding the District Attorney's candor in the attempted concession process, a hearing was held to allow the District Attorney's Office, if it so chose, to offer explanations. Generally, the Office's outside counsel continually took the position that the District Attorney's Office was not obligated to explain its concession. (See, e.g., N.T. 6/23/22 at 11-12 ("[W]e don't think any explanation is necessary. … [W]e are not bringing [the attorneys] in to explain anything.").) Counsel also took the position that neither the Court, the victims, nor the public had a right to know why that Office decided to concede a decades-old verdict. (N.T. 6/23/22 at 37 (Q: "Don't you think the public has a right to know the deliberative process that the office made when

conceding a death penalty?" A: "Absolutely not.".) The Office relied, by analogy, to an exemption in the federal Freedom of Information Act for "deliberative" materials, which protects federal government agencies from having to "operate in a fishbowl." Assembly of the State of California v. Dep't of Commerce, 968 F.2d 916, 921 (9th Cir. 1992). Counsel also referenced, without specific citations, cases stating that a criminal defendant is not entitled to know the workings of a prosecutor's death penalty committee. Long speaking objections by counsel often preceded answers to the Court's questions. What little information the hearing did produce is summarized below.

The recommendation to concede Wharton's Strickland claim came from the District Attorney's Office's Capital Case Review Committee, which consisted of department supervisors. The Law Division Supervisor and Assistant Supervisor, both lawyers who litigated the remand hearings, were on this Committee, but the Supervisor of the Federal Litigation Unit, who actually signed and filed the Notice of Concession and follow-up documents relating to the concession, was not. The Committee delivered its recommendation to the District Attorney, who made the decision to concede. (N.T. 6/23/22 at 24, 42, 60.)

The Law Division Supervisor and Assistant Supervisor, both experienced attorneys, testified that they recommended conceding Wharton's habeas petition without knowing or attempting to know that Wharton had escaped from a City Hall courtroom. (N.T. 6/23/22 at 27, 34, 40, 61.) The Law Division Supervisor did not know whether any other member of the Committee was aware of Wharton's escape while discussing the concession. (N.T. 6/23/22 at 41-42) The Assistant Supervisor's memory was that no one on the Committee was aware of the escape before the concession recommendation was relayed to the District Attorney. (N.T. 6/23/22 at 61-62 (Q: "Was anyone on the Committee aware?" A: "I don't believe so.").) When the Law Division Supervisor was asked whether it would have been appropriate for a judge to sign the order proposed by the

District Attorney stating that the Court had performed a "careful and independent review" while not knowing of Wharton's escape, she responded that she could not "answer that question for the Court." (N.T. 6/23/22 at 59.) As noted above, counsel for the Office continually objected to any questioning into "deliberative" matters, and thus the show-cause hearing shed little light as to why the Office either did not consider Wharton's escape or, if it was considered, how that Office concluded that Wharton's adjustment to prison was sufficiently positive to merit relief under Strickland.

      The District Attorney's supervisors' testimony that they were unaware of the escape before recommending concession was curiously contrary to what had previously been communicated to this Court. On May 11, 2021, at the remand hearing on Wharton's habeas petition, this Court directly asked the Assistant Supervisor whether the District Attorney's Office was aware of Wharton's escape conviction before making the decision to concede Wharton's Strickland claim. Without any explanation or elaboration, he responded "yes." (N.T. 5/11/21 at 66.) That same attorney was asked at the June 23, 2022 show-cause hearing to reconcile this answer with his newfound position that no one on the Committee was aware of Wharton's escape before recommending concession. The Assistant Supervisor responded that his prior affirmative answer was only meant to convey that the District Attorney's Office "as an entity" (e.g., the Office as configured thirty years ago) was aware of the escape but that no one on the Committee that recommended the concession in question was aware of it. (N.T. 6/23/22 at 75-77.)

      An affidavit submitted before the show-cause hearing by the Supervisor of the Federal Litigation Unit who submitted the concession sheds considerable light on the District Attorney's litigation conduct in this case. (ECF No. 287-1.) That Supervisor stated that he signed the Notice of Concession despite having no knowledge of the basis for the concession and despite having

undertaken no investigation. (ECF No. 287-1 ¶¶ 5, 8, 10-11.) When asked why the task of signing the Notice of Concession on behalf of the Office was given to a lawyer with no knowledge of why the concession was being submitted, the Law Division Supervisor responded only that this was the Office's "normal practice" and that other administrations had followed the same procedure. (N.T. 6/23/22 at 24, 51-53.) When pressed to explain why the Court was not advised of the escape, the Law Division Supervisor stated, "[W]e didn't tell you anything. And it isn't a question of with-holding. This is a question of our practice, our practice." (N.T. 6/23/22 at 25.)

Regarding the District Attorney's Office's statement that its concession was made "[f]ol-lowing … communication with the victims' family," the Federal Litigation Supervisor who signed the concession explained in his affidavit that he did not mean to imply that the family had been consulted prior to the Office's decision or that all members of the family had been contacted. Ra-ther, he intended only to convey that the family had been informed of the outcome of the Office's decision—that is, they had been told the Office would concede. This supervisor acknowledged that his statement regarding "communication with the victims' family" was "vague," "lack[ed] … clar-ity," and was "amenable to the interpretation that the victims' family agreed with the concession of penalty phase relief." He also apologized for his lack of clarity. (ECF No. 281-1 ¶ 12.) The Supervisor of the Law Division also recognized the Office's misstep in not notifying the only surviving victim of Wharton's crimes that the District Attorney would be seeking a concession. She stated that victim communication was not her responsibility and acknowledged that contacting that victim was "something we should have done. We recognize our mistake." (N.T. 6/23/22 at 48.)

### III.    LEGAL STANDARD: FEDERAL RULE OF CIVIL PROCEDURE 11

Rule 11(b) imposes three duties relevant here: the duty to conduct an "inquiry reasonable under the circumstances" before filing a paper with the Court, 11(b); the duty not to make filings for "any improper purpose," 11(b)(1); and the duty to refrain from asserting "factual contentions" that lack "evidentiary support," 11(b)(3). Although Rule 11 does not include all aspects of the ethical duty of candor to the Court, that obligation informs Rule 11's prohibition on making unsupported factual contentions. See Notes of the Advisory Committee on the 1993 Amendment (Rule 11 "emphasizes the duty of candor … ."); Presidential Lake Fire & Rescue Squad, Inc. v. Doherty, No. 12-cv-5621, 2014 WL 318330, at *5-6 (D.N.J. Jan. 29, 2014) (using Rule of Professional Conduct 3.3(a) to inform the Rule 11 analysis).

"The legal standard to be applied when evaluating conduct allegedly violative of Rule 11 is reasonableness under the circumstances … ." Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 289 (3d Cir. 1991).[3] Regarding the duty to refrain from making factual assertions that lack "evidentiary support," the question is whether the filer had "an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact." Ford Motor Co., 930 F.2d at 289 (quotation marks omitted). "A court should test the signer's conduct by inquiring what was reasonable for the signer to believe at the time the pleading was submitted." New Life Homecare, Inc. v. Blue Cross of Northeastern Pa., No. 06-cv-2485, 2008 WL 534472, at *2 (M.D. Pa. Feb. 20, 2008). Rule 11 "does not recognize a 'pure heart and empty

---

[3] With respect to the duty to conduct a pre-filing inquiry, four factors typically relevant in assessing whether the signer's inquiry was adequate are: "the amount of time available to the signer for conducting the factual and legal investigation; the necessity for reliance on a client for the underlying factual information; the plausibility of the legal position advocated; and whether the case was referred to the signer by another member of the Bar." Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 95 (3d Cir. 1988). Of these factors, reliance on the client and referral by another member of the bar are not applicable here.

head' defense." In re Cendant Corp. Derivative Action Litig., 96 F. Supp. 2d 403, 405 (D.N.J.

2000).

"If, after notice and a reasonable opportunity to respond, the court determines that Rule

11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm,

or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "Gener-

ally, sanctions are prescribed only in the exceptional circumstance where a claim or motion is

patently unmeritorious or frivolous," and even a "tenuous[] factual basis" may suffice to comply

with the Rule. Ford Motor Co., 930 F.2d at 289-90. "[W]here such exceptional circumstances exist,

the court is merely authorized, not required, to impose sanctions." Pet Gifts USA, LLC v. Imagine

This Company, LLC, No. 14-cv-3884, 2019 WL 3208512, at *2 (D.N.J. July 15, 2019). Sua sponte

sanctions are ordinarily reserved for "only the most egregious cases." Kovarik v. South Annville

Township, No. 17-cv-97, 2018 WL 1428293, at *17 (M.D. Pa. March 22, 2018).

## IV.    DISCUSSION OF REPRESENTATIONS IN THE DISTRICT ATTORNEY'S OF-FICE'S FILINGS

### A.    Was a "reasonable inquiry" undertaken before the District Attorney's Office represented that it had conducted a careful review of the facts pertaining to Wharton's Strickland Claim?

As noted previously, the District Attorney's Office submitted the following filings that

qualify as "other paper[s]" under Rule 11(b): (1) the "NOTICE OF CONCESSION OF PENALTY

PHASE RELIEF," filed on February 6, 2019, stating:

> Following review of this case by the Capital Case Review Committee of the Phila-delphia District Attorney's Office, communication with the victim's family, and no-tice to petitioner's counsel, respondent hereby reports to the Court that it concedes relief on petitioner's remaining claim of ineffective assistance at the second penalty hearing, and does not contest the grant of a conditional writ of habeas corpus with respect to petitioner's death sentences.

(ECF No. 155,) (2) a Proposed Order, filed on February 8, 2019 and submitted by counsel for

Wharton and the District Attorney's Office indicating the Court had undertaken "a careful and

independent review" (ECF No. 156); and (3) a brief, filed on April 3, 2019 which stated that the

Office had "carefully reviewed the facts and law and determined that Wharton's ineffectiveness

claim fulfill[ed] the criteria articulated in Strickland v. Washington, 466 U.S. 668 (1984)." (ECF

No. 162 (emphasis added).) This last submission also stated that the Office "determined that Whar-

ton's remaining habeas claim—that his counsel was ineffective at his second penalty hearing for

not investigating and presenting evidence of his adjustment to prison—is not lacking in merit."

(Id.)[4]

Despite clear instructions from the Third Circuit that anti-mitigation evidence must be con-

sidered and the Pennsylvania Supreme Court's edict that a death penalty verdict on collateral re-

view can only be vacated after appropriate judicial review of the merits of the claim, none of these

filings contained any mention of possibly the worst type of prison adjustment—a violent escape

from City Hall in 1986 and subsequent escape conviction. Under these particular circumstances,

the Court concludes that the District Attorney's Office's representation that they had "carefully

reviewed the facts" was unreasonable, as was its request that the Court sign an order indicating

that a "careful review" had occurred. In short, in light of the Sixth Amendment issue before the

Court, not identifying Wharton's escape cannot, under any circumstances, constitute a "reasonable

---

[4] The District Attorney's Office argues that representations in this brief should be ignored because
it was filed in response to an order calling for a legal analysis of the weight to be afforded the
Office's concession. The Court disagrees. Even assuming the Office could somehow have re-
sponded to this Court's order without citing facts, the District Attorney's Office not only volun-
teered facts but used them to argue that its concession reflected "considered judgment" and was
entitled to "great weight" such that a court "may … accept" it. (ECF No. 162 at 5.) Having offered
its "careful[] review[]" finding "merit" to Wharton's Strickland claim as a basis for its requested
relief, the District Attorney's Office cannot now claim that these representations were irrelevant.

inquiry," nor do these factual representations have any evidentiary support. Ironically, the District Attorney's Office advocates that Wharton's death sentence be vacated because trial counsel failed to investigate prison adjustment, yet the District Attorney's Office failed to do the same.

The District Attorney's Office offers numerous and wide-ranging explanations for its conduct. The first is that its statement that Wharton's <u>Strickland</u> claim was meritorious was a legal position, not a factual representation. But the language of its concession, proposed order, and brief says otherwise: That Office represented that it had performed a "careful[] review[]," which was a factual statement. Any "careful[] review[]" must, as the Third Circuit directed, have included examination of possible negative prison adjustment evidence, and discovery of Wharton's escape could have easily been undertaken.[5] In fact, according to the logic of the Assistant Supervisor, that Office, "as an entity" was aware of the escape. But no matter which version is accepted, the fact remains that the District Attorney's Office failed to alert the Court to such powerful anti-mitigation evidence.

The Office's statement that it had "carefully reviewed" this matter and found that Wharton's <u>Strickland</u> claim was meritorious unmistakably represented that the Office had found no facts that would lead any reasonable judge to reject the claim. In particular, the Office's citation in its brief to two specific facts supporting <u>Strickland</u>'s prejudice prong implied that those facts were significant in the context of its "careful[] review[]"—or, at least, not overwhelmed by other undisclosed facts. The American Bar Association has recognized that "[i]n light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor

---

[5] The Attorney General's Office became aware of Wharton's escape through a simple review of Wharton's criminal history, which included a conviction for escape. (<u>See</u> ECF No. 311.)

to the courts … ." American Bar Association, Standards for the Prosecution Function § 3-1.4. Accordingly, when a prosecutor concedes relief and supplies certain facts "to [a] court[]," there is an implied representation that the prosecutor's basis for its position was made after a "reasonable inquiry," is fully informed, and is not misleading.

The District Attorney's Office continues to press that although it is a public, prosecuting office, a heightened duty of candor does not apply to its communications with the Court. The Office asserts that this heightened duty only applies to disclosures to the defense of exculpatory facts under Brady v. Maryland, 373 U.S. 83 (1963), and Pennsylvania Rule of Professional Conduct 3.8(d). (ECF No. 300-1 at 16.) The Court disagrees.

Not surprisingly, authority is sparse on the ethical duties of prosecutors who advocate, as the District Attorney did here, for death penalty relief on behalf of a defendant on habeas review. But an analogous situation occurs when a prosecutor and defense counsel jointly recommend a sentence that is favorable to a defendant. Under those circumstances, the prosecutor may not withhold relevant information from the sentencing court even where a favorable agreement has been reached with a defendant, and even if such information is adverse to the defendant. See United States v. Casillas, 853 F.3d 215, 218 (5th Cir. 2017); Bruce A. Green, Candor in Criminal Advocacy?, 44 Hofstra L. Rev. 1105, 1124 (2016). The Fifth Circuit's reasoning squarely applies here: "[I]f an attorney for the Government is aware that the court lacks certain relevant factual information or that the court is laboring under mistaken premises, the attorney, as a prosecutor and officer of the court, … has the duty to bring the correct state of affairs to the attention of the court." United States v. Block, 660 F.2d 1086, 1091 (5th Cir. 1981). Failing to disclose these facts lacks candor because "the public has an interest in the decision being informed by knowledge of the

provable facts that are likely to matter," Green, supra, at 1124, and because nondisclosure "improperly undercut[s] the sentencing court's role." United States v. Aragon, 922 F.3d 1102, 1116 (10th Cir. 2019) (Holmes, J., concurring). A private concession by a prosecutor that produces no public record justifying relief is "reminiscent of the Star-Chamber." Brown, 196 A.3d at 146.

Even after the highest Pennsylvania court, which the District Attorney routinely appears before, spelled out in clear terms the proper process in collateral death penalty matters, the District Attorney's Office continues to misunderstand its role. As the Pennsylvania Supreme Court explained in Brown, when a habeas petitioner and a prosecutor jointly request that a sentence be overturned, they are asking the Court to use its power to bring about a change neither party itself, nor both acting together, can accomplish. If the District Attorney's Office files its concession on a misleading presentation of the facts, it attempts to misuse the Court's power, which is an "improper purpose" under Rule 11(b)(1).

In a further attempt to justify its conduct, the District Attorney's Office also disagrees with the suggestion that the agreement it reached with Wharton's counsel, and the lack of adversity it thereby created, heightened their duty to be candid (and "careful[]") about facts that might preclude relief. The District Attorney's Office makes the perplexing argument that even after its concession, the proceeding remained adversarial because Wharton was also a party to it. (ECF No. 300-1 at 19.)

While the facts and posture of this case are unique, courts have recognized analogous situations in which a joint or unopposed request carries a similar affirmative duty to inform the court of adverse facts as exists in ex parte proceedings: (1) when a prosecutor and defense attorney jointly recommend a sentence, United States v. Block, 660 F.2d 1086, 1091 (5th Cir. 1981); (2) when a prosecutor asks a judge to dismiss a case, In re Kress, 608 A.2d 328, 337 (N.J. 1992); (3)

when a class action named plaintiff and a defendant jointly propose a settlement, Arkansas Teachers Retirement System v. State Street Bank & Trust Co., 512 F. Supp. 3d 196, 208 (D. Mass. 2020); and (4) when a court-appointed agent requests fees. Eagan ex rel. Eagan v. Jackson, 855 F. Supp. 765, 790 (E.D. Pa. 1994). These situations have the following attributes in common: (1) the parties seek relief they cannot achieve through private agreement; (2) failing to disclose adverse facts results in a transfer of decision-making authority from the court to the parties, see Aragon, 922 F.3d at 1115-16 (Holmes, J., concurring); and (3) the adversarial system is inadequate to prevent abuse. All of those attributes are present here. As a consequence, the District Attorney's Office's statement that its careful review found merit to Wharton's Strickland claim contained an implied representation, subject to Rule 11(b)(3), that the District Attorney's Office was not aware of any significant, contrary facts that would lead any reasonable judge to deny the requested relief.

While Wharton's habeas proceeding had only two formal parties, the Court also disagrees with the District Attorney's outside counsel that there were no other interests at play in understanding why relief was conceded. The public had an "interest that a result be reached which promotes a well-ordered society," which "is foremost in every criminal proceeding." Young v. United States, 315 U.S. 257, 259 (1942). The victim and the victim's family had a right to clear communication and had an interest in being heard and treated with fairness and respect. 18 U.S.C. § 3771(b)(2)(A). And the state had an interest in having its judgments set aside only "upon proper constitutional grounds" rather than the concession of an "elected legal officer of one political subdivision within the State." Sibron v. New York 392 U.S. 40, 58 (1968); see also Carter v. City of Philadelphia, 181 F.3d 339, 349 (3d Cir. 1999) ("Pennsylvania's case law defines district attorneys—Philadelphia

District Attorneys in particular—as local, and expressly <u>not</u> state, officials."); <u>United States v. Ben-dolph</u>, 409 F.3d 155, 166 (3d Cir. 2005) (Congress did not "intend[] to relegate the efficacy of its reforms [in 18 U.S.C. § 2254] to the vagaries of a prosecutor's decisions or mistakes.").

The last of those three interests—deference to final state court judgments—deserves special consideration. While there are no specific ethical rules in habeas corpus proceedings, there are unique opportunities for abuse that have come to light here. The state of Pennsylvania does not afford the Philadelphia District Attorney's Office discretion to set aside a death sentence once imposed. <u>Brown</u>, 196 A.3d at 149. The state's justifications for that rule are numerous and include that past sentences cannot be left to "the changing tides of the election cycles." <u>Id.</u> Pennsylvania is entitled to limit the District Attorney's discretion in this manner because "States retain autonomy to establish their own governmental processes," <u>Arizona State Legislature v. Arizona Indep. Re-districting Comm'n</u>, 576 U.S. 787, 816 (2015), and "State[s] … ha[ve] … flexibility in deciding what procedures are needed in the context of postconviction relief." <u>Dist. Attorney's Off. for Third Jud. Dist. v. Osborne</u>, 557 U.S. 52, 69 (2009).

As it relates to Rule 11, a prosecutor may not avoid those restrictions by submitting only selected facts to a federal court. This is because federal habeas jurisdiction is premised on the existence of a federal question. <u>Mason v. Myers</u>, 208 F.3d 414, 417 n.6 (3d Cir. 2000). If the federal court is unaware that the presentation is misleading, it cannot enforce the limits of its own jurisdiction, which is particularly important when the court has been asked to issue the "extraordinary remedy" of habeas corpus. <u>See</u> <u>Hensley v. Municipal Court</u>, 411 U.S. 345, 351 (1973).

Here, were it not for the assistance of the Attorney General, there was a risk that this Court may have ordered habeas relief that, under the law, it had no power to grant—a risk that heightened the District Attorney's Office's duty to conduct a reasonable inquiry before requesting relief. Put

another way, had this Court simply accepted the concession, and the public and victims later learned of the escape, the Court's statement that it had "carefully" reviewed the matter could rightfully be called into question, as would the public's trust in the legal process. Apparently in its zeal to overturn a jury's death sentence, the District Attorney's Office did not bother to take this factor into account.

The District Attorney's Office offers yet another justification for its conduct by noting that judges in this District have frequently granted its requests to concede habeas relief. The routine use of concessions in federal court to modify state sentences without a merits review might be tolerable if it were a permissible exercise of discretion. But where it is a discretion forbidden in the "strongest terms," Brown, 196 A.3d at 146, a concern emerges that these concessions serve an improper purpose. Cf. Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("A State's procedural rules are of vital importance to the orderly administration of its criminal courts; when a federal court permits them to be readily evaded, it undermines the criminal justice system.").

The District Attorney's Office lastly claims that it never opposed the development of facts regarding Wharton's habeas petition. (ECF No. 300-1 at 5-6; N.T., 6/23/22, 17-18.) That response is not credible. The Office had an opportunity to develop the facts when remand was ordered but chose to only put before the Court a concession based upon limited selected facts. The District Attorney's Office may have also forgotten that it objected to the Attorney General's Office's conducting a "factual investigation," "calling witnesses," "introducing evidence," and "develop[ing]

a factual record." (ECF No. 226 at 5, 7-8.) And in post-hearing briefing, in objecting to the Attorney General's participation, the District Attorney's Office called the use of the Attorney General's Office as an amicus to complete the record "unprecedented."[6]

Given all of the above, the Court concludes that the District Attorney's Office's representation that it had conducted a careful factual review and found merit to Wharton's <u>Strickland</u> claim lacked an "evidentiary basis" as required by Rule 11. Two key members of the Committee that conducted the purported review claimed that they were unaware that Wharton's "prison adjustment evidence" included evidence of an escape attempt. This information was available in Wharton's criminal history as a conviction for "escape." Whatever review the Committee performed, it was either not of the merits or was not "careful."

The Court also finds that the District Attorney's Office represented that Wharton's <u>Strickland</u> claim was meritorious without conducting an "inquiry reasonable under the circumstances." Wharton's escape attempt resulted in a conviction that appears on his criminal history, which can be found simply by typing Wharton's name into Pennsylvania's Unified Judicial System Web Portal to reveal a conviction for "ESCAPE." Yet two supervisors on the Committee that recommended conceding Wharton's habeas petition testified that they were unaware of the escape attempt at the time and did not know whether the District Attorney, who approved the concession, was aware of it. That two experienced attorneys recommended taking the extraordinary step of attempting to vacate a decades-old death penalty sentence without examining Wharton's criminal history is a matter of inter-office process. But to then ask a court to approve such extraordinary relief based

---

[6] The Attorney General's Office was also invited by the Pennsylvania Supreme Court to participate as an amicus in <u>Brown</u>. <u>See</u> 196 A.3d at 142).

**A60**

on such a patently deficient inquiry is not "reasonable under the circumstances" and implicates the submission requirements of the Federal Rules of Civil Procedure.

Rule 11 also instructs that the "circumstances" at play be considered. Under the circumstances of this case, it cannot be ignored that the underlying facts involved the brutal murder of two parents and an infant left by Wharton to freeze to death who miraculously survived. Under these circumstances, and given the death sentences that followed, the District Attorney's Office's failure to more carefully review this matter before involving the Court further implicates Rule 11. In failing to conduct the required "inquiry reasonable under the circumstances," the supervisors on the Committee and District Attorney's Office violated Rule 11.

### B.    Communication with the Victims' Family

The District Attorney's Office also represented that its concession was made "[f]ollowing … communication with the victims' family." The supervising attorney who signed this statement explained that he did not mean to say that the victims' family had been consulted prior to the decision or that they agreed with that concession. Rather, he meant only that the decision to concede had been communicated to the victims' family <u>after</u> it was made. (ECF No. 287-1 ¶ 12.) But that same supervising attorney acknowledged that this submission to the Court made on behalf of the District Attorney's Office was susceptible to the interpretation that the victims' family had been consulted and that they concurred in the outcome, which was not true. The supervising attorney also admitted that his communication lacked clarity and was vague.

As to the intended assertion—that the victims' family had been notified of the planned concession—the Supervisor of the Federal Litigation Unit who was the signing attorney arrived at this understanding through conversations with the Office's Victim Witness Coordinator. But somehow this conversation failed to convey to him that only one family member had been contacted,

and that the sole surviving victim, Lisa Hart-Newman, had never been contacted. Both he and the Victim Witness Coordinator were therefore unaware that several family members, including Lisa Hart-Newman, would have been vehemently opposed to the concession had they been informed of it.

This Court (which only learned of the family's opposition through the Attorney General's Office) is not the only one who considered the District Attorney's representations misleading. Lisa Hart-Newman, the infant, now age thirty-seven, who was left to die by Wharton after her parents were murdered, stated she was "extremely disappointed to learn of the District Attorney's stance and very troubled that he implied that the family approved of his viewpoint." (ECF No. 171-5 at 16.) Michael Allen, one of the brothers of the deceased, also noted, "[I]t would appear that there was a substantially deficient briefing by the DA's office regarding the significance and implications for vacating Wharton's death penalty." (Id. at 17.)

Accordingly, the Court finds that the District Attorney's Office's statement regarding its communication with the victims' family was false and yet another representation to the Court made after an inquiry that was not reasonable under the circumstances. The supervising attorney who made this representation did so at the direction of his supervisors, was not personally aware of the error, and has apologized for this miscommunication.

## V.   VIOLATION AND SANCTIONS

The Supervisor of Federal Litigation filed the Notice of Concession and signed the other submitted documents in question. With respect to his statement that the Office had "carefully re-viewed the facts" in determining that Wharton's ineffectiveness claim fulfilled the Strickland standard, I credit his explanation that he relied solely on communications from supervisors that a careful review had actually been conducted. He also explained that he had no input regarding the

decision to concede and no authority to ask the Capital Case Review Committee to reconsider its decision. In filing the Notice of Concession, he followed the directive of the Assistant Supervisor of the Law Division and the Office's procedures.

Rule 11 does not preclude the signer from relying on information from other persons. See Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1278-79 (3d Cir. 1994). Comment 1 to Pennsylvania Rule of Professional Conduct 5.2 is informative and instructs that "if a subordinate filed a frivolous pleading at the direction of a supervisor, the subordinate would not be guilty of a professional violation unless the subordinate knew of the document's frivolous character." See also Pa. RPC 5.2 cmt. 2 (when reasonable to do so, a lawyer may take direction from a supervisor so that the office can follow a "consistent course of action").

While a deeper inquiry on the part of Federal Litigation Supervisor would have been preferable, it was not "patently … frivolous" for this lawyer to assume that the highly experienced attorneys on the Capital Case Review Committee and the District Attorney himself had performed a sufficient investigation before directing that a concession in a death penalty case be filed. This same attorney also acted with candor and contrition in acknowledging that his statement regarding communication with the victims' family was unclear and susceptible to a misleading interpretation and has apologized for this mistake. Compare Dr. Pepper Bottling Co. of Texas v. Del Monte Corp., No. 88-cv-3012, 1992 WL 438013, at *1 (N.D. Tex. Jan. 7, 1993) (declining to issue further sanctions based on "the forthright contrition and recognition of error expressed by [the attorney] in his affidavit"), with Milani v. International Business Machines Corp., No. 02-cv-3346, 2004 WL 3068451, at *2 (S.D.N.Y. Dec. 30, 2004) (imposing sanctions in part based on the attorney's "utter lack of contrition[] or even regret"). For these reasons, the Court does not find that the Federal Litigation Supervisor violated Rule 11.

The Court reluctantly concludes that a different view must be taken regarding the Law Division Supervisor and Assistant Supervisor, both of whom were on the Capital Case Review Committee. The Assistant Supervisor directed the Federal Litigation Supervisor to file the Notice of Concession, and both the Law Division Supervisor and Assistant Supervisor had their names included on the brief representing that the Committee had "carefully" reviewed Wharton's Strickland claim. The District Attorney's Office's conduct as a whole must also be considered, as Rule 11 directs that sanctions may be imposed on parties and law firms when these entities are "responsible for [a] violation" of the Rule. See Fed. R. Civ. P. 11(c)(1).

As leaders of the Office's Division that oversees the "Law," and who presumably provide advice and analysis on controlling precedent to the District Attorney, the Supervisor and Assistant Supervisor must have been aware that Strickland's prejudice prong required an assessment of mitigation evidence not presented by trial counsel in conjunction with possible anti-mitigation evidence. See Wharton, 722 F. App'x at 283 ("[W]e must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony."). They were also well aware that recent Pennsylvania Supreme Court precedent mandated that a full development of the facts be undertaken before relief could be granted. Yet the District Attorney's Office, through these supervisors, directed representations to the Court that the Office had "carefully reviewed the facts" when in fact that did not occur. The assertion that a careful review had been conducted by the committee is irreconcilable with the testimony of two supervisors involved in the review that they were ignorant of Wharton's escape attempt. And it is worth repeating that the Court afforded these supervisors the opportunity to explain how their review of

the facts was "careful[]," yet at that hearing, their counsel referred to a deliberative process privilege and engaged in long speaking objections, which at times suggested answers, such that little information was obtained.

The close timing between the Pennsylvania Supreme Court's ruling in <u>Brown</u> that the District Attorney's Office does not have discretion to concede a death penalty sentence on collateral review absent a full exploration of facts and the Office's strategy of doing exactly that in this case only exacerbates this situation. The <u>Brown</u> decision was issued just four months before the Office's concession here, and counsel of record in <u>Brown</u> was the Assistant Supervisor who was also on the Committee that recommended conceding Wharton's federal habeas petition. In <u>Brown</u>, The District Attorney's Office attempted to reverse years of support for a jury's verdict through a "new-found agreement" with no substantive factual reasons. The same tactic was attempted in this federal case. In both cases, the Office sought to use prosecutorial discretion as a "substitute for independent judicial review." These parallels suggest an "improper purpose" for the District Attorney's Office's concession in this case, namely an attempt to circumvent <u>Brown</u> in a forum that may be unfamiliar with its strictures. A reasonable response to these concerns would have been to follow <u>Brown</u> and present all necessary facts to this Court, or at the very least, to acknowledge missteps made and provide assurances that the Office would not misuse federal jurisdiction to evade state law. Instead, the Office's supervisors were reluctant to explain their actions and offered little acknowledgment of <u>Brown</u> or that their failure to advise of Wharton's escape should have been handled with more candor.

As to the assertion that the Office had decided to concede following "communication with the victims' family," this statement gave the impression that the Office had conferred with the family before making the decision to concede and that the family either agreed with the decision

or did not object to it. In fact, the only communication was to inform a single family member that the Office was considering conceding. None of the family members supported the Office's decision to concede, and several expressed shock and indignation that the District Attorney's Office had suggested otherwise. While the Court declines to sanction the signing attorney, no similar justifications excuse the District Attorney's Office as a whole for so carelessly invoking its communications with the victims' family as support for its concession while, at the same time, making only a cursory effort to contact them and no effort to consider their views. The Law Division Supervisor could give no justification for why communication with the surviving victim and her family was handled in this manner other than to say that victim communication was not her responsibility and the Office made a "mistake." (N.T. 6/23/22 at 48.)

In contrast to the regret demonstrated by the (now former) Supervisor of the Federal Litigation Unit, the District Attorney's Office has steadfastly insisted that it has done nothing wrong, owes no explanation, and will provide none. (N.T. 6/23/22 at 11-12.) Cf. Ivy v. Kimbrough, 115 F.3d 550, 553 (8th Cir. 1997) (affirming sanctions where the "response to the court's order to show cause regarding sanctions was so superficial as to be insulting to the court and to the policies underlying Rule 11"). A glaring example of this continued tactic is the Assistant Supervisor's attempt to rationalize his present position that he and others on the Committee were unaware of the escape with his prior statement to the Court, made during the remand hearings, that the Office was aware of it. His explanation that he originally meant only to convey that the Office as it existed decades ago knew of the escape was clearly designed to obfuscate rather than clarify. The Court finds this explanation incredible. When I originally asked that lawyer whether the Office was aware of the escape when it filed its concession, there is no logical reason why I would need to know if the Office "as an entity" and as it existed decades ago was aware of the escape. It would have taken

**A66**

little effort for the Assistant Supervisor to clarify his answer with candor, stating, for instance, "Your Honor, I do not know whether the current Administration considered the escape when we decided to concede the death penalty, but, because an Assistant District Attorney was in the courtroom when the escape occurred in 1986, and Wharton pled guilty to escape, the Office was aware of it at that time." The Assistant Supervisor's rationalization is yet another example of a litigation practice on the part of the District Attorney's Office designed to provide the Court with only limited information that suits the Office's purposes.

Based on the foregoing, I find that the Law Division Supervisor, Assistant Supervisor and the District Attorney's Office violated Rule 11(b)(1) by asserting without "evidentiary support" or an "inquiry reasonable under the circumstances" that it had "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in Strickland v. Washington, 466 U.S. 668 (1984)" and that it had done so "[f]ollowing … communication with the victims' family." I also find that the violation was sufficiently "egregious" and "exceptional" under the circumstances of this case to warrant sanctions under Rule 11.

Rule 11 sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). "In determining the appropriate sanctions, the Court seeks the least significant sanction that will correct or deter similar conduct … in the future." Taggart v. Deutsche Bank Nat'l Trust Co., No. 20-cv-5503, 2021 WL 2255875, at *18 (E.D. Pa. June 3, 2021). "The sanction may include nonmonetary directives," Fed. R. Civ. P. 11(c)(4), and the Federal Judicial Conference has "expressed a preference … for nonmonetary sanctions" over monetary ones. Orlett v. Cincinnati Microwave, Inc., 954 F.2d 414, 421 (6th Cir. 1992). A wide variety of nonmonetary sanctions may be utilized. See Gaiardo v. Ethyl Corp., 835 F.2d 479, 482 (3d Cir. 1987) (listing examples).

Had the District Attorney's Office simply advised the Court of facts that would have al-
lowed a merits review, significant judicial resources and the time and effort expended by the law-
yers from the Attorney General's Office would not have been necessary.[7] The enormous cost re-
quired to uncover crucial facts that the District Attorney's Office so carelessly disregarded could
suggest that monetary sanctions are necessary to deter similar conduct in the future. But the Court
ultimately decides not to impose monetary sanctions here as they would fall on the taxpayers of
Philadelphia and thus may not suffice to deter repetition of the conduct at issue.

In determining an appropriate nonmonetary sanction, I am guided by federal crime victims'
rights legislation. "In a Federal habeas corpus proceeding arising out of a State conviction, the
court shall ensure that a crime victim is afforded" certain rights, including the right not to be ex-
cluded from the proceedings, the right to be heard, and the right to be treated with dignity and
respect. 18 U.S.C. § 3771(b)(2)(A). While the law directs those obligations to courts rather than
prosecutors, § 3771(b)(2)(C), "courts … make decisions based on information supplied by the
parties" and "must depend on the parties to provide accurate information." Armstrong Surgical
Center, Inc. v. Armstrong County Memorial Hospital, 185 F.3d 154, 176 (3d Cir. 1999). The Dis-
trict Attorney's Office's conduct in this case impeded my ability to ensure that the victims were
provided their statutory rights—as well as their broader right, shared with the public generally, to
have courts issue decisions "informed by knowledge of the provable facts that are likely to matter."
Green, supra, at 1124.

Other than the admonition contained in this Opinion, the Court declines to impose any
monetary or non-monetary sanctions on the Law Division Supervisor and Assistant Supervisor.

---

[7] The Court greatly appreciates the resources and input provided by the Attorney General's Office.

Both are public servants who were following the policies and procedures of the Office that employed them. I will however impose the following nonmonetary sanction on the District Attorney's Office under Federal Rule of Civil Procedure 11(c)(4):

First, within thirty (30) days of the filing of this opinion, the District Attorney's Office shall send separate written apologies to victim family members Tony Hart, Michael Allen, Patrice Carr, and to victim Lisa Hart-Newman for representing that it engaged in "communication with the victims' family[.]" As the testimony of the two Law Division supervisors was that the District Attorney approved and implemented internal procedures that created the need for this sanction, and that the District Attorney had the sole, ultimate authority to direct that the misleading Notice of Concession be filed, the apologies shall come from the District Attorney, Lawrence Krasner, personally. Copies of the apologies shall be filed with the Court.

Second, while I have no authority to control the conduct of the District Attorney in litigation before other judges, in cases where I am assigned, all concessions by the Philadelphia District Attorney's Office in proceedings under 28 U.S.C. § 2254 must be accompanied by a full, balanced explanation of facts that could affect my decision to accept or reject the concession. For instance, and by way of suggestion, the concession in this case could have stated:

> **"As directed by the United States Court of Appeals for the Third Circuit, and as it relates to the Sixth Amendment issue before the Court, the Capital Case Review Committee of the Philadelphia District Attorney's Office has reviewed and considered both positive and negative prison adjustment evidence. Consistent with our duty of candor and the Third Circuit's directive that anti-mitigation evidence be considered, we also advise that this evidence includes an incident in 1986 in which Mr. Wharton escaped from a City Hall courtroom. Having carefully reviewed all of the facts and law, including anti-mitigation evidence, we advise that the District Attorney's Office believes that Wharton's positive prison adjustment evidence is sufficiently mitigating to satisfy the prejudice prong of <u>Strickland</u>. The District Attorney's Office also advises that it has contacted the victims' immediate family (including the only surviving victim), and all family members are opposed to this concession."**

**A69**

An appropriate order will follow.[8]

---

[8] Local Civil Rule 83.6(V)(A) states the following:

> When the misconduct or other basis for action against an attorney (other than as set forth in Rule II) or allegations of the same which, if substantiated, would warrant discipline or other action against an attorney admitted to practice before this court shall come to the attention of a Judge of this court, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these Rules, the judge shall refer the matter to the Chief Judge who shall issue an order to show cause.

For the reasons set forth above, this matter will be referred to the Chief Judge of this Court.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT WHARTON,

*Petitioner*,

*v.*

DONALD T. VAUGHN,

*Respondent.*

Civil Action

No. 01-cv-6049

## ORDER

**AND NOW**, this 12th day of September, 2022, upon consideration of Respondents' "Motion to Cancel Hearing and Dismiss Allegations of Sanctionable Conduct" (ECF No. 300), "Emergency motion to Continue Hearing" (ECF No. 303), and "Response to Order to Show Cause" (ECF No. 312), and following a hearing held on June 23, 2022, and for the reasons set out in the accompanying memorandum opinion, it is hereby **ORDERED** that:

1.     Respondents' "Motion to Cancel Hearing and Dismiss Allegations of Sanctionable Conduct" (ECF No. 300) is **DENIED**.

2.     Respondents' "Emergency motion to Continue Hearing" (ECF No. 303) is **DENIED**.

3.     The District Attorney's Office of Philadelphia and its attorneys as set forth in the accompanying memorandum opinion have violated Federal Rule of Civil Procedure 11(c).

BY THE COURT:

*/s/ Mitchell S. Goldberg*

**MITCHELL S. GOLDBERG, J.**

**A71**