**22-2839**

# United States Court of Appeals
# for the Third Circuit

ROBERT WHARTON,

v.

SUPERINTENDENT GRATERFORD SCI

THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE,
PAUL GEORGE, and NANCY WINKELMAN,

*Appellants.*

On Appeal from the Order entered on September 12, 2022,
in the United States District Court for the Eastern District of Pennsylvania
in Civil Action No. 2:01-cv-06049-MSG

**BRIEF OF COURT-APPOINTED *AMICUS CURIAE*
IN SUPPORT OF AFFIRMANCE OF DISTRICT COURT'S
RULE 11 SANCTIONS ORDER**

Roman Martinez
Gregory B. in den Berken
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Tel.:   (202) 637-2200
Fax:   (202) 637-2201
Email:  roman.martinez@lw.com
        greg.indenberken@lw.com
        christina.gay@lw.com

August 14, 2023

*Court-Appointed* Amicus Curiae *Counsel in Support of Affirmance*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................1

ISSUES PRESENTED FOR REVIEW ..................................................5

STATEMENT OF RELATED CASES ..................................................5

STATEMENT OF THE CASE.............................................................6

    A.    Wharton's Criminal Conduct And Brutal Murder Of Bradley And Ferne Hart.....................................................................6

    B.    Wharton's Habeas Proceedings And This Court's 2018 Remand Decision.............................................................................8

    C.    The District Attorney Office's Post-Remand Concession Efforts......10

    D.    The Pennsylvania Office Of Attorney General's Investigation..........13

    E.    The District Court's Evidentiary Hearing And May 2022 Order Denying Wharton's Habeas Petition.................................................17

    F.    The District Court's June 2022 Show-Cause Hearing.......................21

    G.    The District Court's September 2022 Order Imposing Rule 11 Sanctions On The DAO....................................................................23

PERTINENT RULES .....................................................................26

SUMMARY OF ARGUMENT ...........................................................26

ARGUMENT ...............................................................................28

I.    THE DISTRICT COURT'S ORDER SANCTIONING APPELLANTS SHOULD BE UPHELD ................................................................28

    A.    The District Court's Rule 11 Sanctions Order Is Reviewed Deferentially For Abuse Of Discretion .............................................28

**Page**

B.    Rule 11 And The Duty Of Candor Impose Special Obligations On Prosecutors Not To Mislead The Court ........................................ 29

C.    The District Court Did Not Abuse Its Discretion In Sanctioning Appellants For Misrepresentations About Their Review Of Wharton's Habeas Claim .................................................................. 36

D.    The District Court Did Not Abuse Its Discretion In Sanctioning Appellants For Misrepresenting Their Communication With The Family ........................................................................................... 44

II.    THE DISTRICT COURT WAS NOT REQUIRED TO REFER THE PROCEEDINGS TO THE CHIEF JUDGE BEFORE IMPOSING SANCTIONS ....................................................................................... 48

A.    The District Court's Interpretation Of Its Local Rules Is Reviewed Deferentially For Abuse Of Discretion ............................ 48

B.    The District Court Did Not Abuse Its Discretion In Concluding That Local Rule 83.6(V) Did Not Require It To Transfer The Disciplinary Proceedings At The Outset ............................................ 48

C.    Appellants Received Detailed Notice And Extensive Opportunities To Be Heard .................................................................. 55

CONCLUSION ........................................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams v. Ford Motor Co.*,
   653 F.3d 299 (3d Cir. 2011) ....................................................28, 53, 54

*Arkansas Teacher Retirement System v. State Street Corp.*,
   25 F.4th 55 (1st Cir. 2022)....................................................35, 42, 47

*Berger v. United States*,
   295 U.S. 78 (1935)..........................................................................34

*Ex parte Burr*,
   501 U.S. (9 Wheat.) 529 (1824) .....................................................52

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991)....................................................................28, 52

*Commonwealth v. Pownall*,
   278 A.3d 885 (Pa. 2022)..................................................................46

*Commonwealth v. Wharton*,
   607 A.2d 710 (Pa. 1992)....................................................................7

*Commonwealth v. Wharton*,
   665 A.2d 458 (Pa. 1995)....................................................................6

*Commonwealth v. Wharton*,
   811 A.2d 978 (Pa. 2002)................................................................8, 9

*Commonwealth v. Wharton*,
   886 A.2d 1120 (Pa. 2005)..................................................................6

*Cooter & Gell v. Hartmarx Corp.*,
   496 U.S. 384 (1990)..................................................................28, 29

**Page(s)**

*Dillon v. BMO Harris Bank, N.A.*,
  2016 WL 5679190 (M.D.N.C. Sept. 30, 2016), *aff'd sub nom.*
  *Six v. Generations Federal Credit Union*, 891 F.3d 508 (4th Cir.
  2018) ............................................................................................46

*Domain Protection, L.L.C. v. Sea Wasp, L.L.C.*,
  23 F.4th 529 (5th Cir. 2022) ........................................................31

*Douglas v. Donovan*,
  704 F.2d 1276 (D.C. Cir. 1983) ...................................................32

*Eagan ex rel. Keith v. Jackson*,
  855 F. Supp. 765 (E.D. Pa. 1994) ...........................................34, 35

*Garr v. United States Healthcare, Inc.*,
  22 F.3d 1274 (3d Cir. 1994) .........................................................30

*Juniper v. Davis*,
  74 F.4th 196 (4th Cir. 2023) ........................................................33

*King v. Whitmer*,
  71 F.4th 511 (6th Cir. 2023) ........................................................30

*Koch v. Pechota*,
  744 F. App'x 105 (3d Cir. 2018) ..........................................31, 38, 47

*LaSalle National Bank v. First Connecticut Holding Group*,
  *L.L.C. XXIII*,
  287 F.3d 279 (3d Cir. 2002) .........................................................30

*Lewis v. University of Pennsylvania*,
  779 F. App'x 920 (3d Cir. 2019) ...................................................52

*In re Lightfoot*,
  217 F.3d 914 (7th Cir. 2000) ...................................................45, 47

*Maine Audubon Society v. Purslow*,
  907 F.2d 265 (1st Cir. 1990) ....................................................34, 39

**Page(s)**

*Marino v. Usher*,
  2014 WL 2116114 (E.D. Pa. May 21, 2014), *aff'd*,
  673 F. App'x 125 (3d. Cir. 2016) ...................................................52

*Martin v. Brown*,
  63 F.3d 1252 (3d Cir. 1995) ...........................................................48

*McCoy v. Court of Appeals of Wisconsin, District 1*,
  486 U.S. 429 (1988)........................................................................30

*Pennsylvania Environmental Defense Foundation v. United States*
  *Department of the Navy*,
  1995 WL 56602 (E.D. Pa. Feb. 3, 1995), *aff'd*, 70 F.3d 1256
  (3d Cir. 1995)..................................................................................35

*Roadway Express, Inc. v. Piper*,
  447 U.S. 752 (1980).........................................................................52

*In re Ronco, Inc.*,
  838 F.2d 212 (7th Cir. 1988) ...........................................31, 38, 46

*Scott v. Vantage Corp.*,
  64 F.4th 462 (3d Cir. 2023) ..............................................29, 30, 37

*Sibron v. New York*,
  392 U.S. 40 (1968)............................................................33, 39, 42

*Six v. Generations Federal Credit Union*,
  891 F.3d 508 (4th Cir. 2018) ...........................................31, 38, 39

*Strickland v. Washington*,
  466 U.S. 668 (1984)...........................................................................9

*Taggart v. Deutsche Bank National Trust Co.*,
  2021 WL 2255875 (E.D. Pa. June 3, 2021),
  *aff'd*, 2023 WL 4578801 (3d Cir. July 18, 2023) .............................52

*In re Taylor*,
  655 F.3d 274 (3d Cir. 2011) .............................................29, 55

**Page(s)**

*United States v. Block*,
660 F.2d 1086 (Former 5th Cir. Unit B Nov. 12, 1981).....................................34

*United States v. Jimenez*,
928 F.2d 356 (10th Cir. 1991) .........................................................34

*United States v. Miller*,
624 F.2d 1198 (3d Cir. 1980) .........................................................48

*United States v. Shaffer Equipment Co.*,
11 F.3d 450 (4th Cir.1993) .........................................................31

*Weitzner v. Sanofi Pasteur Inc.*,
909 F.3d 604 (3d Cir. 2018) .........................................................48

*Wharton v. Vaughn*,
2012 WL 3535868 (E.D. Pa. Aug. 16, 2012) .................................8, 9

*Wharton v. Vaughn*,
722 F. App'x 268 (3d Cir. 2018) ...................................5, 9, 10, 37, 38

*Williams v. Beard*,
637 F.3d 195 (3d Cir. 2011) .......................................................10, 38

*Woosley v. United States District Court, District of Connecticut*,
2016 WL 4247561 (E.D. Pa. Aug. 10, 2016) .....................................53

*Young v. United States*,
315 U.S. 257 (1942).........................................................39, 42

## FEDERAL STATUTES

18 U.S.C. § 3771(b)(2)(A).........................................................20, 47

## STATE STATUTES

18 Pa. Cons. Stat. § 11.201(4) .........................................................47

18 Pa. Cons. Stat. § 11.201(5) .........................................................47

18 Pa. Cons. Stat. § 11.213(b) .........................................................47

**Page(s)**

18 Pa. Cons. Stat. § 11.213(e)................................................................47

18 Pa. Cons. Stat. § 11.213(f)................................................................47

42 Pa. Cons. Stat. § 9541 *et seq.*..........................................................8

42 Pa. Cons. Stat. § 9711(d)(6).............................................................8

42 Pa. Cons. Stat. § 9711(d)(10)...........................................................8

42 Pa. Cons. Stat. § 9711(e)(4).............................................................7

42 Pa. Cons. Stat. § 9711(e)(8).........................................................7, 8

## OTHER AUTHORITIES

American Bar Association, *Criminal Justice Standards for the Prosecution Function* (4th ed. 2017), https://www.americanbar.org/groups/criminal_justice/ standards/ProsecutionFunctionFourthEdition/ ............................31, 32

*Black's Law Dictionary* (11th ed. 2019)........................................40, 49

Eastern District of Pennsylvania Local Rule of Civil Procedure 1.1 ....................51

Eastern District of Pennsylvania Local Rule of Civil Procedure 83.6 ............*passim*

Fed. R. Civ. P. 11(c)(1)........................................................................51

Fed. R. Civ. P. 11(b)(3)........................................................................29

Fed. R. Civ. P. 83(a)(1)........................................................................51

Bruce A. Greene, *Candor in Criminal Advocacy*, 44 Hofstra L. Rev. 1105 (2016)................................................................................32

Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* (6th ed. 2021)................................................................................34

**Page(s)**

National District Attorneys Association, *National Prosecution Standards* (3d ed. 2009), https://ndaa.org/wp-content/uploads/NDAA-NPS-3rd-Ed.-w-Revised-Commentary.pdf ............................ 32

Pennsylvania Rule of Professional Conduct 3.8(d) ................................................. 33

## INTRODUCTION

The Philadelphia District Attorney's Office ("DAO") repeatedly misled the District Court through half-truths, omissions, and affirmative misrepresentations that almost tricked the Court into granting habeas relief without considering the most relevant contrary evidence. In two careful and extensive opinions, the District Court explained why the DAO's conduct violated Federal Rule of Civil Procedure 11 and the duty of candor. It then imposed modest, nonmonetary sanctions on the DAO and two of its supervisory attorneys. In doing so, the Court recognized that sanctions should be reserved for extraordinary circumstances—but as the Court explained, this is an extraordinary case. That decision was not an abuse of discretion and should be affirmed.

In 1985, a jury sentenced Robert Wharton to death after he brutally murdered Bradley and Ferne Hart and left their infant daughter, Lisa, to freeze to death. In 2018, this Court remanded for an evidentiary hearing on whether Wharton's counsel was ineffective for not presenting evidence of Wharton's purported positive adjustment to prison at the penalty phase. This Court directed that the hearing should cover any evidence the Commonwealth might have presented in rebuttal.

Despite having worked for decades to defend Wharton's sentences, the DAO on remand abruptly reversed course. It filed a "Notice of Concession" stating that it was conceding relief on Wharton's claim "following review of this case" and

"communication with the victims' family." When the District Court asked for further explanation, the DAO doubled down and claimed that it had "carefully reviewed" Wharton's claim and concluded that it had "merit."

Given this Court's mandate that the District Court explore rebuttal evidence and the parties' lack of adversity, the District Court appointed the Pennsylvania Office of Attorney General ("OAG") as *amicus* to provide its view on Wharton's entitlement to relief. The OAG investigated Wharton's claim and found significant evidence of *negative* behavior in prison, including that Wharton had attempted a violent, planned escape. The OAG also introduced evidence that the Harts' family was vehemently opposed to relief and that Lisa, the sole surviving victim, had never been contacted by the DAO about its concession.

The District Court then issued a careful opinion explaining why the DAO had likely violated Rule 11 and its duty of candor. The Court then issued a show-cause order, held a hearing, and provided the DAO with multiple chances to explain its conduct. Only then did the Court solidify its findings in a second opinion and impose nonmonetary sanctions on the DAO and two DAO attorneys.

The Court's sanctions ruling focused on two important misleading statements by the DAO. First, the DAO had falsely represented that it "carefully reviewed" the facts and merits of Wharton's prison-adjustment claim, even though the evidence revealed that the DAO had never even reviewed Wharton's prison records or

criminal history. These representations were especially misleading in light of this Court's directive to explore rebuttal evidence on remand. Second, the DAO had misleadingly implied that "communication with the victims' family" supported granting Wharton relief—even though the family was opposed to relief and Lisa had never been contacted. The Court concluded that both misrepresentations violated Rule 11 and the duty of candor—each of which prohibits making false and misleading statements—and warranted sanctions. The Court then imposed two nonmonetary sanctions: (1) that the District Attorney send apologies to Lisa and her family for representing that the DAO engaged in "communication with the victims' family"; and (2) that all concessions by the DAO in future habeas proceedings before the Court "be accompanied by a full, balanced explanation of facts."

That ruling was not an abuse of discretion. The District Court rightly emphasized that the DAO had a particularly important duty of candor to the Court in this case. Prosecutors always have a special obligation to ensure that courts are not misled and justice is done. But where, as here, proceedings are non-adversarial and the court cannot rely on opposing counsel to flag mistakes, a prosecutor's duty to be transparent and forthcoming is further heightened. As the District Court rightly found, the DAO breached this duty by omitting information and offering half-truths and misrepresentations about its review and its communication with the victim and the family, all in an effort to obtain relief for Wharton without conducting the

evidentiary hearing directed by this Court. Those misrepresentations were sanctionable.

Appellants' repeated attempts to frame this case as turning on the District Court's disagreement with their decision to concede relief are baseless. As the Court recognized, concessions of habeas relief *do* have a proper place and should be encouraged when a prosecutor believes that a sentence is unlawful. But the DAO's misconduct here only undermines such concessions. Courts must be able to expect that counsel's representations are based on a reasonable factual inquiry and have evidentiary support—especially if the representations are made by a prosecutor in a one-sided proceeding. The District Court's sanctions order preserves the integrity of judicial proceedings and serves the public interest.

Appellants also claim that Eastern District of Pennsylvania Local Rule of Civil Procedure 83.6(V) strips district judges of the authority to impose sanctions, but they are wrong. This rule requires judges to refer allegations of misconduct that might warrant broader disciplinary measures like disbarment or suspension to the Chief Judge. As the District Court *and* the Chief Judge held, the rule does not curtail the authority of district-court judges to police their own proceedings, including through Rule 11 sanctions.

The District Court's proceedings were by the book, and its ruling was supported by the law and the record. At minimum, the District Court did not abuse its discretion in imposing sanctions. This Court should affirm.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court abused its discretion in imposing Rule 11 sanctions on the DAO, Nancy Winkelman, and Paul George for making false, misleading, or unjustified representations to the Court.

2.    Whether the District Court was required to refer the case to the Chief Judge of the Eastern District of Pennsylvania pursuant to Eastern District of Pennsylvania Local Rule 83.6(V) before imposing sanctions.

## STATEMENT OF RELATED CASES

Wharton's habeas claims were previously before this Court in *Wharton v. Vaughn*, 722 F. App'x 268 (3d Cir. 2018) (per curiam). His appeal of the denial of his habeas claim is now pending before this Court in an appeal docketed as *Wharton v. Superintendent Graterford SCI*, No. 22-9001. Appellants George and Winkelman also have pending disciplinary proceedings based on a referral to the Chief Judge of the Eastern District of Pennsylvania pursuant to Local Rule 83.6(V), which stem from their misconduct in this case. *See In re Paul George*, No. 2:22-mc-50 (E.D. Pa. filed Sept. 14, 2022); *In re Nancy Winkelman*, No. 2:22-mc-51 (E.D. Pa. filed Sept. 14, 2022).

## STATEMENT OF THE CASE

### A.   Wharton's Criminal Conduct And Brutal Murder Of Bradley And Ferne Hart[1]

Robert Wharton terrorized Bradley and Ferne Hart for five months before brutally murdering them in January 1984. Wharton first burglarized the Harts' home on August 14, 1983. He then returned a week later to burglarize their home again. This time, Wharton vandalized the Harts' home by slashing furniture, ransacking closets, mutilating family photographs, pouring bleach, paint, and oil throughout the house, and defecating and urinating on the floors. He also left behind a doll with a rope tied around its neck and a note taunting Bradley for failing to protect his family. SA8 n.2. Then, in September 1983, Wharton burglarized Bradley's father's church and pinned a defaced photograph of Bradley to the wall with a letter opener.

In January 1984, Wharton and an accomplice went to the Harts' home when only Bradley and Ferne and their seven-month-old daughter, Lisa, were home. When Bradley answered the door, Wharton and his coconspirator forced their way into the home at knifepoint. They coerced Bradley into writing a check, and then tied up the Harts on a couch while the two men watched television for hours. Eventually, Wharton took Ferne upstairs. Wharton bound her hands and legs,

---

[1]   Unless otherwise noted, these facts are taken from prior opinions in this case. *See Commonwealth v. Wharton*, 886 A.2d 1120 (Pa. 2005); *Commonwealth v. Wharton*, 665 A.2d 458 (Pa. 1995).

covered her eyes, nose, and mouth with duct tape, strangled her with a necktie, and drowned her in a bathtub. Meanwhile, Wharton's accomplice took Bradley to the basement. There, he forced Bradley to lie with his face in a pan of water, placed his foot on Bradley's back, and strangled him to death with an electrical cord.

Wharton and his accomplice then stole various items, turned off the heat in the house, and fled—leaving seven-month-old Lisa to fend for herself in the dead of winter. Three days later, Bradley's father discovered the gruesome scene and found Lisa suffering from dehydration and hypothermia. Fortunately, Lisa recovered and survived.

In 1985, Wharton was sentenced to death for each of the murders. The Supreme Court of Pennsylvania affirmed his convictions but vacated the death sentences because of a jury-instruction error. *Commonwealth v. Wharton*, 607 A.2d 710 (Pa. 1992).

At Wharton's second penalty hearing in 1992, the jury heard evidence of the history between Wharton and the Harts, as well as the grisly evidence of Wharton's murder of Bradley and Ferne. Wharton presented two mitigating circumstances: (1) his age at the time of the murders (twenty), 42 Pa. Cons. Stat. § 9711(e)(4); and (2) the "catch-all mitigator" of other evidence about "the character and record of the defendant and the circumstances of his offense," *id.* § 9711(e)(8).

The jury unanimously concluded that the two aggravating circumstances it found—(1) that Wharton committed the murders while perpetrating a felony (robbery), *id.* § 9711(d)(6); and (2) that Wharton had been convicted of another offense punishable by life imprisonment or death (the other homicide), *id.* § 9711(d)(10)—outweighed the one "catch-all" mitigating circumstance that it also found, *id.* § 9711(e)(8). Wharton was sentenced to death for each of the murders.

## B. Wharton's Habeas Proceedings And This Court's 2018 Remand Decision

After an unsuccessful appeal, Wharton petitioned for relief under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541 *et seq.* Among other things, Wharton argued that his trial counsel was ineffective for not presenting evidence of his alleged "positive adjustment" to prison during the seven years between his two penalty hearings in 1985 and 1992. A6. In support of this claim, Wharton provided prison grievances, one-page monthly evaluations from the prison's Program Review Committee, and a declaration from a psychologist, Harry Krop, stating that Wharton had made a positive adjustment to prison life between the two hearings. *See Wharton v. Vaughn*, 2012 WL 3535868, at *57-59 (E.D. Pa. Aug. 16, 2012).

The PCRA court dismissed this claim and the Pennsylvania Supreme Court affirmed. *See Commonwealth v. Wharton*, 811 A.2d 978 (Pa. 2002). Both courts found that Wharton had not shown that his counsel's performance fell below "an

objective standard of reasonableness" or that Wharton had suffered prejudice under the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). On reasonableness, both courts focused on the fact that the prison records Wharton provided "cut both ways." *Wharton*, 811 A.2d at 989. On prejudice, both courts suggested that this evidence would have been cumulative because the jury already found the "catch-all" mitigating factor. *Id.*

In 2003, Wharton filed 23 federal habeas claims under 28 U.S.C. § 2254, including a claim that his trial counsel was ineffective for not introducing evidence of Wharton's positive adjustment to prison during the time between his two penalty hearings. On August 16, 2012, the District Court issued an extensive opinion denying all of his claims. *See Wharton*, 2012 WL 3535868.

On January 11, 2018, this Court affirmed 22 of those rulings but remanded for an evidentiary hearing on Wharton's claim that his counsel was ineffective for not presenting evidence of Wharton's purportedly positive adjustment to prison. *See Wharton*, 722 F. App'x at 272-84. The panel concluded that the Pennsylvania Supreme Court's analysis was an unreasonable application of *Strickland* because counsel's performance could have been deficient even if the records "cut both ways," and just because the jury had found the "catch-all" mitigator did not necessarily mean additional mitigating evidence would not matter. *Id.* at 280-81.

9

The panel then examined Wharton's *Strickland* claim de novo to determine whether an evidentiary hearing was warranted.  In doing so, the panel noted that *Strickland* requires determining "whether Wharton's proffered evidence had a reasonable probability of changing at least one juror's vote." *Id.* at 282.  To perform that analysis, the panel explained, "'we must reconstruct the record and assess it anew.  In so doing, we cannot merely consider the mitigation evidence that went unmentioned in the first instance; we must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut [Wharton]'s mitigation testimony.'" *Id.* at 282-83 (quoting *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011)).

The panel observed that Wharton's proffered prison records did indeed "'cut both ways'" and contained "negative information." *Id.* at 283.  And it noted that, "had Wharton presented the testimony of Dr. Krop (or a similar expert witness), the Commonwealth might have countered with other evidence, including an expert holding a contrary opinion." *Id.*  The panel ultimately "remand[ed] the claim to the District Court for an evidentiary hearing" to assess the claim, including potential anti-mitigation evidence. *Id.* at 280.

## C.    The District Attorney Office's Post-Remand Concession Efforts

In February 2019, the DAO filed a two-page Notice of Concession of Penalty Phase Relief (the "Notice") stating that it conceded relief on Wharton's remaining

claim and would "not seek new death sentences in state court." A94-95. In its Notice, the DAO asserted that its decision to concede relief was made "[f]ollowing review of this case by the Capital Case Review Committee of the [DAO], communication with the victims' family, and notice to [Wharton]'s counsel." A95. But the Notice provided no explanation about why, after decades of defending Wharton's death sentences, the DAO had changed its mind about whether a *Strickland* violation had occurred.

Two days later, Wharton and the DAO jointly filed a five-sentence draft order for Judge Goldberg to sign that purported to vacate Wharton's death sentences. A98. This draft order stated that Judge Goldberg was granting relief based on his own "careful and independent review of all of the parties' submissions and all prior proceedings in this matter." *Id.*

On March 4, 2019, Judge Goldberg issued an opinion declining to adopt the proposed order. A99-110. He observed that neither the DAO's Notice nor the parties' proposed order identified any facts in the record that established Wharton was entitled to relief "without conducting the evidentiary hearing directed by the Third Circuit." A104, A110. Judge Goldberg explained that a federal court cannot grant habeas relief based only on the DAO's concession, but instead must independently evaluate the merits of the claim—which he could not do on the

11

"current record." A105-10. He accordingly "order[ed]" the parties to "provide any facts and legal authority supporting their request" for relief. A101, A104, A110-12.

In response, on April 3, 2019, the DAO submitted a brief stating that it had "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim" had merit. A115. The DAO offered two "circumstances" supporting this conclusion: (1) the "Third Circuit's ruling," and (2) a declaration from Wharton's trial counsel stating that he "was not operating under any strategy or tactic when [he] did not investigate and present evidence of … Wharton's positive prison adjustment" at the 1992 hearing. *Id.* The DAO also argued that because "the sentencing jury initially reported that it was deadlocked on whether to sentence" Wharton to death, there was a "reasonable probability that at least one juror" would have voted differently if the prison-adjustment evidence had been presented. A115-16. And the DAO opined that its "considered judgment to concede penalty[-]phase relief under the specific circumstances of this case, while not binding on [the] Court, is entitled to great weight." A117.

On May 7, 2019, Judge Goldberg issued an order observing that the DAO had "fail[ed] to indicate whether it did any investigation regarding [Wharton]'s adverse or negative adjustment to prison"; failed to "comment on the expert report submitted by [Wharton], that expert's qualifications, or whether the [DAO] ha[d] even considered consulting with its own expert"; and appeared to have "accepted the

additional evidence offered by [Wharton] at face value, without exploring whether contrary views may be viable and worth considering." SA2-3.  Judge Goldberg also noted that although the DAO claimed to have "carefully reviewed the facts and law," the DAO did not say "whether it has sought out any facts beyond those that are either currently in the record or that have been submitted by [Wharton]." SA2.  Based on the DAO's persistent reluctance to explain the grounds for its concession, Judge Goldberg appointed the OAG as *amicus* to address whether Wharton was entitled to relief.  SA3-4.[2]

### D.    The Pennsylvania Office Of Attorney General's Investigation

On July 22, 2019, the OAG submitted a 49-page *amicus* brief detailing significant evidence plainly undermining Wharton's habeas claim—and the DAO's concession.  *See* SA5-53.  This evidence included (1) "numerous prison misconducts between 1985 and 1992 (two of which involved the possession of contraband that constituted both an 'implement of escape' and potential weapon)," (2) "[an] attempted escape from City Hall while in the custody of Philadelphia deputy sheriffs," which led to a separate criminal conviction, and (3) "the fact that the

---

[2]    Soon afterwards, the DAO filed a brief in the Pennsylvania Supreme Court urging that Court to declare Pennsylvania's death penalty unconstitutional under the state constitution.  *See* Resp'ts Br. 2, *Cox v. Commonwealth*, No. 102 EM 2018 (Pa. July 15, 2019), 2019 WL 4640114.  In that filing, the DAO assured the Court that its own "policy for the review of death and death-eligible cases" was for a committee to "carefully review the facts and law" in such cases and then to make a recommendation to District Attorney Larry Krasner.  *Id.* at 6 n.2.

Pennsylvania Department of Corrections (DOC) identified Wharton's areas of concern[] as 'assaultiveness' and 'escape.'" SA16-17. The OAG included Wharton's prison records and criminal record as exhibits. SA56-158.

Wharton first tried to escape on April 21, 1986—less than a year after he was first sentenced to death—during his sentencing in an unrelated home-invasion and robbery case at Philadelphia City Hall. *See* SA86-135. Minutes after stating that he had "caused a lot of people pain and suffering" and was "sorry," A11, Wharton shoved a deputy into a closing elevator door, fled down a stairwell, and used a handcuff key that he had hidden in a sling on his arm to unlock his handcuffs. A11-12, A22-23. The deputy fired two shots to prevent Wharton's escape, apprehending him outside. A12. Those shots put Wharton and "everybody around at serious risk." ECF No. 267 at 18. In December 1986, Wharton pled guilty to escape and was sentenced to one to three years' imprisonment. SA97-100

The evidence submitted by the OAG also showed that Wharton was *still* trying to escape in May 1989. *See* SA18-20; SA57-85. Prison officials twice discovered a makeshift handcuff key or other implements of escape in Wharton's cell. Both times, hearing examiners found Wharton guilty of "possession of contraband … implements of escape," SA58, SA60; SA73—an "extremely serious misconduct," SA62.

14

All of these facts, the OAG explained, established that Wharton's counsel did not act unreasonably by not presenting evidence of Wharton's allegedly positive prison adjustment at the 1992 hearing.  SA17.  Had counsel presented evidence of Wharton's "positive" adjustment, he would have opened the door for the Commonwealth to rebut that evidence with the extensive evidence of Wharton's escape attempts and other misconduct.  If anything, the jury "would likely have found the full prison records *aggravating* rather than mitigating."  SA29.  So if counsel had opened the door to this evidence, he "would likely be facing a challenge for doing exactly what he is now challenged for not doing."  *Id.*

The OAG also submitted a declaration from an experienced forensic psychiatrist who reviewed Dr. Krop's findings and concluded that they do not "reflect[] a balanced inquiry into … Wharton's history … and cannot be accepted at face value."  SA152.

Finally, the OAG noted that "[c]onsultation with the victims of crime, or the family members of homicide victims, is required under both federal and state law and is at issue" due to the DAO's statement that its concession followed "communication with the victims' family."  SA49, SA15.  The OAG provided letters from the sole surviving victim, Lisa Hart-Newman, and other family members of the Harts establishing that they "were not contacted about this case" and in fact "oppose penalty[-]phase relief."  SA51-52; *see* SA154-58.

In her letter, Lisa wrote that "[a]t no point was I contacted by the District Attorney or anyone in his office to ascertain what my views are. Seeing as I was also a victim in this tragedy, my opinion should have been sought." SA154. The DAO's stance, she explained, "is an affront to justice and has shown a total disregard for the life of my parents, my own life, and the impact that this would have on our family." *Id.* Lisa was "extremely disappointed to learn of the District Attorney's stance and very troubled that he implied that the family approved." *Id.*

Michael Allen, Ferne's brother, similarly wrote that "[a]t no time did any one … contact me concerning this matter." SA155. He said that agreeing to relief was "nothing less than an egregious insult to injury and an affront to the sensibilities of a responsible community which holds its members accountable for their acts." *Id.* And he wrote that he knew "of no member of the Allen or Hart family who supports" relief. *Id.*

Patrice Carr, Bradley's sister, likewise wrote that she was "never contacted" about vacating Wharton's death sentences and that she "would have never, ever agreed to it and never will.… The idea that [relief] is even a consideration is unbearably painful and shocking." SA157.

Dr. Tony Hart, Bradley's brother, wrote that he did talk to the DAO before the concession but was misadvised about the posture of the case. SA158. He explained that he was told that "Wharton had won an appeal and that in order to

avoid a new trial a plea deal was offered and accepted." *Id.* He further stated that "[t]he family is in one accord asking that [Wharton's] status not change and that the District Attorney do all that he can to maintain the death penalty in this case." *Id.*

### E.    The District Court's Evidentiary Hearing And May 2022 Order Denying Wharton's Habeas Petition

After receiving the OAG's brief, Judge Goldberg noted that the OAG had "pointed to numerous facts, not previously provided to me by the District Attorney[,] that belied Wharton's claim that trial counsel was ineffective." SA190-92. Based on the DAO's "reluctance to fully investigate this matter and explain its concession of the death penalty," Judge Goldberg concluded that the OAG's "participation at the [evidentiary] hearing is necessary." SA193-94. Judge Goldberg further held that, based on the DAO's reliance on communication with the victims' family and the Court's statutory obligation to afford victims an opportunity to be heard, the parties were allowed to introduce evidence of the DAO's communication with the victims' family and their views on the DAO's concession. A10.

Judge Goldberg ultimately held an evidentiary hearing that took place over the course of five days. The DAO continued to urge Judge Goldberg to accept its concession and grant relief on Wharton's habeas claim. The DAO objected to the OAG's involvement and opposed its efforts to "introduce[e] evidence," and "develop a factual record." SA207, SA210. The DAO also joined Wharton's

counsel in cross-examining the OAG's witnesses, objecting to the OAG's questions, and arguing against the OAG's positions.

On May 11, 2022, Judge Goldberg issued a 40-page opinion concluding that Wharton had failed to meet his burden of showing that, but-for counsel's alleged deficient performance, one juror would have voted to impose a life sentence. A3-42. Judge Goldberg considered the "vicious nature of Wharton's offenses," emphasizing that the "brutality exhibited by Wharton and his co-defendant as they terrorized [the Harts] for months before murdering them and leaving their infant daughter to freeze to death would surely have weighed heavily in the minds of the jury." A27. And he concluded that Wharton's purportedly positive "adjustment" to prison was "marred by multiple efforts to escape," finding it "difficult to fathom how any juror would have found Wharton's positive[-]adjustment evidence more significant than [his] premeditated escape from a City Hall courtroom followed by two subsequent misconducts, received days apart, for possessing a makeshift handcuff key and other implements of escape." A29.

Judge Goldberg also "preliminarily conclude[d]" that the DAO had breached its "duty of candor" to the Court in connection with its concession. A33, A42. He noted that all attorneys have an "overarching duty of candor to the Court," which requires that they refrain from knowingly making false statements and correct any previous false statements of fact. A33. Judge Goldberg explained that this duty is

heightened when the lawyer is a prosecutor, when the proceedings lack the "balance of presentation by opposing advocates," and when the case involves a federal court being "asked to interfere with a state criminal prosecution"—which were all true here. A34-35.

The District Court found that the DAO had likely breached its heightened duty of candor in two respects. First, the Court concluded that the DAO had improperly withheld information about Wharton's escape, which would be "crucial information to provide to a judge who had been asked to vacate a death[-]penalty sentence" imposed thirty years ago for a horrific crime. A37. This omission, the Court concluded, contradicted the DAO's representation that it had "carefully reviewed the facts and law" in determining that Wharton's claim had merit. *Id.*

Second, the District Court criticized the DAO's "minimal and woefully deficient communication" with the sole surviving victim and the Harts' family. A33. The Court concluded that the DAO's statement that its concession was based in part on "communication with the victims' family" conveyed the misleading message that the "family had *agreed*" with the DAO's about-face, when they were in fact "vehemently opposed to vacating the death sentence[s]." A38, A41. And it wrongly conveyed that Lisa—who Wharton left to freeze to death as an infant—had been contacted by the DAO, when in fact the DAO had only once contacted Tony (Lisa's uncle), and even he was unsure about the posture of the case after that contact. A38-

39. The Court concluded that the DAO had flouted the statutory obligation to ensure that victims are heard at habeas proceedings and treated with fairness and respect. A42 (citing 18 U.S.C. § 3771(b)(2)(A)).

The Court then determined that the DAO "should be given an opportunity to explain or challenge" these preliminary conclusions and stated that an "order to show cause" would follow. *Id.*

After that order issued, the DAO moved to vacate the show-cause hearing, arguing that there was no basis to "sanction" the DAO or its lawyers, and that the District Court "lacks the power and jurisdiction to proceed and this matter should be referred to the Chief Judge" of the Eastern District of Pennsylvania under Local Rule 83.6(V). A134, A155-76.

During a telephone conference on June 21, 2022, Judge Goldberg confirmed that the hearing would cover "a possible breach of the duty [of] candor" by the DAO before he "reach[ed] a conclusion one way or the other." A260-61. He also confirmed that he "intend[ed] to ask questions," including of "Mr. Kaufman," who signed the filings, and the "two assistant DAs" who had instructed Kaufman to do so, Nancy Winkelman and Paul George. A261.

Later that afternoon, the DAO filed an emergency motion with the Chief Judge to stay all proceedings and assume jurisdiction over the misconduct allegations under Local Rule 83.6(V). ECF No. 302.

The next day, the District Court denied the DAO's motion to cancel the hearing.  A273-75.  It also denied the DAO's request to refer the matter to the Chief Judge, noting that it possesses the "inherent authority" to address its concerns over how a case is litigated before it.  A274.

Chief Judge Sánchez also denied the DAO's transfer request, "agree[ing] with Judge Goldberg that transfer [was] not required at this juncture under [Local Rule 83.6(V)]" and concluding that "nothing in the Rule suggests the Chief Judge may divest a presiding judge of his or her inherent authority to address litigation conduct by attorneys in a matter before that judge."  SA213 n.1.

### F.    The District Court's June 2022 Show-Cause Hearing

On June 23, 2022, the District Court held the hearing to allow the DAO to explain its conduct.  Generally, the DAO's counsel took the position that the DAO had no obligation to explain anything.  *See, e.g.*, A286-87, A312-14.  In the DAO's view, neither the Court, the victims, nor the public had any right to know why the DAO decided to concede a decades-old verdict.  A312-14.  The DAO's counsel also argued that the DAO did not violate its duty of candor, even though Judge Goldberg needed information to make an informed ruling on Wharton's claim, because the Court eventually "got everything [it] needed" from the OAG at the evidentiary hearings.  A304.

Winkelman and George, the DAO's Law Division Supervisor and Assistant Supervisor, respectively, then explained that the recommendation to concede relief came from the DAO's Capital Case Review Committee (the "Committee"), which consisted of department supervisors. A299, A335-36. Winkelman and George were on this Committee; Kaufman, the supervisor who signed and filed the Notice and the follow-up brief, was not. *Id.* The Committee delivered its recommendation to the District Attorney, Larry Krasner, who made the final decision. A299, A317, A335.

Winkelman and George both testified that they had recommended conceding relief without knowing or even attempting to know that Wharton had escaped from a City Hall courtroom. A302, A309, A315, A324-25, A336. George recalled that no one on the Committee was aware of the escape. A337. When asked whether it would have been appropriate for Judge Goldberg to sign the proposed order stating that he had performed a "careful and independent review" despite not knowing of Wharton's escape, Winkelman responded that she could not "answer that question for the Court." A334.

Kaufman, who had drafted and filed the Notice and responsive brief, was also unaware of the escape. A355, A360; *see also* A128-30 (Kaufman's affidavit). He testified that "it was certainly [his] understanding that [the DAO] had investigated and reviewed" the basis for the concession before he filed those documents. A356.

Turning to the communication with the victims' family, Winkelman recognized the DAO's "mistake" in not notifying Lisa—the only surviving victim of Wharton's crimes—of the DAO's concession. A323. And Kaufman acknowledged that, "[i]n retrospect," the statement that the concession followed "communication with the victims' family" was "obviously … amenable" to the "interpretation that the victims' family agreed," and he "apologize[d]" for making this statement. A365-66; *see* A130.

### G.   The District Court's September 2022 Order Imposing Rule 11 Sanctions On The DAO

On September 12, 2022, the District Court issued a 28-page opinion concluding that the DAO, Winkelman, and George violated Federal Rule of Civil Procedure 11(b) and their duty of candor in two respects. A43-70.

First, the Court concluded that the DAO's representations that it had "carefully reviewed" Wharton's claim and determined it had merit—in the Notice, the proposed order, and the April 3, 2019 brief—lacked "evidentiary support" and were not made following a "reasonable inquiry." A52-61. As for the lack of "evidentiary support," the Court determined that "[w]hatever review the Committee performed, it was either not of the merits or was not careful,'" so making that claim was false. A60. The Court based this conclusion on testimony by "[t]wo key members of the Committee that conducted the purported review" that "they were unaware that Wharton's 'prison[-]adjustment evidence' included evidence of an

escape attempt"—even though such evidence "was available in Wharton's criminal history," which could be found "simply by typing Wharton's name into Pennsylvania's Unified Judicial System Web Portal," as a conviction for "ESCAPE." *Id.* The Court concluded that any "careful review" must, "as the Third Circuit directed," include examination of possible prison-misconduct evidence and an inquiry into Wharton's criminal history—which the DAO concededly had not done. A54. "Ironically," the Court stated, the DAO "advocates that Wharton's death sentence[s] be vacated because trial counsel failed to investigate prison adjustment, yet [the DAO] failed to do the same." *Id.*

For the same reasons, the Court found that these "careful review" representations were made without conducting an "inquiry reasonable under the circumstances," in violation of Rule 11(b). A60. And it concluded that, by filing a concession based on a "misleading presentation of the facts," the DAO had attempted to "misuse the Court's power," in violation of the duty of candor. A56. The Court noted that if it had "simply accepted the concession, and the public and victims later learned of the escape," the Court's statement that it "had 'carefully' reviewed the matter could rightfully be called into question, as would the public's trust in the legal process." A58-59.

Second, the Court concluded that the DAO's representation that its "communication with the victims' family" supported its concession was yet another

false representation and violation of the duty of candor. A61-62. This statement, the Court concluded, wrongly implied that the victim had been consulted about the DAO's concession *and* that the family agreed with conceding relief—neither of which were true. *Id.*

Turning to whether sanctions should be imposed, the Court first concluded that Kaufman had not violated Rule 11(b), in part because he acted with candor and contrition in acknowledging that his statement was susceptible to a misleading interpretation. A62-63.

The Court reached a different conclusion about Winkelman and George, who "directed representations to the Court that the [DAO] had 'carefully reviewed the facts' when in fact that did not occur." A64. It also concluded that the DAO as a whole had violated Rule 11 and its duty of candor by so "carelessly invoking its communication with the victims' family as support for its concession while, at the same time, making only a cursory effort to contact them and no effort to consider their views." A66. That conduct "impeded [the Court's] ability to ensure that the victims were provided their statutory rights." A68. The Court observed that, in contrast to the regret demonstrated by Kaufman, the DAO "steadfastly insisted that it ha[d] done nothing wrong, owe[d] no explanation, and w[ould] provide none." A66.

25

The Court noted that "[t]he enormous cost required to uncover crucial facts that the [DAO] so carelessly disregarded could suggest that monetary sanctions" were warranted.  A68.  Nonetheless, the Court decided not to impose such monetary penalties.  *Id.*  Instead, it imposed two nonmonetary sanctions on the DAO:  (1) that the District Attorney apologize to Lisa, Tony, Michael, and Patrice for misleadingly representing that the DAO engaged in "communication with the victims' family"; and (2) that all future concessions by the DAO in habeas proceedings before Judge Goldberg "be accompanied by a full, balanced explanation of facts that could affect [his] decision to accept or reject the concession."  A69.  As to Winkelman and George, the Court "decline[d] to impose" any sanctions "[o]ther than the admonition" in its opinion.  A68.

The Court then referred the matter to the Chief Judge for further disciplinary proceedings under Local Rule 83.6(V).  A70 n.8.  Disciplinary proceedings against Winkelman and George remain pending.

## PERTINENT RULES

Relevant rules are reproduced in the addendum to this brief.

## SUMMARY OF ARGUMENT

The District Court did not abuse its discretion in sanctioning Appellants for violating Rule 11 and their duty of candor.

As the District Court recognized (and Appellants do not dispute), Rule 11 and the overarching duty of candor impose obligations on attorneys—including that they not mislead the court and bring relevant facts to the court's attention—that are grounds for sanctions if violated. Where, as here, the case involves representations by a prosecutor and a non-adversarial proceeding, these duties are heightened and must be rigorously followed. Appellants' position that they were not subject to a heightened duty of candor in this case flouts caselaw from this Court and others, and contravenes established ethical standards.

The District Court properly applied these standards to determine that the DAO breached Rule 11 and its heightened duty of candor in two critical respects. *First*, the DAO falsely represented that it had performed a "careful review" of the "merits" of Wharton's *Strickland* claim in urging the Court to grant him relief—even though the DAO had not reviewed his prison records or criminal history. These representations were especially misleading given this Court's explicit directive to explore adverse evidence on remand. *Second*, the DAO misleadingly stated that its decision to concede relief was supported by "communication with the victims' family"—even though the family was vehemently opposed to relief, and even though the DAO had never contacted the sole surviving direct victim. Both of these misrepresentations justified sanctions.

As an alternative argument, Appellants ask this Court to hold that Local Rule 83.6(V) requires judges in the Eastern District of Pennsylvania to transfer all possible disciplinary proceedings to the Chief Judge upon the first sign of misconduct, stripping them of the authority to supervise litigation conduct themselves. This misreads Local Rule 83.6(V), which covers situations where a judge believes discipline such as suspension or disbarment may be appropriate by the court as an institution overseeing its admitted attorneys. And it conflicts with longstanding precedent recognizing the "inherent power" of federal courts "to discipline attorneys who appear before [them]," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), as well as with how courts in the Eastern District of Pennsylvania actually operate.

This Court should affirm.

## ARGUMENT

## I.    THE DISTRICT COURT'S ORDER SANCTIONING APPELLANTS SHOULD BE UPHELD

### A.    The District Court's Rule 11 Sanctions Order Is Reviewed Deferentially For Abuse Of Discretion

Whether to impose sanctions is a decision entrusted to the discretion of the district court. *Adams v. Ford Motor Co.*, 653 F.3d 299, 303 (3d Cir. 2011). "[A]ll aspects of a district court's Rule 11 determination" are reviewed for "abuse-of-discretion," which is a "deferential standard." *Cooter & Gell v. Hartmarx Corp.*,

496 U.S. 384, 405 (1990).  Such deference is "especially important in the Rule 11 context because the [d]istrict [c]ourt is '[f]amiliar with the issues and litigants' and 'is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11.'"  *Scott v. Vantage Corp.*, 64 F.4th 462, 471 (3d Cir. 2023) (quoting *Cooter*, 496 U.S. at 402); *see also id.* at 471-72 (a district court "will always be 'better situated than the court of appeals' to apply the rule").  As long as the district court's decision indicates "neither an 'erroneous view of the law,' nor a 'clearly erroneous assessment of the' facts," it must be affirmed.  *Id.* at 474 (quoting *Cooter*, 496 U.S. at 405).

### B. Rule 11 And The Duty Of Candor Impose Special Obligations On Prosecutors Not To Mislead The Court

As the District Court correctly recognized, both the text of Rule 11 and the overarching duty of candor impose obligations on attorneys—including that they not make false statements—that, if breached, provide grounds for sanctions.  And where the attorney is a prosecutor or the proceeding lacks adversarial advocacy, the attorney's duty of candor is heightened.

1.  Rule 11 imposes on attorneys several requirements regarding written representations to the court, each of which is sanctionable if violated.  As relevant here, Rule 11 requires that any "factual contentions" made in filings "have evidentiary support."  *Scott*, 64 F.4th at 467 (quoting Fed. R. Civ. P. 11(b)(3)).  This requirement prohibits statements that are "either false or misleading."  *In re Taylor*,

655 F.3d 274, 283 (3d Cir. 2011).  Rule 11 also requires that, "before filing [a pleading, motion, or other paper], the parties and their attorneys … undertake an 'inquiry reasonable under the circumstances' to verify compliance with" Rule 11. *Scott*, 64 F.4th at 467 (quoting Fed. R. Civ. P. 11(b)).  Reasonableness is assessed under "an objective standard" that is "fact[-]specific" and requires "consider[ation] [of] all the material circumstances." *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1278-79 (3d Cir. 1994).

Rule 11 also "imposes an implied 'duty of candor,'" which provides an additional ground for imposing sanctions. *King v. Whitmer*, 71 F.4th 511, 521 (6th Cir. 2023) (citation omitted).  This duty requires that attorneys, as "officer[s] of the court," comport themselves "with integrity and honesty when making representations regarding a matter in litigation." *LaSalle Nat'l Bank v. First Conn. Holding Grp., L.L.C. XXIII*, 287 F.3d 279, 293 (3d Cir. 2002).  More specifically, the duty of candor imposes three substantive obligations on attorneys.

*First*, under the "implied duty of candor," a court may sanction attorneys for factual assertions that are "false or wholly unsupported," including "misrepresent[ing] the evidence supporting their claims." *King*, 71 F.4th at 521.

*Second*, the duty of candor requires that attorneys not make statements that, while technically true, "mislead the court." *McCoy v. Ct. of Appeals of Wis., Dist. 1*, 486 U.S. 429, 436 (1988).  An attorney violates the duty by advancing ambiguous

arguments that present an "overall mosaic of half-truths and deception." *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 511, 515 n.7, 521 (4th Cir. 2018). "The [judicial] system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457-59 (4th Cir.1993); *see also In re Ronco, Inc.*, 838 F.2d 212, 218 (7th Cir. 1988) (affirming Rule 11 sanctions where lawyer "omit[ted] facts that were highly relevant to an accurate characterization of the facts that were stated").

*Third*, the duty of candor requires "bringing relevant facts … to the Court's attention." *Koch v. Pechota*, 744 F. App'x 105, 113 n.8 (3d Cir. 2018); *see also Domain Prot., L.L.C. v. Sea Wasp, L.L.C.*, 23 F.4th 529, 543 (5th Cir. 2022) (same). This requires an attorney to disclose all facts that, if kept hidden, would "undermine the integrity of" the judicial process. *Shaffer*, 11 F.3d at 459.

2.  Prosecutors have a particularly important responsibility to abide by Rule 11 and uphold the duty of candor.  The American Bar Association ("ABA") has recognized that, based on their "public responsibilities, broad authority[,] and discretion," prosecutors have a "heightened duty of candor," which requires that they "not make a statement of fact or law" that they "do[] not reasonably believe to be true" and that they "correct a … representation of material fact or law" that they "reasonably believe[] is, or later learn[] was, false."  American Bar Association,

*Criminal Justice Standards for the Prosecution Function* § 3-1.4(a)-(b) (4th ed. 2017) ("*Criminal Justice Standards*")[3]; *see also* National District Attorneys Association, *National Prosecution Standards* § 6-1.1 (3d ed. 2009) (same).[4] By requiring prosecutors to refrain from making statements that they do not reasonably believe, rather than only statements they know to be false, the ABA expects prosecutors to take greater care than the ethics rules generally require of other lawyers. *See* Bruce A. Greene, *Candor in Criminal Advocacy*, 44 Hofstra L. Rev. 1105, 1115-19 & n.62 (2016) (describing the "higher degree of candor" expected of prosecutors).

The ABA also advises prosecutors to "disclose a material fact or facts when necessary to … avoid misleading a judge or factfinder." *Criminal Justice Standards* § 3-1.4(b). The expectation that prosecutors will "ensure that the tribunal is aware of ... significant events that may bear directly on" the case stems from the fact that prosecutors owe "special responsibilities to both [the] court and the public at large." *Douglas v. Donovan*, 704 F.2d 1276, 1279-80 (D.C. Cir. 1983).

These duties are at their zenith in a capital case, where the stakes are high and the consequences of an unjust result irreversible—for both the defendant and the

---

[3]   https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEdition/.

[4]   https://ndaa.org/wp-content/uploads/NDAA-NPS-3rd-Ed.-w-Revised-Commentary.pdf.

state. A state has an interest in having its judicial judgments set aside only "upon proper constitutional grounds" rather than the concession of an "elected legal officer of one political subdivision within the State." *Sibron v. New York*, 392 U.S. 40, 58-59 (1968). A prosecutor therefore may not submit only cherry-picked facts to a court, leaving out others that are critical to determining whether relief should be granted.

Appellants assert (at 32) that a prosecutor's heightened duty of candor "applies only to disclosures mandated to a criminal defendant by *Brady v. Maryland*, 373 U.S. 83 (1963)," and Pennsylvania Rule of Professional Conduct 3.8(d), which cover the duty to disclose exculpatory evidence. This is an extraordinary position that contradicts the standards of the ABA and the National District Attorneys Association discussed above, and caselaw from a number of circuits—which all make clear that the obligation to disclose exculpatory evidence is merely one component of the broader ethical responsibilities that prosecutors owe to defendants *and to courts*. *See, e.g.*, *Juniper v. Davis*, 74 F.4th 196, 253 (4th Cir. 2023) ("[W]hile *Brady* establishes a constitutional minimum for prosecutors, it does not encompass the entirety of prosecutorial obligations.").

Prosecutors have special obligations to courts because they are representatives "not of an ordinary party to a controversy, but of a sovereignty whose obligation [is] to govern impartially" and whose interest is—or ought to be—that "justice shall be

done." *Berger v. United States*, 295 U.S. 78, 88 (1935). So "if an attorney for the Government is aware that the court lacks certain relevant factual information or that the court is laboring under mistaken premises, the attorney, as a prosecutor and officer of the court, ... has the duty to bring the correct state of affairs to the attention of the court." *United States v. Block*, 660 F.2d 1086, 1091 (Former 5th Cir. Unit B Nov. 12, 1981) (citations omitted); *see, e.g.*, *United States v. Jimenez*, 928 F.2d 356, 363 (10th Cir. 1991) (prosecutors have "an ethical duty to disclose" relevant sentencing information). These obligations apply regardless whether that information would harm or help the defendant.

3.   An attorney's obligation to be forthcoming also is heightened where proceedings are non-adversarial. In such circumstances, "the customary checks and balances do not pertain—and the court is entitled to expect an even greater degree of thoroughness and candor from unopposed counsel than in the typical adversarial setting." *Me. Audubon Soc'y v. Purslow*, 907 F.2d 265, 268-69 (1st Cir. 1990). Without adversarial advocacy, there is no opposing counsel "to correct even inadvertent mistakes" before a court renders its decision. Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 7(C)(4) (6th ed. 2021); *see also Eagan ex rel. Keith v. Jackson*, 855 F. Supp. 765, 790 (E.D. Pa. 1994) (imposing sanctions because "[c]andor to the Court, though desirable under any circumstance,

is mandated in *ex parte* proceedings, where the Court is deprived of the benefits of the dialectic of the adversary system").

Appellants argue (at 33) that this heightened duty applies only when proceedings are *technically* "*ex parte*," which they say is not the case if (as here) both "parties are provided notice and are participating."  That is not the law, and adopting this rigid position would ignore the purpose of the heightened duty of candor.  Any time a proceeding is non-adversarial—even if both sides are participating—a court must rely on one-sided submissions.  It thus becomes "vulnerable to being misled, whether by affirmative misrepresentation or by half-truths that deceived through their incompleteness." *Ark. Tchr. Ret. Sys. v. State St. Corp.*, 25 F.4th 55, 65 (1st Cir. 2022) (heightened duty of candor applied to class-action settlement because of "distinct possibility that no adversary would ever offer any meaningful opposition").  So the heightened duty of candor is "equally applicable" where, as here, "the parties make a joint request to the Court" because that means "the Court is denied the benefit of adversarial advocacy." *Pa. Env't Def. Found. v. U.S. Dep't of the Navy*, 1995 WL 56602, at *2 (E.D. Pa. Feb. 3, 1995), *aff'd*, 70 F.3d 1256 (3d Cir. 1995); *see also Eagan*, 855 F. Supp. at 790 (similar).

**C.    The District Court Did Not Abuse Its Discretion In Sanctioning Appellants For Misrepresentations About Their Review Of Wharton's Habeas Claim**

The District Court correctly applied these standards to conclude that Appellants violated Rule 11(b)(3) and their duty of candor by falsely representing that they had "carefully reviewed" the merits of Wharton's claim. Appellants' contrary arguments distort the District Court's careful opinion and have no merit.

1. To start, the District Court properly found that Appellants' representations that they had performed a "careful review" of the merits of Wharton's claim following this Court's remand were false—and thus violated Rule 11(b)(3)— because Appellants did not meaningfully review the merits of Wharton's claim. At minimum, the District Court did not abuse its discretion in concluding as much.

Two different times, Appellants chose to represent to the Court that they had "carefully reviewed" the merits of Wharton's claim before conceding relief. A98; *see* A115. But those representations were false—the DAO essentially conducted *no* review of Wharton's claim that he had adjusted positively to prison. As the District Court found based on the voluminous record before it, the DAO never retrieved or reviewed Wharton's complete prison records or criminal history. *See* SA191 ("It is notable that, before submitting its 'concession,' the District Attorney never obtained, as the Attorney General did, these prison records or asked [Wharton's counsel] to consider them."). In fact, nothing in the record suggests that the DAO "sought out

36

*any* facts beyond those that [were] either currently in the record" or selectively submitted by Wharton. SA2 (emphasis added). As the Court found, the DAO simply "accepted the additional evidence offered by [Wharton] at face value, without exploring whether contrary views may be viable and worth considering" before filing its concession. SA3. In light of these factual findings—which Appellants do not challenge and which were, in any event, not clearly erroneous—whatever review the DAO *did* perform cannot reasonably be labeled "careful," so claiming as much lacked "evidentiary support" and was false. *See, e.g.*, *Scott*, 64 F.4th at 473-74 (affirming Rule 11 sanctions because district court articulated the correct "legal framework" and did not have a "clearly erroneous assessment of the facts").

The DAO's representations that it had "carefully reviewed" Wharton's claim were particularly misleading given this Court's remand opinion, which specified the remaining issues to be adjudicated. This Court remanded for an evidentiary hearing to determine (1) if Wharton's counsel "acted unreasonably by failing to investigate and/or present Wharton's prison-adjustment evidence," and (2) whether, if that evidence *had* been presented "at the second penalty hearing, there is a reasonable probability that at least one juror would have voted against imposing the death penalty." *Wharton*, 722 F. App'x at 281. This Court explicitly flagged that these determinations would require "reconstruct[ing] the record and assess[ing] it anew"—not "merely consider[ing] the mitigation evidence that went unmentioned

in the first instance," but "also tak[ing] account of the anti-mitigation evidence that the Commonwealth would have presented to rebut [Wharton's] mitigation testimony." *Id.* at 282-83 (quoting *Williams*, 637 F.3d at 227).

So as this Court made clear, granting Wharton relief would require an inquiry into any never-before-presented evidence that could contradict Wharton's positive-prison-adjustment argument. In light of that directive, the DAO's representations necessarily implied that the DAO had investigated negative evidence that the Commonwealth could have presented in rebuttal. But, as the District Court found, the DAO had not performed that investigation. The DAO's statements that it had performed a "careful review" of the facts were false.

2. For similar reasons, the District Court also correctly found that the DAO violated its duty of candor by failing to "bring[] relevant facts ... to the Court's attention," *Koch*, 744 F. App'x at 113 n.8, and failing to "correct[] [any] misleading argument," *Six*, 891 F.3d at 519. *See* A55-59.

In its briefing, the DAO explained the "circumstances supporting" its conclusion that Wharton's claim had merit, which included this Court's remand opinion, a declaration by Wharton's counsel, and past jury findings. A115-16. But having chosen to affirmatively offer reasons for its concession, the DAO then needed to disclose that it had *not* actually reviewed Wharton's prison records or criminal history to avoid "omit[ting] … relevant [facts]." *In re Ronco*, 838 F.2d at 218. The

DAO knew that it had not investigated possible rebuttal evidence—a fact that was *highly* relevant to a federal court deciding whether it should accept the DAO's concession of habeas relief. *See Six*, 891 F.3d at 521, 515 n.7 (affirming sanctions where party created an "overall mosaic of half-truths").[5]

This lack of candor was particularly problematic in this case. As the District Court recognized, a concession of habeas relief implicates several important interests. *See* A57-58. These include the public's "interest that a result be reached which promotes a well-ordered society," which is "foremost in every criminal proceeding." *Young v. United States*, 315 U.S. 257, 259 (1942). They also include the court's interest in being fully informed of relevant facts before making a decision on capital relief, which is heightened when a proceeding lacks the "typical adversarial setting" that would otherwise bring contrary facts to the court's attention. *Me. Audubon Soc'y*, 907 F.2d at 268. And they include the state's interest in having its judgments set aside only "upon proper constitutional grounds," not merely upon the whims of an elected official. *Sibron*, 392 U.S. at 58-59. All of these interests

---

[5]  Appellants argue (at 33-34) that the duty of candor requires only that they inform the court of *known* facts. That truism has no bearing here. Appellants knew they had not reviewed Wharton's criminal history or full prison records, yet represented that they had performed a "careful[] review" of the facts of Wharton's claim.

imposed an especially important duty of candor on the DAO, which the District Court rightly found was violated.

3.  Appellants have no good answer to any of this.  In one vague paragraph, they argue (at 36) that their "characterizations" of their investigation as "careful" are not factual "statements amenable to sanctions" and are instead merely a form of "lawyer advocacy."  But the rest of Appellants' brief acknowledges the opposite— in their own words, a review is "careful" if it involves "[s]erious attention" to the subject under review.  *See* Appellants' Br. 39 (quoting Care, *Black's Law Dictionary* (11th ed. 2019)).  And in this context, where the District Court specifically asked the DAO to spell out the reasons for its concession, the DAO's claim to having undertaken a "careful review" obviously implied that the DAO had (1) looked at the relevant issues in light of *Strickland* and this Court's remand opinion; and (2) done so meaningfully and in good faith to attempt to determine whether relief was appropriate.  But that is inconsistent with what the District Court concluded the DAO did, which was to conduct *no* review for anti-mitigation evidence whatsoever.  *See* A60; SA2-3; SA191.

Appellants also assert (at 37-39) that the District Court never "made an effort" to determine whether the DAO performed a "careful review."  That is wrong:  Judge Goldberg repeatedly concluded that the DAO's review was not "careful" because it did not cover readily available evidence rebutting Wharton's prison-adjustment

claim. *See* A54 (concluding that any "'careful[] review[]' must, as the Third Circuit directed, have included examination of possible negative prison adjustment evidence"), A60 (finding that the DAO's review was "either not of the merits or was not 'careful'" because the DAO failed to examine "Wharton's criminal history"), A60-61 (concluding that the DAO's inquiry was "patently deficient" because Wharton's escape could be found "simply by typing Wharton's name into" a portal).

Appellants had multiple chances to defend their "careful review" statements in the District Court. Judge Goldberg specifically tried to ascertain what their review consisted of during the hearing, providing Appellants several chances to explain how their review had been reasonable or careful—but Appellants refused. *See, e.g.,* A296, A302, A309-15, A338-41. The *only* review they pointed to—and still point to now, *see* Appellants' Br. 39—was "reading the [o]pinions and [b]riefs" filed at earlier stages in the case, A338, "g[etting] in[to] the facts at a very high level," A302, and weighing the "pros and cons" of the "facts of this case," A340-41.[6] On this record, and in light of this Court's directive to explore rebuttal evidence, Judge Goldberg's determination that Appellants did not perform the "careful review" that

---

[6]    Appellants in passing mention (at 40 n.19) a "deliberative-process privilege," which they say barred any "deep[] inquiry" into their review by the District Court. But Appellants never explain how this privilege applies here. Nor do they argue that any information covered by this privilege would render sanctions inappropriate or undermine any of the District Court's findings.

they touted was not an abuse of his discretion. *See, e.g., Ark. Tchr. Ret. Sys.*, 25 F.4th at 65 (affirming sanctions in non-adversarial proceeding where court was "vulnerable to being misled").[7]

Appellants claim (at 40-42) that the District Court improperly focused on Wharton's 1986 escape, which they argue is "irrelevant" to whether his *Strickland* claim has merit. But Judge Goldberg deemed Wharton's violent escape *highly* relevant. *See* A28-32. And his view is the one that matters: "All agree" that it is the *court's* call—not an elected official's—whether evidence of a violent escape should impact the outcome of a *Strickland* claim. Appellants' Br. 4; *see, e.g., Young*, 315 U.S. at 258-59 ("judicial obligations" compel a court to "examine independently" whether a conviction should be reversed, despite a concession); *Sibron*, 392 U.S. at 58-59 (court's obligation to independently assess the merits of a constitutional claim is heightened when a prosecutor attempts to concede relief). Had the OAG not helpfully participated in this matter, Judge Goldberg would never have even known this evidence existed.

---

[7]   Appellants' review of the "briefs from prior stages of the case," Appellants' Br. 39, only makes matters worse for them. When addressing this exact claim in 2002 before the Pennsylvania Supreme Court, the DAO's own brief observed that the prison records provided by Wharton were "not comprehensive" and omitted disciplinary infractions. Appellee's Br. 16 n.4, *Commonwealth v. Wharton*, No. 170 CAP (Pa. 2002), 2002 WL 32181316. Appellants thus had clear notice that the prison records offered by Wharton were unreliable and that his full prison records were an obvious source of relevant evidence.

Appellants latch on (at 41) to the fact that prior DAO administrations never used Wharton's escape as evidence in earlier stages of the case. That misses the point: Until now, no prior DAO administration had claimed that a "careful review" of Wharton's record showed that he had a positive adjustment to prison between his two penalty hearings. And as the OAG explained, the only reason that evidence of Wharton's negative prison behavior (including his escape) has become relevant *now* is because this Court remanded the case for an evidentiary hearing to examine his claim more closely. *See* SA166 n.5. Appellants note (at 13) that the DAO "did not present [the escape] evidence" at Wharton's 1992 penalty hearing, but that omission makes perfect sense. As the OAG explained at the show-cause hearing, the escape "wasn't proper rebuttal to the mitigating evidence that was presented"—which focused on Wharton's good behavior *before* the murders—because it would only "become[] relevant" if Wharton's counsel had argued that "he was a nice guy in jail" who "hasn't … done anything bad[]" since his arrest. A342-46.

One final point bears mention: Throughout their brief, Appellants try to paint the District Court's decisions as nothing more than a disagreement with the DAO's decision to concede habeas relief. This distorts the District Court's careful work here. The Court recognized that concessions of habeas relief can be entirely appropriate—and even that the DAO could have attempted to concede relief in Wharton's case *without* violating Rule 11. *See* A69. The problem here was not the

concession, but that the DAO affirmatively misled the Court about the inquiry it had performed while urging the Court to adopt the concession.

### D. The District Court Did Not Abuse Its Discretion In Sanctioning Appellants For Misrepresenting Their Communication With The Family

The District Court also correctly found that the DAO's statement that its concession was made "[f]ollowing … communication with the victims' family" was false or misleading, and therefore violated Rule 11(b)(3) and the duty of candor.

*First*, as the District Court rightly found, this statement falsely conveyed that family members *agreed* with the DAO's decision to concede relief—not merely that one member of the family, Tony, had been *notified* of it. A38, A61-62. Even Kaufman, the statement's drafter, admitted that in retrospect the statement was "obviously … amenable to [the] interpretation" that the family agreed with the concession. A365-66. That is exactly how the victim, Lisa, interpreted this statement. In her letter to the Court, Lisa stated that she was "extremely disappointed to learn of the District Attorney's stance [to seek to vacate the death sentences] and very troubled that he implied that the family approved of this viewpoint." SA154. Of course, the record developed by the OAG establishes that all the family members, including Lisa, actually *opposed* the DAO's about-face. *See* SA154-58.

Context confirms that this statement was misleading. The statement was made in the Notice where, in one loaded sentence, the DAO provided all of its

reasons for conceding relief:  It had reviewed the case, it had communicated with the victims' family, and it had notified Wharton's counsel of its final decision. Having provided *no* other details regarding the family's position, the DAO's obvious implication was that the family *supported* relief, which is the only way to make sense of the DAO's decision to flag this "communication" in its concession.

*Second*, this statement was misleading because it implied that the DAO had at least notified Lisa, the sole surviving direct victim of Wharton's crimes, of its concession.  *See* A38, A41, A62.  The District Court would reasonably assume that when the DAO was deciding which family member to notify about Wharton's case, the obvious first choice would have been the infant (now 35-years old) who Wharton left to freeze to death after brutally murdering her parents.  But despite invoking its "communication with the victims' family" as support for its concession, the DAO *never* reached out to Lisa about the decision—rendering the "communication" statement misleading in this respect too.  *See, e.g.*, *In re Lightfoot*, 217 F.3d 914, 917-18 (7th Cir. 2000) (prosecutor violated "duty of candor" by "creat[ing] a thoroughly false impression").  At minimum, as the District Court also held, Appellants did not perform a "reasonable inquiry" under the circumstances by failing to confirm that Lisa and other members of the family had been informed of the concession before putting this statement in the Notice.  *See, e.g.*, A61-62.

Appellants respond (at 47-48) that this statement was literally accurate because it did not say with whom the DAO communicated, and did not characterize the substance of the DAO's conversation with the family.  They argue (at 48) that if a statement is literally accurate, "[t]hat should be the end of the inquiry."  That is not the law.  Instead, "[f]actual statements by counsel that are so carefully worded as to be both technically accurate and misleading by omission are of *particular concern, as they reflect an intent to lead the Court down the garden path." Dillon v. BMO Harris Bank, N.A.*, 2016 WL 5679190, at *14 (M.D.N.C. Sept. 30, 2016) (emphasis added), *aff'd sub nom. Six v. Generations Fed. Credit Union*, 891 F.3d 508 (4th Cir. 2018).  That is all the more true when the misleading statement is from a prosecutor in a non-adversarial setting where victims have no ability to ensure their voices are heard other than by relying on counsel.  *Cf. Commonwealth v. Pownall*, 278 A.3d 885, 917 (Pa. 2022) (Dougherty, J., concurring) ("present[ing] only half the relevant picture" would be "worrisome coming from any litigant," but it is "even more concerning" when it is the "prosecutor's doing").

What's more, even if the DAO "did not misstate an empirical fact, it did omit facts that were highly relevant to an accurate characterization of the facts that" it *did* deliberately state.  *In re Ronco*, 838 F.2d at 218 (affirming sanctions where omission "placed a heavy burden on a court" to reveal the information).  By affirmatively claiming that "communication with the victims' family" supported its decision to

concede relief, the DAO implied that it had done something akin to consulting and hearing out members of the family in good faith, and at least notifying the sole surviving victim of its concession.  Neither was true.  This is precisely the kind of "pregnant omission," *In re Lightfoot*, 217 F.3d at 917, and "half-truth[]," *Ark. Tchr. Ret. Sys.*, 25 F.4th at 65, that violates the duty of candor.

Appellants argue (at 49) that the family's "views are irrelevant to the merits of … Wharton's claim and the decision whether to accept or reject the DAO's concession."  But if that were so, then why did Appellants go out of their way to flag this "communication" in their Notice?  The reason is obvious:  They fully understood that it could influence Judge Goldberg to grant Wharton relief.

In any event, the fact that the family opposed relief and that Lisa was never contacted—facts that the DAO obscured until the OAG revealed them—were highly "relevant facts," *Koch*, 744 F. App'x at 113 n.8, for a court to consider given its statutory obligations under 18 U.S.C. § 3771(b)(2)(A) and the additional rights afforded to victims under 18 Pa. Cons. Stat. § 11.201(4)-(5).  Those provisions required the District Court to ensure that victims were provided an opportunity to be heard and "treated with fairness and with respect for [their] dignity and privacy."  18 U.S.C. § 3771(b)(2)(A); *see also* 18 Pa. Cons. Stat. §§ 11.201(4)-(5), 11.213(b), (e)-(f).  But as the Court found, the DAO's vague representation about Lisa and her family's involvement significantly "impeded [the Court's] ability to ensure that"

they had been provided with their statutory rights, thus violating the duty of candor.

A68; A42.

## II.    THE DISTRICT COURT WAS NOT REQUIRED TO REFER THE PROCEEDINGS TO THE CHIEF JUDGE BEFORE IMPOSING SANCTIONS

Finally, Appellants argue (at 50) that the District Court violated their due-process rights by (1) holding a show-cause hearing and imposing sanctions instead of referring their misconduct to the Chief Judge under Local Rule 83.6(V); and (2) "shifting among various targets and grounds for discipline as the matter proceeded."  Neither argument is persuasive.

### A.    The District Court's Interpretation Of Its Local Rules Is Reviewed Deferentially For Abuse Of Discretion

This Court reviews de novo whether "the procedure the district court use[d] in imposing sanctions" satisfied due process.  *Martin v. Brown*, 63 F.3d 1252, 1262 (3d Cir. 1995).  But "a district court's application and interpretation of its own local rules" is reviewed for abuse of discretion.  *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613 (3d Cir. 2018); *see also United States v. Miller*, 624 F.2d 1198, 1200 (3d Cir. 1980).

### B.    The District Court Did Not Abuse Its Discretion In Concluding That Local Rule 83.6(V) Did Not Require It To Transfer The Disciplinary Proceedings At The Outset

Local Rule 83.6 of the Eastern District of Pennsylvania establishes the "Rules of Disciplinary Enforcement" governing disciplinary proceedings for members of

that court's bar.  Rule V of those rules (*i.e.*, Local Rule 83.6(V)) requires judges in the Eastern District of Pennsylvania to refer to the Chief Judge misconduct "allegations" against "an attorney admitted to practice" before that court.  Appellants argue (at 51) that this rule required Judge Goldberg to refer this case to the Chief Judge as soon as he "identified a potential breach of Appellants' duty of candor," stripping him of the ability to impose sanctions himself.  That is wrong.  As both Judge Goldberg and Chief Judge Sánchez recognized in this case, this rule does not restrict the inherent power of courts to police their own proceedings, including through Rule 11 sanctions.  Instead, it covers situations where a judge believes disciplinary measures like disbarment or suspension could be warranted, which must be imposed by the court as an institution overseeing its admitted attorneys.  In line with that interpretation, Judge Goldberg sanctioned Appellants and *then* referred the matter to the Chief Judge for further disciplinary proceedings.  This interpretation of Local Rule 83.6(V) was not an abuse of discretion.

1.  Local Rule 83.6 establishes the "Rules of Disciplinary Enforcement" for "disciplinary" proceedings against members of the court's bar.  A "disciplinary proceeding" is an "[a]n action brought to reprimand, suspend, or expel a licensed professional … from a profession or other group," which "may result in the lawyer's being suspended or disbarred from practice."  Disciplinary Proceeding, *Black's Law Dictionary*, *supra*.    The various rules in 83.6 accordingly deal with the

"suspen[sion]" of attorneys (Rule I), "disbarment" (Rules III and VI), and "reinstatement" after "[d]isbarment or [s]uspension" (Rule VII). Local Rule 83.6 does not reference sanctions.

The rule Appellants cite, Local Rule 83.6(V), mandates referring misconduct "allegations" to the Chief Judge for disciplinary proceedings "[w]hen the misconduct … come[s] to the attention of a judge of this court, whether by a complaint or otherwise, and the applicable procedure is not otherwise mandated by these rules." This covers situations where a judge learns about possible misconduct that could warrant disciplinary measures like suspension or disbarment. After referral, the Chief Judge can hold disciplinary proceedings to consider whether such measures are appropriate. But the rule does not mandate that a judge transfer a pending case to the Chief Judge the minute he suspects misconduct, denying him the power to control his courtroom by holding a show-cause hearing or imposing sanctions himself. Indeed, Local Rule 83.6(XII) *specifically disclaims* such an interpretation: "Nothing contained in these rules shall be construed to deny to this court such powers as are necessary for the court to maintain control over proceedings conducted before it, such as proceedings for contempt under Title 18 of the United States Code or under Federal Rule of Criminal Procedure 42." The Local Rules thus do not restrict a court's authority to police its own proceedings, including through sanctions.

Local Rule 83.6(V) certainly does not restrict a court's authority to impose sanctions under Federal Rule of Civil Procedure 11, which is what Judge Goldberg did here.  Rule 11 expressly empowers judges to impose "appropriate sanction[s]" on attorneys or firms that violate its requirements.  Fed. R. Civ. P. 11(c)(1).  The Rules do not override that authority; in fact, the operative Rules state that they "shall be construed in a way [that is] *consistent with* … the Federal Rules of Practice and Procedure."  Local Rule 1.1 (2023) (emphasis added).[8]  Accordingly, Local Rule 83.6(V) does not divest judges of their Rule 11 sanctions power.

2.  In this case, both Judge Goldberg and Chief Judge Sánchez reasonably held that Local Rule 83.6(V) does not supplant a court's inherent authority to address concerns arising from litigation conduct.  Judge Goldberg concluded that although "any disciplinary matters that arise from this case should, at the appropriate time, be referred to the Chief Judge" under Local Rule 83.6(V), the ethical questions raised by the DAO's litigation conduct "should be addressed independent and irrespective of any disciplinary matters that may stem from it."  A274.  And in denying Appellants' emergency motion to assume jurisdiction, Chief Judge Sánchez likewise concluded that a "presiding judge" has "inherent authority to address litigation conduct by attorneys in a matter before" him before referring the matter for

---

[8]  *See also* Fed. R. Civ. P. 83(a)(1) (local rules "must be consistent with—but not duplicate—federal statutes and rules").

disciplinary proceedings under Local Rule 83.6(V). SA213 n.1. Thus, after first addressing the DAO's litigation conduct and imposing sanctions, Judge Goldberg *then* invoked Local Rule 83.6(V) and referred the matter to the Chief Judge for any further disciplinary proceedings. A492 n.8.[9]

Judge Goldberg and Chief Judge Sánchez's interpretation of Local Rule 83.6(V) makes sense and harmonizes the rule with the "inherent power" of courts to address litigation misconduct. *Chambers*, 501 U.S. at 43 (citing *Ex parte Burr*, 501 U.S. (9 Wheat.) 529, 531 (1824)); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980) (noting the "well-acknowledged inherent power of a court to levy sanctions in response to abusive litigation practices"). And their interpretation accords with established practice in the Eastern District of Pennsylvania, in which courts regularly sanction counsel under Rule 11 and *then* refer misconduct allegations to the Chief Judge for disciplinary proceedings. *See, e.g.*, *Marino v. Usher*, 2014 WL 2116114, at *11-14 (E.D. Pa. May 21, 2014), *aff'd*, 673 F. App'x 125 (3d. Cir. 2016); *Taggart v. Deutsche Bank Nat'l Tr. Co.*, 2021 WL 2255875, at *11-19 (E.D. Pa. June 3, 2021), *aff'd*, 2023 WL 4578801 (3d Cir. July 18, 2023); *see also Lewis v. Univ. of Pennsylvania*, 779 F. App'x 920, 926 (3d Cir. 2019) (affirming sanctions order of Eastern District of Pennsylvania judge who "was in the

---

[9] As mentioned above (but not mentioned by Appellants), the disciplinary proceedings stemming from that referral remain pending.

best position to assess counsel's conduct and the need for sanctions"). Indeed, the only Rule 11 case Appellants cite for their argument that Local Rule 83.6(V) required Judge Goldberg to refer the matter to the Chief Judge before imposing sanctions proceeded in the same order as this case. *See* Appellants' Br. 51 n.25 (citing *Woosley v. U.S. Dist. Ct., Dist. of Conn.*, 2016 WL 4247561, at *12 (E.D. Pa. Aug. 10, 2016)). In *Woosley*, the court referred the matter to the Chief Judge under Local Rule 83.6(V) only *after* imposing Rule 11 sanctions in the form of *sua sponte* dismissing the complaint. *See* 2016 WL 4247561, at *10, *12.

3. Appellants rely (at 52-54) almost entirely on *Adams*, 653 F.3d 299, for their interpretation of Local Rule 83.6(V), but that reliance is misplaced. In *Adams*, this Court vacated a magistrate judge's finding that Adams's counsel had violated an ABA Model Rule of Professional Conduct. *Id.* at 306-07. This Court then addressed Adams's counsel's alternative argument that the magistrate "violated his procedural due[-]process rights" by referring the matter to the Virgin Islands Bar Association after concluding that counsel engaged in misconduct, instead of referring the matter to the Chief Judge under Local Rule 83.2(b) of the District Court of the Virgin Islands at the outset. *Id.* at 303, 308. The Government, who was appointed to defend the magistrate's order, argued that Local Rule 83.2(b) "applies only to the imposition of sanctions." *Id.* at 308. This Court noted that this response was "of little moment" because the magistrate's misconduct finding "was equivalent

to a sanction"; accordingly, under the parties' interpretation of Local Rule 83.2(b), the magistrate had "fail[ed] to follow [the] local rule." *Id.*

*Adams* does not help Appellants. Most importantly, *Adams* did not involve Rule 11 sanctions. So it could not—and did not—hold that a local rule divested a court of its fundamental ability to impose sanctions under Rule 11. Nor did it consider or mention a provision similar to Local Rule 83.6(XII), which emphasizes that the Eastern District of Pennsylvania Local Rules' disciplinary provisions do not "deny" a court "powers" that are "necessary for the court to maintain control over proceedings conducted before it."

*Adams* is distinguishable for other reasons too. The main issue there was *where* the case should be referred for disciplinary proceedings—to the Chief Judge or an outside bar association. This Court held that the magistrate misread the rule by referring the matter to a bar association instead of the Chief Judge. *See Adams*, 653 F.3d at 305, 308. Here, though, Judge Goldberg *did* refer the matter to Chief Judge Sánchez—not to an outside entity—for disciplinary proceedings, so *Adams*'s key holding is irrelevant. Moreover, in *Adams*, both parties *agreed* that the local rule required referral before sanctions; their disagreement was over whether sanctions were actually imposed. *See id.* at 308. The Court therefore had no briefing on and no opportunity to address the point of dispute here: whether Local Rule 83.6(V) requires referral *before* imposing Rule 11 sanctions in pending proceedings.

## C.  Appellants Received Detailed Notice And Extensive Opportunities To Be Heard

Finally, Appellants' argument (at 53-55) that Judge Goldberg violated their due-process rights by not giving notice of the possibility of sanctions is baseless. Judge Goldberg's May 11, 2022 opinion included a 10-page section that carefully explained his concerns with Appellants' conduct. A32-42. The opinion concluded by noting that the DAO "should be given an opportunity to explain or challenge" the Court's preliminary conclusions, including through fact development if necessary. A42. Consistent with Rule 11(c)(3), the Court then issued a show-cause order and scheduled a hearing to address these concerns. A126. Appellants filed extensive submissions in response to that order. *See, e.g.*, A134. Those submissions confirm that Appellants were on notice that sanctions were under consideration. *See id.* (arguing that "sanctions" should not be imposed). And Appellants were provided another opportunity to be heard at the show-cause hearing.

Appellants thus had ample notice of (1) "the fact that Rule 11 sanctions [we]re under consideration," and (2) "the reasons why." *In re Taylor*, 655 F.3d at 286. Appellants thus received all the process they were due.

*       *       *

Prosecutorial concessions of error are appropriate—and should be encouraged—when the government concludes that a defendant's conviction or sentence is unlawful. But our judicial system gives trial judges the ultimate

responsibility to decide whether relief is appropriate in such extraordinary circumstances.  And in exercising that responsibility, judges need to be able to trust that the government's representations are accurate, candid, and based on a thorough and good-faith assessment of the facts and law.  Appellants' representations did not satisfy that standard here.  The District Court's order imposing modest sanctions for their misconduct was appropriate and should be upheld.

## CONCLUSION

The District Court's Rule 11 sanctions order should be affirmed.

Dated:  August 14, 2023

Respectfully submitted,

*/s/ Christina R. Gay*
Roman Martinez
Gregory B. in den Berken
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Tel.:    (202) 637-2200
Fax:    (202) 637-2201
Email:  roman.martinez@lw.com
            greg.indenberken@lw.com
            christina.gay@lw.com

*Court-Appointed* Amicus Curiae
*Counsel in Support of Affirmance*

## COMBINED CERTIFICATIONS

Pursuant to Federal Rule of Appellate Procedure 32(g) and Local Appellate Rules 28.3(d), 31.1(c), 32.1, 46.1(e), and 113.4, I certify that:

1.    I am a member in good standing of the bar of this Court.

2.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,999 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

3.    This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in 14-point Times New Roman font using Microsoft Word for Microsoft 365.

4.    The text of the electronic version of this brief filed with the Court via CM/ECF is identical to the text of the paper copies.

5.    The electronic version of this brief was scanned using virus-detection software—namely with Microsoft Defender—and no virus was detected.

6.    On August 14, 2023, I caused a copy of this Brief of Court-Appointed *Amicus Curiae* Counsel in Support of Affirmance to be filed via the Court's CM/ECF system and thus to be served on all parties' counsel registered to receive electronic notices.

Dated:  August 14, 2023                     Respectfully submitted,

/s/ Christina R. Gay
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Tel.:     (202) 637-2200
Fax:      (202) 637-2201
Email:  christina.gay@lw.com

*Court-Appointed* Amicus Curiae
*Counsel in Support of Affirmance*

# ADDENDUM

## Pursuant to Federal Rule of Appellate Procedure 28(f)

# TABLE OF CONTENTS

**Page**

Federal Rule of Civil Procedure 11……………………………………..ADD-1

E.D. Pa. Local Rule of Civil Procedure 1.1………………...……………..ADD-3

E.D. Pa. Local Rule of Civil Procedure 83.6………………………....…ADD-3

# Federal Rule of Civil Procedure 11

## Rule 11. Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions

(a) SIGNATURE.  Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name—or by a party personally if the party is unrepresented.  The paper must state the signer's address, e-mail address, and telephone number.  Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit.  The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention.

(b) REPRESENTATIONS.  By presenting to the court a pleading, written motion, or other PAPER—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

   (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

   (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

   (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

   (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(c) SANCTIONS.

   (1) *In General*.  If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.  Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

(2) *Motion for Sanctions*.  A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b).  The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.  If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

(3) *On the Court's Initiative*.  On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

(4) *Nature of a Sanction*.  A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated.  The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

(5) *Limitations on Monetary Sanctions*.  The court must not impose a monetary sanction:

(A) against a represented party for violating Rule 11(b)(2); or

(B) on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.

(6) *Requirements for an Order*.  An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

(d) INAPPLICABILITY TO DISCOVERY.  This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.

## E.D. Pa. Local Rule of Civil Procedure 1.1 (2023)

The Local Civil Rules of the United States District Court for the Eastern District of Pennsylvania, 1 adopted May 22, 1995 and effective July 1, 1995, and amended January 21, 1997, March 3, 1997, August 3, 1998, October 24, 2003, June 2, 2004, February 15, 2005, April 2, 2007, December 1, 2009, September 5, 2013, and June 15, 2017, are hereby amended with an effective date of May 8, 2023.

A court's authority to prescribe local rules is governed by both statute and the Federal Rules of Practice and Procedure.  These Local Rules shall be construed in a way consistent with both Acts of Congress and the Federal Rules of Practice and Procedure. See 28 U.S.C. §§ 2071(a)- (b); Fed. R. App. P. 47; Fed. R. Bankr. P. 9029; Fed. R. Civ. P. 83; Fed. R. Crim. P. 57.

## E.D. Pa. Local Rule of Civil Procedure 83.6 (2023)[*]

The United States District Court for the Eastern District of Pennsylvania, in furtherance of its inherent power and responsibility to supervise the conduct of attorneys who are admitted to practice before it, promulgates the following Rules of Disciplinary Enforcement superseding all of its other Rules pertaining to disciplinary enforcement heretofore promulgated.

*     *     *

## Rule V -- Disciplinary or Other Proceedings against Attorneys.

A.    When the misconduct or other basis for action against an attorney (other than as set forth in Rule 83.6 Section II) or allegations of the same which, if substantiated, would warrant discipline or other action against an attorney admitted to practice before this court shall come to the attention of a judge of this court, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these rules, the judge shall refer the matter to the Chief Judge who shall issue an order to show cause.

B.    Upon the respondent-attorney's answer to the order to show cause, if any issue of fact is raised or the respondent-attorney wishes to be heard in

---

[*]    The Local Rules were amended effective May 8, 2023.  The version of Local Rule 83.6 in effect during the district-court proceedings contained minor non-substantive changes from the currently operative language included here.

mitigation, the Chief Judge shall set the matter for prompt hearing before one or more judges of this court, provided however that if the proceeding is predicated upon the complaint of a judge of this court the hearing shall be conducted before a panel of three other judges of this court appointed by the Chief Judge.

C.      This court may at any stage appoint counsel to investigate and/or prosecute the proceeding under this rule.

D.      This court may refer any matter under this rule to the appropriate state disciplinary or other authority for investigation and decision before taking any action.  The attorney who is the subject of the referral shall promptly notify this court of the decision of any state court or authority and shall take whatever steps are necessary to waive any confidentiality requirement so that this court may receive the record of that referral.

E.      The judge or judges to whom any proceeding under this rule is assigned shall make a report and recommendation to the court after the parties have been heard, which will be filed under seal and served on the parties.  A party shall serve and file under seal any objections within fourteen (14) days thereafter.  Further submissions by any party shall be served and filed under seal within seven (7) days after service of any objections.  The court shall then decide the matter; after decision the report and recommendation, any objections, and any submissions shall be unsealed unless otherwise ordered by the court.

*      *      *

## Rule XII - Jurisdiction.

Nothing contained in these rules shall be construed to deny to this court such powers as are necessary for the court to maintain control over proceedings conducted before it, such as proceedings for contempt under Title 18 of the United States Code or under Federal Rule of Criminal Procedure 42.

*      *      *