No. 22-2839

# In the United States Court of Appeals for the Third Circuit

---

ROBERT WHARTON,

*Petitioner*,

v.

SUPERINTENDENT GRATERFORD SCI,

*Respondent*.

THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE,
PAUL GEORGE, and NANCY WINKELMAN,

*Appellants*.

---

On Appeal from the Order Entered on September 12, 2022,
in the U.S. District Court for the Eastern District of Pennsylvania,
Civil Action No. 2:01-cv-06049-MSG

---

**BRIEF OF LISA NEWMAN, PATRICE CARR, AND DR. DAVID "TONY"
ANTONY HART AS *AMICI CURIAE* SUPPORTING AFFIRMANCE**

---

Paul G. Cassell
UTAH APPELLATE PROJECT
S.J. QUINNEY COLLEGE OF LAW
  AT THE UNIVERSITY OF UTAH
383 South University Street
Salt Lake City, Utah  84112
Telephone: (801) 585-5202

Meg Garvin
NATIONAL CRIME VICTIM
  LAW INSTITUTE
1130 SW Morrison Street,
  Suite 240
Portland, Oregon  97205
Telephone: (503) 768-6953

Allyson N. Ho
Bradley G. Hubbard
Matthew Scorcio
Stephen J. Hammer
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201
Telephone: (214) 698-3100

M. Christian Talley
Joshua R. Zuckerman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500

COUNSEL FOR *AMICI CURIAE*

## TABLE OF CONTENTS

Page

Table of Authorities ................................................................... ii

Interest of *Amici Curiae* ........................................................... 1

Introduction .............................................................................. 2

Background ............................................................................... 5

Argument ................................................................................ 14

I.   Federal and state law requires prosecutors and courts to honor crime victims' rights to be heard and treated with respect. ................................................................. 16

II.  In the context of federal and state victims' rights, the DA's office's representation was plainly misleading. .......... 19

  A.  The DA's office's statement must be evaluated in context. ................................................................. 19

  B.  In context, the DA's office's statement falsely implied that the victims' family supported the concession. ................................................................ 21

    1.  The DA's office's only "communication" with the family was a vague call to Lisa's uncle. ...... 22

    2.  The victims' family is adamantly opposed to the DA's office's attempted concession. ............. 24

Conclusion ............................................................................. 28

Combined Certifications ........................................................ 30

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Commonwealth v. Wharton*,
607 A.2d 710 (Pa. 1992) (*Wharton I*) ....................................5, 6, 7, 8, 9

*Commonwealth v. Wharton*,
665 A.2d 458 (Pa. 1995) (*Wharton II*) ..................................................10

*Commonwealth v. Wharton*,
811 A.2d (Pa. 2002) (*Wharton III*) .......................................................10

*Commonwealth v. Wharton*,
886 A.2d 1120 (Pa. 2005) (*Wharton IV*) ..................................6, 7, 8, 10

*Kenna v. U.S. Dist. Ct. for C.D. Cal.*,
435 F.3d 1011 (9th Cir. 2006) ...............................................................16

*In re Taylor*,
655 F.3d 274 (3d Cir. 2011) ...................................................................21

*United States v. Degenhardt*,
405 F. Supp. 2d 1341 (D. Utah 2005) ....................................................16

*United States v. Stevens*,
239 F. Supp. 3d 417 (D. Conn. 2017) .....................................................18

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
579 U.S. 176 (2016) ...............................................................................20

*Wharton v. Vaughn*,
2012 WL 3535868 (E.D. Pa. Aug. 16, 2012) .........................................10

*Wharton v. Vaughn*,
722 F. App'x 268 (3d Cir. 2018) ............................................................10

### Statutes & Rules

18 U.S.C. § 3771 .................................................................. 17, 19, 26, 28

18 Pa. Stat. § 11.201 ........................................................................ 18, 19

18 Pa. Stat. § 11.213 ........................................................................ 18, 19

Fed. R. App. P. 29 ...................................................................................1

**T**ABLE OF **A**UTHORITIES
(continued)

Page(s)

### Other Authorities

150 Cong. Rec. 7294 (2004) .................................................... 16, 17, 27, 28

Hon. Jon Kyl et al.,
  *On the Wings of Their Angels: The Scott Campbell,*
  *Stephanie Roper, Wendy Preston, Louarna Gillis, and*
  *Nila Lynn Crime Victims' Rights Act*, 9 Lewis & Clark L.
  Rev. 581 (2005) ..................................................................................... 16

Julie Shaw,
  *35 Years After Her Parents' Murders, City and State*
  *Prosecutors Fight over Death-Row Inmate's Appeal*, The
  Philadelphia Inquirer (Sept. 7, 2019) .................................................... 1

Lisa Hart,
  *Krasner Ignores Victims and Sides with Murderers—*
  *Including My Parents' Killer*, Broad + Liberty (Sept. 27,
  2022) ..................................................................................................... 13

Restatement (Second) of Contracts (Am. Law. Inst. 1981) .................... 20

W. Page Keeton et al.,
  *Prosser & Keeton on the Law of Torts* (5th ed. 1984) ......................... 20

### INTEREST OF *AMICI CURIAE*[*]

Lisa Newman is the daughter of Bradley and Ferne Hart, who were murdered by Robert Wharton in 1984. Wharton left then seven-month-old Lisa to freeze to death after murdering her parents. Patrice Carr is Bradley's sister, and Dr. David "Tony" Hart is his brother. These family members each have an interest in this case and come together as *amici* based on their mutual desire to see justice carried out for themselves and their loved ones, attain some semblance of closure, and ensure that victims of crime are treated with fairness and respect in criminal proceedings.



*Bradley, Ferne, and Lisa in 1983.*[1]

---

[*] This brief was not authored in whole or in part by counsel for any party. No party, party's counsel, or person—other than *amici* or their counsel—contributed money that was intended to fund preparing or submitting this brief. Fed. R. App. P. 29(a)(4)(E).

[1] Julie Shaw, *35 Years After Her Parents' Murders, City and State Prosecutors Fight over Death-Row Inmate's Appeal*, The Philadelphia Inquirer (Sept. 7, 2019), bit.ly/3QOydnh.

## INTRODUCTION

In January 1984, Robert Wharton and his accomplice brutally murdered Bradley and Ferne Hart in their home and left their then-seven-month-old baby daughter, Lisa, to die—the horrific climax of a months-long campaign of terror against the family.  After Wharton strangled and drowned Ferne in a bathtub and his accomplice stomped and strangled Bradley in the basement, Wharton sadistically shut off the home's heat in the dead of winter, leaving baby Lisa to freeze and starve. Miraculously, she survived—discovered three days later among the carnage when Bradley's father visited the home and heard her cries.

A jury found Wharton guilty of two counts of first-degree murder in 1985 and returned two death sentences.  After a reviewing court vacated his sentences on a technicality, a second jury again determined that he should be sentenced to death in 1992.

For nearly forty years, Lisa and her family have awaited justice. That agonizing delay has only "intensifie[d]" their grief.  ECF 252, at 94:13–14.  Wharton, however, has dragged out the proceedings at every step, filing numerous baseless claims for post-conviction relief in state and federal court.  His sole remaining claim, which he brought on federal

habeas, is that his lawyer at his 1992 penalty hearing was ineffective because he failed to present "mitigation evidence" of Wharton's "positive adjustment" to prison.[2]

The interminable delay in holding Wharton accountable for his crimes has been agonizing enough for Lisa and her family. But the actions of the Philadelphia District Attorney's Office have only compounded their suffering. Despite "zealously oppos[ing]" Wharton's efforts to "overturn his conviction and death sentence" for over "three decades," the DA's office, with "no explanation," suddenly announced that "it would no longer contest the only remaining penalty-phase claim." A100. The DA's office then led the district court to believe that the Hart family *supported* this about-face—representing to the court that the DA's office decided to concede Wharton's claim only "[f]ollowing . . . communication with the victims' family." A95.

That statement was deeply misleading. As the district court found, "the only communication was to inform a single family member that the DA's office was *considering* conceding. None of the family members

---

[2] The district court denied Wharton's habeas claim. A31–32. An appeal is pending before this Court as case number 22-9001.

supported the decision to concede, and several expressed shock and indignation that the District Attorney's Office had suggested otherwise." A66 (emphasis added).  Lisa—the only member of her immediate family who survived Wharton's rampage that day—was "confused," "hurt," "outraged," and "had no idea what was going on."  ECF 252, at 90:7–11 (capitalization altered).    Bradley's sister, Patrice Carr, found it "unbearably painful and shocking" to learn that the concession was "even a consideration."  SA53.  And Bradley's brother, Dr. Tony Hart, was "taken [a]back" when he learned the truth.  ECF 267, at 160:9–15. Contrary to what the DA's office led the district court to believe, the family "is in one accord in asking . . . that the District Attorney do all he can to maintain the death penalty in this case."  SA158.

In response to that shocking misrepresentation—which impeded the district's court ability to comply with its own statutory obligation to ensure (among other things) that crime victims are afforded their rights, including to be treated with dignity and respect—the court imposed the mildest of sanctions.  It simply—but importantly—ordered the district attorney to apologize to the family in writing, and the DA's office to present "a full, balanced explanation of facts" in future habeas

proceedings. A69. Those sanctions were the bare minimum to ensure that the victims' statutory rights weren't reduced to mere paper promises. Yet the DA's office has appealed the court's order and contends that it discharged its legal and ethical obligations all along. This Court should affirm the district court's sanctions order and, in so doing, acknowledge the harm inflicted by the DA's office on a family that has already suffered far more than enough.

## BACKGROUND

1.    In the summer of 1983, Bradley and Ferne Hart hired a general contractor for repair and construction work at their home and at a radio station owned by Bradley's father. As the station's business manager, Bradley oversaw the construction project. Wharton was employed by the contractor and performed the construction work along with the contractor's son, Larue Owens. Dissatisfied with the quality of Wharton's work, Bradley didn't pay the contractor in full. The contractor, in turn, refused to pay Wharton. *Commonwealth v. Wharton*, 607 A.2d 710, 713 (Pa. 1992) (*Wharton I*).

Incensed, Wharton and Owens waged a campaign of terror against the Hart family. On August 14, 1983, Wharton and Owens burglarized

the Harts' home while the family was at church.  On August 22, Wharton, Owens, and an accomplice named Eric Mason again burglarized the Harts' home:  "This time they also vandalized the Harts' home by slashing furniture; ransacking closets; mutilating family photographs; pouring different liquids such as bleach, paint, and oil throughout the house; and, defecating and urinating on the floors." *Commonwealth v. Wharton*, 886 A.2d 1120, 1121 (Pa. 2005) (*Wharton IV*).

"Human excrement was also left in the house, the heat had been set at 90 degrees, and the stench of urine filled the air.  Additionally, the faces of Bradley, Ferne and Lisa . . . had been completely blotted-out by yellow paint on family photographs."  *Wharton I*, 607 A.2d at 713. Wharton, Owens, and Mason "caused damage in excess of $3,000" and stole "televisions, stereo equipment, cameras and accessories, telephones, and numerous other appliances and electronic items." *Id.*

Wharton and his accomplices next decided to target the Harts' place of worship.  On September 4, 1983, they burglarized the Germantown Christian Academy Church, founded by Bradley's father, and where Bradley served as a deacon.  They stole a computer and cash and pinned

a photo of Bradley to the wall with a letter opener. *Wharton I*, 607 A.2d at 713.

On January 30, 1984, Wharton and Mason—who had been arrested, released, and indicted for burglarizing the Harts' church—returned to the Harts' home, armed with a knife. Bradley, Ferne, and seven-month-old Lisa were all inside. Wharton and Mason "forced their way in at knifepoint" and "coerced Bradley Hart into writing [Wharton] a check for nine hundred and thirty four dollars as settlement for the debt that [Wharton] felt was owed to him." *Wharton IV*, 886 A.2d at 1121. They tied up Bradley and Ferne and "watched television" while settling the couple's fate. *Id.*

After "several hours," Wharton and Mason decided to separate the couple. *Wharton IV*, 886 A.2d at 1121. Wharton took Ferne "upstairs where he bound her hands and legs; covered her eyes, nose, and mouth with duct tape; strangled her with a necktie; and ultimately drowned her in a bathtub." *Id.* Wharton left Ferne's lifeless body "draped over the bathtub, her sweat pants pulled down around her legs and her shirt pulled up, exposing her breasts." *Wharton I*, 607 A.2d at 714.

Mason, meanwhile, took Bradley "to the basement where Mason forced [him] to lie with his face in a pan of water; placed his foot on [his] back; and strangled him to death with an electrical cord." *Wharton IV*, 886 A.2d at 1121.  Wharton and Mason then stole Bradley's coat, camera, and camera bag, "extinguished the back light [and] locked the door." *Wharton I*, 607 A.2d at 135.

But Wharton and Mason weren't done yet.  Before fleeing, Wharton and Mason turned off the heat—in January in Germantown—leaving baby Lisa to fend for herself on a bed in an upstairs bedroom. *Wharton I*, 607 A.2d at 714.

The temperature in the house dropped to fifty degrees.  Baby Lisa was left to suffer alone in the house for three days, and nearly died of hypothermia.  She was saved when Bradley's father came to check on the family, heard her cries, and forced his way into the home. *Wharton I*, 607 A.2d at 714.  He rushed baby Lisa back to his family, who frantically "tried to warm her up and get her out of her wet/soiled clothes." SA156. Lisa "was taken to a local hospital in a 'preshock' state, suffering from dehydration and hypothermia.  She also suffered respiratory arrest on the way to the hospital." *Wharton I*, 607 A.2d at 714.  Despite having

been left alone freezing and starving for three days, the now-orphaned Lisa somehow survived.

2. For his depraved acts against the Harts, Wharton was arrested and charged with two counts of first-degree murder, criminal conspiracy, robbery, and burglary. A jury found Wharton guilty and returned two death sentences. *Wharton I*, 607 A.2d at 715.

While incarcerated, Wharton attempted to escape on multiple occasions. One time, he assaulted a sheriff's deputy in the process. SA22. In 1989, Wharton was twice caught with contraband implements of escape. SA18–19. In 1991, prison officials concluded that Wharton's "areas of concerns" included "Assaultiveness" and "Escape." SA17.

In 1992, the Pennsylvania Supreme Court affirmed Wharton's murder convictions, holding that the evidence against him was "overwhelming[]" and that his arguments were "meritless," "frivolous," and "absurd." *Wharton I*, 607 A.2d at 718, 722. But it vacated his sentences—based on an error in a penalty-phase jury instruction about whether Wharton had committed the murders "by means of torture"— and remanded for a new penalty-phase hearing. *Id.* at 723. After reweighing the evidence, a second jury again decided that Wharton

9

should be sentenced to death, A5–6, and the Pennsylvania Supreme Court affirmed that sentence on appeal. *Commonwealth v. Wharton*, 665 A.2d 458 (Pa. 1995) (*Wharton II*).

In the intervening decades, Wharton has made repeated bids for post-conviction relief—almost all of which courts have rejected. In 2002, the Pennsylvania Supreme Court determined that Wharton's arguments for state post-conviction relief were "waived," "procedurally barred," and "unquestionably . . . meritless." *Commonwealth v. Wharton*, 811 A.2d at 983, 989–90 (Pa. 2002) (*Wharton III*). The Pennsylvania Supreme Court rejected as untimely his second attempt at state post-conviction relief in 2005. *Wharton IV*, 886 A.2d 1120, 1127 (Pa. 2005).

Wharton also filed 23 federal habeas claims, which the district court comprehensively rejected in 2012. *See Wharton v. Vaughn*, 2012 WL 3535868, at *1 (E.D. Pa. Aug. 16, 2012). This Court subsequently affirmed as to every claim but one—that Wharton's counsel at the 1992 penalty-phase hearing failed to present evidence supposedly establishing that Wharton had positively adjusted to prison—and remanded so the district court could evaluate this sole remaining claim. *Wharton v. Vaughn*, 722 F. App'x 268, 284 (3d Cir. 2018).

3. The misconduct at the heart of this appeal took place during that remand. After vigorously defending Wharton's death sentences for over thirty years, the DA's office suddenly (and inexplicably) did an about-face and decided that it would concede that Wharton's former counsel had been ineffective, support vacating the death sentences, and agree not to "seek new death sentences." A7–8.

The DA's office represented to the district court that its decision had been made "[f]ollowing . . . communication with the victims' family." A95. As the court later explained, that representation created the "unmistakable impression . . . that the victims' family had agreed with the District Attorney's change of position. But this was not the case." A38. In reality, the DA's office had reached out only to Dr. Tony Hart— not Lisa, Patrice, or any other family member—and only then to tell him that the DA's office was *considering* its position on Wharton's petition. ECF 267, at 145:21–25; *id.* at 205:12–16.

After the truth came to light, the district court determined that the DA's office and two of its supervisors had misrepresented the facts and failed to show candor to the court in violation of their ethical obligations and Rule 11. Yet the court's sanction was exceedingly modest and

11

narrowly tailored to ameliorate the effects of the misrepresentation and to vindicate the rights of the victims.  The court "decline[d] to impose any monetary or non-monetary sanctions" on the supervisors other than the admonition contained in its opinion.  A68.  It required only that (1) the district attorney personally send a written apology to the family members, and (2) the DA's office present "a full, balanced explanation of facts" about whether relief should be granted in future habeas cases. A69.

Although the district attorney sent written apologies to the family, A397–400, the DA's office and the sanctioned supervisors nevertheless decided to appeal the sanctions order, insisting to the family and this Court that they "acted within their professional and ethical duties." A400.[3]

4.    This saga is only the latest chapter in the Hart family's continued victimization.  In letters and testimony below, members of the

---

[3] Although the DA's office's position in this appeal calls into question the sincerity of the district attorney's apology letters, *amici* presume that the DA's office is not now seeking to rescind those letters.

family laid bare the pain they've been forced to endure over the past four decades.

Lisa is "the sole survivor of this tragedy" and is "alive despite [Wharton's] efforts." SA154. "Every day" she must "live with the effects of that horrific night." SA154. And "[e]ach milestone of [her] life, every occasion that is to be celebrated, is colored with the heartbreak of [her] parents not being here to share in it." SA154. In Lisa's own words:

> The loss of my parents forever changed my life. My world was destroyed. And though it has been rebuilt over the decades, the faults in the foundation still remain. Is it safe to trust anyone? Are they just going to leave me too? Am I safe? Will the night terrors, the darkness of anxiety and depression ever end? Can I protect my own daughter?

Lisa Hart, *Krasner Ignores Victims and Sides with Murderers— Including My Parents' Killer*, Broad + Liberty (Sept. 27, 2022), bit.ly/3qJJpa0.

Bradley was his sister Patrice's "best [friend] from birth to the day he died." SA156. They "played together, laughed together, vacationed together, sang together, celebrated life together. [They] loved each other very much." SA156. That is, until Wharton and Mason—"these monsters of men"—murdered Bradley. ECF 252, at 136:21. Patrice "can't put into words how much [she] miss[es]" Bradley. SA156. Their "parents never

really got over this horrific experience," and their father—who found Bradley and Ferne's bodies and rescued Lisa from certain death— "suffered from nightmares and depression" for "the rest of his life." SA157.

Ferne's brother Michael Allen (who has since passed away) was similarly devastated by Wharton's "cold hearted killing of" Ferne, who was "as delicate as the plant from which her name is borrowed." SA155. For Michael, Wharton's successful prosecution "inject[ed] back into life a measure of sanity and confidence" in light of Wharton's "diabolical nature." SA155.

These victims and their interests should have been front of mind, yet they were treated as an afterthought at every stage—until the district court caught on and exposed what had happened. The district court's sanctions order is exceedingly modest. Yet it represents an important step in vindicating the victims' rights in this case and should be affirmed.

## ARGUMENT

When the district court evaluated the DA's office's representation that it decided to concede error in Wharton's death sentences only "[f]ollowing . . . communication with the victims' family," A95, the court

didn't proceed in a vacuum.  It did so in the context of federal and state laws that afford crime victims fundamental rights designed to make them meaningful participants in the criminal justice process—specifically the rights to be heard and treated with fairness and respect.  Against that backdrop, the district court reasonably understood the statement to imply that the DA's office had explained its decision to the victims' family and that the family supported (or at least didn't oppose) that decision.

But that was a false impression, because the family is and always has been adamantly opposed to anything short of carrying out the sentences imposed for Wharton's vicious crimes.  As the district court accurately determined, the DA's office's misrepresentation impeded the court's ability to "ensure that the victims were provided their statutory rights."  A68.  That misrepresentation also increased the suffering of a family that has already suffered more than enough.  The mild sanctions the district court imposed are amply justified and should be affirmed if the rights afforded victims are to have any modicum of meaning.

**I.    Federal and state law requires prosecutors and courts to honor crime victims' rights to be heard and treated with respect.**

Enacted by Congress in 2004, the landmark Crime Victims' Rights Act "is the most sweeping federal victims' rights law in the history of the nation." Hon. Jon Kyl et al., *On the Wings of Their Angels: The Scott Campbell, Stephanie Roper, Wendy Preston, Louarna Gillis, and Nila Lynn Crime Victims' Rights Act*, 9 Lewis & Clark L. Rev. 581, 583 (2005). As part of a decades-long "civil rights movement" "to end the unjust treatment of crime victims by reforming the culture of the criminal justice system," the Act "establishes substantive and procedural" rights for crime victims to help ensure that they are treated with respect and dignity. *Id.*

Congress designed the Act "to be a 'broad and encompassing' statutory victims' bill of rights," *United States v. Degenhardt*, 405 F. Supp. 2d 1341, 1343 (D. Utah 2005) (quoting 150 Cong. Rec. 7294, 7295 (2004) (Sen. Feinstein)), with the aim of "making victims independent participants in the criminal justice process." *Kenna v. U.S. Dist. Ct. for C.D. Cal.*, 435 F.3d 1011, 1013 (9th Cir. 2006). Concerned that the justice system treated crime victims "as non-participants in a critical event in

16

their lives," 150 Cong. Rec. at 7296 (Sen. Feinstein), Congress gave crime victims the right "to participate in the process where the information that victims and their families can provide may be material and relevant." *Id.*

Four provisions of the Act are particularly relevant here. In federal habeas proceedings arising from state convictions, crime victims— including "family member[s]" of murder victims, 18 U.S.C. § 3771(b)(2)(D)—are expressly guaranteed multiple rights, including the rights:

- "not to be excluded from any . . . public court proceeding" except under limited circumstances;

- "to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding";

- "to proceedings free from unreasonable delay"; and

- "to be treated with fairness and with respect for the victim's dignity and privacy."

18 U.S.C. § 3771(a)(3), (4), (7), (8).

The Act charges the district court with "ensur[ing] that the crime victim is afforded" these rights. 18 U.S.C. § 3771(b)(1). The statute thereby "imposes no less than an *affirmative* obligation on judges to

ensure that the victim's rights are respected." *United States v. Stevens*, 239 F. Supp. 3d 417, 420 (D. Conn. 2017).

In addition, Pennsylvania's Crime Victims Act provides victims of crime with "analogous rights under state law." SA50 (*Amicus* Br. of Pennsylvania Office of Attorney General). Among other protections, the Pennsylvania Act affords crime victims the rights to:

- "have [the] opportunity to offer prior comment on the sentencing of a defendant";

- submit "a written and oral victim impact statement detailing the physical, psychological and economic effects of the crime on the victim and the victim's family"; and

- have their victim-impact statements "considered by a court when determining the . . . sentence of an adult."

18 Pa. Stat. § 11.201(5). Pennsylvania law also imposes "complementary duties" on prosecutors "to ensure that the victims' rights are honored." SA51 (*Amicus* Br. of Pennsylvania Office of Attorney General). Pennsylvania prosecutors, including the DA's office, must "make reasonable efforts to notify a victim" about dispositional proceedings for personal injury crimes and must provide victims with notice of "sentence modifications" upon the victim's request. 18 Pa. Stat. § 11.213(e), (f)(1).

So when the DA's office informed the district court that it made its concession "[f]ollowing . . . communication with the victims' family," A95, it did so aware that the district court would view that statement in the light not only of the prosecutors' responsibility to notify and consult with the victims, 18 Pa. Stat. §§ 11.201(5), 11.213(e)–(f), but also of the court's own duty to ensure the family's "right to be treated with fairness and with respect" during the criminal proceedings.  18 U.S.C. § 3771(a)(8); *see* A10 (district court understood the prosecutor's statement in light of its "statutory obligation . . . to afford victims an opportunity to be heard where sentencing or release is involved").

## II.    In the context of federal and state victims' rights, the DA's office's representation was plainly misleading.

### A.    The DA's office's statement must be evaluated in context.

The DA's office's only defense is that its words were technically true.  After all, the DA's office argues (at 47), it said only that it communicated with the victims' family—not that the family in any way supported its decision.  Whether the district court chose to read that inference into the statement, the DA's office maintains, isn't its

responsibility. But that isn't how truthfulness is evaluated—by courts or anyone else. In law, as in life, context matters.

That's why "half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 188 (2016). A party making a contract, for example, "may not, of course, tell half-truths"—and "his assertion of only some of the facts without the inclusion of such additional matters as he knows or believes to be necessary to prevent it from being misleading is itself a misrepresentation." Restatement (Second) of Contracts § 161 cmt. a (Am. Law. Inst. 1981). The same goes for tort law, where it is "obvious" that when a person "speak[s], he must disclose enough to prevent his words from being misleading." W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 106, p. 738 (5th ed. 1984).

This deeply rooted legal principle reflects everyday experience. Imagine a teen telling his mother, "I'm taking the family car for a drive. I already talked to Dad about it." The mother would undoubtedly understand her son to mean that, when he spoke to his father, his father had *approved* the trip—else why mention the fact? If it turned out that

the teen's father had actually *forbidden* him from taking the car, his mother wouldn't likely be satisfied by a plea that her son's statement was literally true.

In short, the relevant question isn't whether the DA's office's statement was literally true in the narrowest, technical sense. As this Court has recognized, representations that are "actually misleading" are a proper basis for sanctions, regardless of whether they are "literally true." *In re Taylor*, 655 F.3d 274, 283 (3d Cir. 2011) (discussing bankruptcy equivalent of Rule 11). The question is whether, in the overall context in which the statement was made, the district court would have been left with a misimpression about the information being conveyed by the prosecutors' representation that their decision to concede relief "[f]ollow[ed] . . . communication with the victims' family." The answer to that question can only be yes.

## B. In context, the DA's office's statement falsely implied that the victims' family supported the concession.

The DA's office made no attempt to contact Lisa—the only victim who survived Wharton's attack on her immediate family. And it never explained to the one family member it did contact the magnitude of its decision—which involved not only vacating Wharton's death sentences,

but also forgoing the opportunity to "seek new death sentences" in the future.

The DA's office then misled the district court into believing the Hart family affirmatively *supported* the proposed concession. Upon learning the truth, Lisa, Patrice, and Tony were united in their strenuous opposition to the concession. Setting aside the prosecutors' post hoc justifications for their behavior, a simple review of the facts makes plain what really happened here.

### 1. The DA's office's only "communication" with the family was a vague call to Lisa's uncle.

The DA's office and its victim coordinator, Heather Wames, admit they never contacted Lisa. ECF 267, at 201:13–16. Wames "didn't call her on the phone." *Id.* at 201:17–19. She "didn't write [Lisa a] letter." *Id.* She didn't even "send her an email." *Id.* She didn't do any of that, even though she *knew* about Lisa, knew she was "a grown woman now," and of course realized that Lisa would be keenly interested in developments concerning the punishment of the man who brutally murdered her parents and left her to die—particularly when those developments involve ensuring that the jury's sentence would never be carried out. *Id.* at 201:13–202:12. Wames never contacted surviving

siblings of Bradley and Ferne, either—despite her knowledge of those survivors, too. *Id.* at 205:12–16.

Wames instead attempted to outsource her obligations to Lisa's uncle, Tony. She "relied solely" on him to convey all the critical information about the decision to concede. ECF 267, at 202:13–16. But that reliance was patently unreasonable under the circumstances. Wames had never spoken to Tony before in her life, and she admittedly had no idea "about the extent of his communications or contacts" with Lisa. *Id.* at 202:17–23, 203:3–5.

She also had no reason to think Tony was somehow serving as a family "spokesperson," *id.* at 203:11–23, and had no recollection of whether she ever asked Tony if he had passed information along to the other family members. *Id.* at 204:1–5. Tony himself testified that Wames neither asked him whether he was "the family contact or spokesperson," nor directed him to pass along information to Lisa and the other family members. *Id.* at 148:11–149:1.

Wames's terse communications with Tony were plainly deficient in all events. She conveyed to him almost nothing about the nature or magnitude of the proceedings. Instead, she gave Tony "the impression"

23

that Wharton "had won the right to an appeal"—*not* that the DA's office planned to concede that Wharton's death sentences were invalid and voluntarily forgo the opportunity to have a jury return the same sentence. ECF 267, at 146:4–12. "She didn't go into any detail." *Id.* at 146:25. She never told Tony that the family's "input would make any difference" in the DA's office's decision about how to proceed. *Id.* at 158:15–17.

Tony only found out "what actually was happening"—that the DA's office was throwing in the towel—months later, when he spoke to the Pennsylvania Attorney General's Office. ECF 267, at 158:1. When he did, he was stunned. That "the DA's Office had decided to remove the death sentences" was information he surely "would have communicated" to the other family members had it been conveyed to him. *Id.* at 160:22–161:5.

### 2. The victims' family is adamantly opposed to the DA's office's attempted concession.

Contrary to the clear implication of the prosecutors' statement, the Hart family is united in adamantly opposing the concession and deeply hurt by their callous treatment by the DA's office.

For Lisa, the "one highpoint in this entire situation" was when "justice was served" and the jury handed down Wharton's sentence.

24

SA154.  She views the DA's office's concession as an attempt "to undo" that "justice."  SA154.  Had the DA's office informed Lisa about its plans, she would have opposed any concession in no uncertain terms:

> Please don't do this.  I don't in any way agree with the position that you've taken in this matter, and as a victim I feel like that should matter.

ECF 252, at 90:23–91:9.  Instead, the message from the DA's office was clear:  "[Y]ou don't matter."  *Id.* at 90:3–14.  The unexplained concession was "an affront to justice"—it showed "a total disregard for the life of my parents, my own life, and the impact that this would have on our family." SA154.  That the DA's office didn't even bother to contact her left Lisa "confused," "hurt," and "outraged."  ECF 252, at 90:7–11.  And by the time she found out about the concession, "it was as though, well, it's already done, and there's nothing you can do about it."  *Id.* at 90:12–13.

Patrice, too, "would have never, ever agreed" to the concession "and never will"—through the jury's verdict, "[j]ustice was served" and "justice was confirmed."  SA157.  But now the DA's office "wanted to take . . . away" that justice—regardless of "what the two juries very thoughtfully decided."  ECF 252, at 134:3–9; 140:3–8.

That's why Patrice found it "unbearably painful and shocking" to learn about the concession months *after* it occurred.  SA157.  Freeing Wharton of "the consequences of" his crime, after all, "would benefit him" alone; it "wouldn't benefit [Patrice's] family," "bring back [her] brother and . . . sister-in-law," or mitigate in any way "the experience that [Lisa] has gone through."  ECF 252, at 134:15–135:5.

Tony also opposes relief for Wharton.  He believes the sentences "should stand."  ECF 267, at 165:1.  "[T]hat's what the jury decided on, and that's justice"—"the DA's office should defend the position that they fought for in the first place."  *Id.* at 178:7–12.  When Tony finally, "really understood what was going on," he was "taken [a]back" that the prosecutors "would just let [the death sentences] slip away."  *Id.* at 160:20; 161:9–15.

The Hart family deserved much better.  Federal law entitled them to be "reasonably heard" and "treated with fairness and respect for [their] dignity and privacy."  18 U.S.C. § 3771(a)(4), (8).  "To carry out this obligation," the district court "depend[ed] on truthful information from the lawyers who practice before [it]."  A42.

That is why the DA's office's half-truth was so damaging. By conveying that it had communicated with the family—without explaining to whom those communications were made or what was said—the DA's office unmistakably "gave the impression that the Office had conferred with the family before making the decision to concede and that the family either agreed with the decision or did not object to it." A65–66. Even the DA's office supervisor who signed the notice of concession conceded below that the statement was "amenable to the interpretation that the victims' family agreed with the concession of penalty phase relief." ECF 287-1, at 4. In making this misleading statement, the DA's office "impeded [the district court's] ability to ensure that the victims were provided their statutory rights." A68.

Congress enacted the Crime Victims Rights Act because it found that, in case after case, victims "were kept in the dark by prosecutors to[o] busy to care . . . and by a court system that simply did not have a place for them." 150 Cong. Rec. at 7296 (Sen. Feinstein). Providing incomplete and misleading information to one family member, failing even to contact other victims—including a direct survivor of the crime—and then misleading a district court into believing those victims

supported a decision they weren't even aware of and vehemently disagree with is the polar opposite of treating victims "with fairness and with respect." 18 U.S.C. § 3771(a)(8).

Upholding the modest sanctions imposed by the district court would take an important step in fulfilling the Act's purpose of "correct[ing] . . . the legacy of the poor treatment of crime victims in the criminal process," 150 Cong. Rec. at 7303 (Sen. Feinstein), and preventing them from being "victimized a second time . . . by our criminal justice system." *Id.* at 7298 (Sen. Kyl). While Lisa, Patrice, and Tony have bravely forged ahead despite their suffering, the conduct of the DA's office in this case has only increased their suffering—essentially telling them "you don't matter." ECF 252, at 90:3–14.

Counteracting that false and degrading message is precisely why state and federal victims' rights statutes were adopted. The district court's recognition of the fundamental rights of Lisa, Patrice, and Tony— and its modest efforts to protect those rights—is the least the justice system can do.

## CONCLUSION

This Court should affirm the sanctions order.

28

Dated:  August 21, 2023

Paul G. Cassell
UTAH APPELLATE PROJECT
S.J. QUINNEY COLLEGE OF LAW
  AT THE UNIVERSITY OF UTAH[*]
383 South University Street
Salt Lake City, Utah  84112
Telephone: (801) 585-5202
Facsimile:  (801) 581-6897
*cassellp@law.utah.edu*

Meg Garvin
NATIONAL CRIME VICTIM
  LAW INSTITUTE
1130 SW Morrison Street,
  Suite 240
Portland, Oregon  97205
Telephone: (503) 768-6953
*garvin@lclark.edu*

Respectfully submitted,

 */s/ Allyson N. Ho*
Allyson N. Ho
Bradley G. Hubbard
Matthew Scorcio
Stephen J. Hammer
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201
Telephone: (214) 698-3100
Facsimile:  (214) 571-2900
*aho@gibsondunn.com*
*bhubbard@gibsondunn.com*
*mscorcio@gibsondunn.com*
*shammer@gibsondunn.com*

M. Christian Talley
Joshua R. Zuckerman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile:  (202) 467-0539
*ctalley@gibsondunn.com*
*jzuckerman@gibsondunn.com*

COUNSEL FOR *AMICI CURIAE*

---

[*] Institutional information provided only for identification purposes; does not imply institutional endorsement.

## COMBINED CERTIFICATIONS

Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(G) and 32(g)(1) and Local Appellate Rules 28.3(d), 31.1(c), 32.1, 46.1(e), and 113.4, I certify that:

1.     I am a member in good standing of the bar of this Court.

2.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,511 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

3.     This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point New Century Schoolbook LT font using Microsoft Word for Microsoft Office Professional Plus 2019.

4.     The text of the electronic version of this brief filed with the Court via CM/ECF is identical to the text of the paper copies.

5.     The electronic version of this brief was scanned using the virus-detection software CrowdStrike Falcon and no virus was detected.

6.    On August 21, 2023, I caused a copy of this brief to be filed via the Court's CM/ECF system and thus to be served on all parties' counsel registered to receive electronic notices.

/s/ Allyson N. Ho
Allyson N. Ho
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201
Telephone: (214) 698-3100
Facsimile:  (214) 571-2900
*aho@gibsondunn.com*

Counsel for *Amici Curiae*